# EXHIBIT A

*Execution Version*

ASSET PURCHASE AGREEMENT

**by and between**

**TECHNICAL METALS, INC. and HOFFMAN TOOL, INC.**, as Sellers

**and**

**TECHMETALS, LLC**, AN ILLINOIS LIMITED LIABILITY COMPANY, as Buyer

**and**

**MANUFACTURING REVITALIZATION CORPORATION OF AMERICA**, L.P. I, A DELAWARE LIMITED PARTNERSHIP, as Guarantor

**dated as of**

**February 20, 2025**

*Execution Version*

## ASSET PURCHASE AGREEMENT

This Asset Purchase Agreement ("Agreement") is made and entered into as of February 20, 2025, by and among Technical Metals, Inc., an Illinois corporation, and Hoffman Tool, Inc., an Illinois corporation (each a "Seller" and collectively, "Sellers"), and TechMetals, LLC, an Illinois Limited Liability Company ("Buyer"), and Manufacturing Revitalization Corporation of America, L.P. I, a Delaware limited partnership in its capacity as guarantor for Buyer ("Guarantor").

### Recitals

WHEREAS, Sellers operate metal fabrication businesses that drill, tap, bore, ream, thread mill, roller burnish, grind, and broach metal to create precision components/products (collectively "Business");

WHEREAS, Buyer desires to purchase and Sellers desire to sell substantially all of the assets of Sellers, and Buyer desires to assume certain liabilities of Sellers, on the terms and conditions set forth herein.

NOW, THEREFORE, in consideration of the mutual covenants and agreements hereinafter set forth and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties hereto agree as follows:

1. Purchase and Sale of Assets

   a. Purchased Assets. Subject to the terms and conditions of this Agreement, Sellers agree to sell, transfer, convey, assign, and deliver to Buyer, and Buyer agrees to purchase from Sellers, all of Sellers' right, title, and interest in and to all of the assets, properties, and rights of Sellers of every kind and description, tangible and intangible, wherever situated and whether or not carried on the books of Sellers (collectively, the "Purchased Assets"), including but not limited to:

      i. Accounts receivable (including bank accounts that receive Accounts Receivable);

      ii. Inventory;

      iii. Equipment and machinery;

      iv. Intellectual property;

      v. Assigned Contracts (defined below);

      vi. Permits and licenses;

      vii. Goodwill; and

      viii. Other tangible and intangible assets.

b.    Excluded Assets. Notwithstanding the forgoing, Buyer expressly understands and agrees that it is not purchasing or acquiring, and Sellers are not selling or assigning, any assets, properties, or rights of Sellers specifically set forth on **Exhibit A**, and all such assets and properties shall be excluded from the Purchased Assets (the "Excluded Assets").

2.    Purchase Price

a.    Purchase Price. The aggregate purchase price for the Purchased Assets shall be $17,000,000 (the "Purchase Price"), subject to adjustment as provided in Section 7 herein, plus the assumption of the Assumed Liabilities. Buyer shall pay the cash portion of the Purchase Price to Sellers at the Closing (as defined herein) by wire transfer of immediately available funds in accordance with Section 2(b) and the wire transfer instructions set forth in the Funds Flow Memorandum.

b.    Payment of Purchase Price. The Purchase Price shall be paid by Buyer to Sellers as follows:

i.    $10,000,000 payable in cash at Closing.

ii.    $3,000,000 payable six (6) months after the Closing Date (the "Deferred Payment"). The Deferred Payment shall be guaranteed by Guarantor pursuant to the terms of the Guaranty.

iii.    $3,000,000 payable in the form of a promissory note (the "Seller Note") over a three (3) year period, commencing twelve (12) months after the Closing Date. The Seller Note shall be guaranteed by Guarantor. The payments of the note shall not be conditioned upon performance or sales metric. The terms and conditions of the promissory note are substantially in the form set forth on **Exhibit B** attached hereto. The Seller Note shall be guaranteed by Guarantor pursuant to the terms of the Guaranty.

c.    Allocation of Purchase Price. Within 30 days of the Post-Closing Adjustment, Sellers shall deliver a schedule allocating the Purchase Price (including any Assumed Liabilities treated as consideration for the Purchased Assets for tax purposes) (the "Allocation Schedule"). Sellers and Buyer agree to allocate the Purchase Price between each Seller and among the Purchased Assets for all purposes (including tax and financial accounting) in accordance with the methodology set forth in **Exhibit C**. The Allocation Schedule shall be deemed final unless Buyer notifies Sellers in writing that Buyer objects to one or more items reflected in the Allocation Schedule within 15 days after delivery of the Allocation Schedule to Buyer. In the event of any such objection, Sellers and Buyer shall negotiate in good faith to resolve such dispute; provided, however, that if Sellers and Buyer are unable to resolve any dispute with respect to the Allocation Schedule

*Execution Version*

within 15 days after the delivery of the Allocation Schedule to Buyer, such dispute shall be resolved by a mutually agreeable, nationally or regionally recognized, independent accountant as soon as practicable within 30 days (or such other timeframe as the parties shall agree in writing). The fees and expenses of such accountant shall be borne equally by Sellers, on the one hand, and Buyer, on the other hand. Buyer and Sellers shall file all tax returns (including amended returns and claims for refund) and information reports in a manner consistent with such allocation.

3.    Assumption of Liabilities

a.    Assumed Liabilities. Buyer shall assume only those liabilities and obligations of Sellers specifically listed on **Exhibit D** or as specifically set forth in this Agreement (the "Assumed Liabilities").

b.    Excluded Liabilities. Buyer shall not assume, and shall not be liable for, any liabilities or obligations of Sellers other than the Assumed Liabilities (the "Excluded Liabilities").

4.    Closing

a.    Closing Date. The closing of the transactions contemplated by this Agreement (the "Closing") shall take place on or before February 20, 2025, or such other date as the parties may agree in writing (the "Closing Date"). The Closing shall take place remotely by exchange of documents and signatures (or their electronic counterparts). The consummation of the transactions contemplated by this Agreement shall be deemed to occur at 12:01 a.m. on the Closing Date.

b.    Deliveries at Closing. At the Closing:

i.    Sellers shall deliver to Buyer the following:

1.    a Bill of Sale and Assignment in the form of **Exhibit E** hereto (the "Bill of Sale"), duly executed by Sellers, transferring the Purchased Assets to Buyer;

2.    An assignment and assumption in the form of **Exhibit F** hereto ("Assignment Agreement"), duly executed by Sellers;

3.    Signature counterpart to the Lease Agreement (defined below);

4.    Signature counterpart to the Transition Agreement (defined below);

5.    a certificate of the President (or equivalent officer) of Sellers certifying as to the resolutions of the board of directors (or

*Execution Version*

its equivalent) of Sellers, duly adopted and in effect, which authorize the execution, delivery and performance of this Agreement and the transactions contemplated hereby;

6. an IRS Form W-9 duly executed by each Seller;

7. all third-party consents, if any, in connection with the Assigned Contracts; and

8. such other customary instruments of transfer, assumption, filings or documents, in form and substance reasonably satisfactory to Buyer, as may be required to give effect to this Agreement.

ii. Buyer shall deliver to Sellers the following:

1. cash portion of the Purchase Price (as set forth in Section 2(b)(i));

2. Assignment Agreement, duly executed by Buyer;

3. the Seller Note;

4. the Lease Agreement attached hereto as **Exhibit G** ("Lease Agreement"), duly executed by the Buyer;

5. the Guaranty and Suretyship Agreement by Guarantor for the Seller Note, attached hereto as **Exhibit H** ("Guaranty"), duly executed by Guarantor;

6. an employment agreement with Rebecca Young attached hereto as **Exhibit I** ("Young Employment Agreement");

7. an employment agreement with Gerald Hoffman attached hereto as **Exhibit J** ("Hoffman Employment Agreement");

8. the Transition and Customer Servicing Agreement attached hereto as **Exhibit K** ("Transition Agreement") and

9. a certificate of the President (or equivalent officer) of Buyer certifying as to the resolutions of the board of directors (or its equivalent) of Buyer, duly adopted and in effect, which authorize the execution, delivery and performance of this Agreement and the transactions contemplated hereby.

iii. The parties shall execute and deliver any other documents necessary to consummate the transactions contemplated by this Agreement, including the agreements set forth in the exhibits hereto.

*Execution Version*

5. <u>Funds Flow Memorandum</u>. On or prior to the Closing Date, the parties shall have prepared a mutually agreeable funds flow memorandum (the "<u>Funds Flow Memorandum</u>"), a copy of which is attached hereto as **Exhibit L**, setting forth the amounts to be paid pursuant to this Agreement and the wire transfer instructions for each payee thereunder.

6. <u>Withholding Tax</u>. Buyer shall be entitled to deduct and withhold from the Purchase Price all taxes that Buyer may be required to deduct and withhold under any applicable tax law; provided, however, that Buyer shall provide Sellers with written notice of its intent to withhold at least 3 days prior to the Closing with a written explanation substantiating the requirement to deduct or withhold, and the parties shall use commercially reasonable efforts to cooperate to mitigate or eliminate any such withholding to the maximum extent permitted by law. Assuming that each Seller delivers signed IRS Form W-9 at the Closing, Buyer acknowledges and agrees that no withholding is required as of the date hereof. Any such withheld amounts shall be treated as delivered to Sellers hereunder.

7. <u>Working Capital Adjustment</u>: The Purchase Price is subject to adjustment in connection with the Net Working Capital (defined below) level being maintained at the time of Closing relative to the Target Net Working Capital (defined below).

   a. As used in this Agreement, (i) "<u>Net Working Capital</u>" means the aggregate of (A) Sellers' accounts receivables, plus (B) Sellers' inventories (comprising raw materials, work-in-progress, and finished goods), minus (C) [Reserved], minus (D) Any outstanding checks issued by Seller that exceed the available bank balance (provided, however, that such checks shall not be drawn against or tied to any line of credit), (ii) "<u>Target Net Working Capital</u>" means $6,287,979.65, (iii), the "<u>Lower Limit</u>" will be an amount equal to $5,659,181.68, (iv) the "<u>Higher Limit</u>" will be an amount equal to $6,916,777.61 and (v) "<u>Actual Net Working Capital</u>" means Net Working Capital as of the Closing Date which will serve as the basis for any adjustment to the Purchase Price. It should be noted that all positive cash balances in bank accounts will be excluded from the Net Working Capital calculation. For the avoidance of doubt, Buyers are assuming the Sellers' short-term accounts payable.

   b. Within 90 days after the Closing Date, the Buyer shall prepare and deliver to the Sellers a statement setting forth their calculation of Actual Net Working Capital, which statement shall include a balance sheet of the Sellers's Business as of the Closing Date (without giving effect to the transactions contemplated in this Agreement) (the "<u>Closing Working Capital Statement</u>") The Closing Working Capital Statement shall be prepared in accordance with the Sellers' historic accounting methods, practices, principles, policies and procedures used in the preparation of the financial statements previously provided by Sellers to Buyer.

*Execution Version*

c. The post-closing adjustment shall be an amount equal to the difference between Actual Net Working Capital and the Target Net Working Capital (the "<u>Post-Closing Adjustment</u>"). If Actual Net Working Capital is less than the Lower Limit of the Target Net Working Capital, the Sellers shall pay to the Buyer the amount of such shortfall as an adjustment to the Purchase Price. If Actual Net Working Capital exceeds the Higher Limit of the Target Net Working Capital, the Buyer shall pay to the Sellers the amount of such excess as an adjustment to the Purchase Price.

d. After receipt of the Closing Working Capital Statement, the Sellers shall have 30 days (the "<u>Review Period</u>") to review the Closing Working Capital Statement. During the Review Period, the Sellers shall have full access to such books, records, work papers, and personnel of the Buyer as the Sellers may reasonably request for the purpose of reviewing the Closing Working Capital Statement and preparing a Statement of Objections (defined below), provided that such access shall be in a manner that does not interfere with the normal business operations of the Buyer. Before the last day of the Review Period, the Sellers may object to the Closing Working Capital Statement by delivering to the Buyer a written statement setting forth Sellers' objections in reasonable detail, indicating each disputed item or amount and the basis for Sellers' disagreement (the "<u>Statement of Objections</u>"). If the Sellers fail to deliver the Statement of Objections before the expiration of the Review Period, the Closing Working Capital Statement and the Post-Closing Adjustment, if any, reflected in the Closing Working Capital Statement shall be deemed to have been accepted by the Sellers. If the Sellers deliver the Statement of Objections before the expiration of the Review Period, the Buyer and the Sellers shall in good faith negotiate to resolve the objections within 10 days after the delivery of the Statement of Objections (the "<u>Resolution Period</u>"). If the Buyer and the Sellers resolve the objections within the Resolution Period, the Post-Closing Adjustment and the Closing Working Capital Statement with such changes as so agreed in writing by the Buyer and the Sellers shall be final and binding on the parties. If the Buyer and Sellers are unable to resolve the disputed items during the Resolution Period, then the parties shall submit the disputed items to a mutually agreeable, nationally or regionally recognized, independent accountant as soon as practicable within 30 days (or such other timeframe as the parties shall agree in writing). The independent accountant shall have 30 days after its engagement to resolve the disputed items. The parties agree that the independent account shall (A) make any and all adjustments without regard to materiality, (B) only decide the specific disputed items that remain under dispute by the parties, and (C) decide each disputed item within the range of values assigned to each such item in the Closing Working Capital Statement and the Statement of Objections, respectively. The independent accountant's resolution of the disputed items and its adjustments to the Closing Working Capital Statement and the Post-Closing Adjustment shall be final and binding upon the parties. The fees

*Execution Version*

and expenses of the independent accountant shall be shared equally by the Sellers, on the one hand, and by the Buyer, on the other hand.

e. Payment of the Post-Closing Adjustment shall be made within five business days of the determination of Actual Net Working Capital by wire transfer of immediately available funds to the account designated by the Buyer or the Sellers, as the case may be.

8. <u>Real Estate Lease and Option to Purchase:</u>   As a condition of this Agreement and concurrent with the Closing, the Buyer and the Sellers' principal landlord will execute and deliver a Lease Agreement for the properties located at (i) 1301 West Oak Street, Fairbury, IL 67136, (ii) 1301 ½ West Oak Street, Fairbury, IL 67136, and (iii) 1303 West Oak Street, Fairbury, IL 67136 (collectively, "<u>Real Estate Premises</u>").

9. <u>Assigned Contracts; Third Party Consents.</u>

a. <u>Assigned Contracts</u>:  "<u>Assigned Contracts</u>" shall mean any Contract (defined below) to which Sellers are a party and which is being assigned to Buyer pursuant to this Agreement as set forth on **Exhibit M** attached hereto. To the extent that Sellers' rights under any Assigned Contract may not be assigned to Buyer without the consent of any third party which has not been obtained, this Agreement will not constitute an agreement to assign the same if an attempted assignment would constitute a breach thereof or be unlawful. Sellers and Buyer will use its commercially reasonable best efforts to obtain any such required consent(s) as promptly as possible. Notwithstanding anything set forth in this Agreement, all of the parties agree to waive the provisions of Section 4(b)(i)(6) as a Closing deliverable.

b. <u>Third Party Consents</u>: If any such consent is not obtained prior to the Closing or if any attempted assignment would be ineffective or would impair Buyer's rights under the Assigned Contracts in question so that Buyer would not, in effect, acquire the benefit of such rights, Sellers, to the maximum extent permitted by applicable law and the Assigned Contract, will act after the Closing as Buyer's agent in order to obtain for Buyer the benefits thereunder. Sellers will cooperate, to the maximum extent permitted by applicable law and the Assigned Contract, with Buyer in any other reasonable arrangement designed to provide such benefits to Buyer, and Buyer will reimburse Sellers for Sellers' costs to provide the benefits to Buyer under the Assigned Contract.

10. <u>Representations and Warranties</u>

a. <u>Representations and Warranties of Sellers.</u> Except as set forth in the Disclosure Schedules, Sellers represent and warrant to Buyer that the statements contained in this Section 10(a) are true and correct as of the date hereof:

*Execution Version*

i.    <u>Organization and Authority of Sellers; Enforceability</u>. Both Sellers are corporations duly organized and validly existing under the laws of the State of Illinois. Sellers have full organizational power and authority to enter into this Agreement and the transactions documents to be delivered hereunder, to carry out its obligations hereunder and to consummate the Transaction. The execution, delivery and performance by Sellers of this Agreement and the transaction documents to be delivered hereunder and the consummation of the Transaction have been duly authorized by all requisite corporate action on the part of Sellers. This Agreement and the transaction documents to be delivered hereunder have been duly executed and delivered by Sellers, and (assuming due authorization, execution and delivery by Buyer) this Agreement and the transaction documents to be delivered hereunder constitute legal, valid and binding obligations of Sellers, enforceable against Sellers in accordance with their respective terms.

ii.   <u>No Conflicts; Consents</u>. The execution, delivery and performance by Sellers of this Agreement and the transaction documents to be delivered hereunder, and the consummation of the Transaction, do not and will not: (a) violate or conflict with the articles of incorporation, by-laws, or other organizational documents of Sellers; (b) violate or conflict with any judgment, order, decree, statute, law, ordinance, rule or regulation applicable to Sellers or the Purchased Assets; (c) conflict with, or result in (with or without notice or lapse of time or both) any violation of, or default under, or give rise to a right of termination, acceleration or modification of any obligation or loss of any benefit under any contract or other instrument to which Sellers are a party or to which any of the Purchased Assets are subject; or (d) result in the creation or imposition of any Encumbrance on the Purchased Assets. No consent, approval, waiver or authorization is required to be obtained by Sellers from any person or entity (including any governmental authority) in connection with the execution, delivery and performance by Sellers of this Agreement and the consummation of the Transaction.

iii.  Sellers have good and valid title to the Purchased Assets.

iv.   The execution and delivery of this Agreement and the consummation of the transactions contemplated hereby have been duly authorized by all necessary corporate action.

v.    Except as set forth on Section 10(a)(v) of the Disclosure Schedules, the Purchased Assets are free and clear of all liens, claims, and encumbrances, including but not limited to, any Uniform Commercial Code (UCC) liens ("<u>Encumbrances</u>").

*Execution Version*

vi.    Sellers have complied with all applicable laws, regulations, and ordinances relating to the Purchased Assets and the operation of the Business.

vii.    Sellers have filed all necessary tax returns and has paid all taxes due and owing. All financial statements provided to Buyer are true, and accurate and fairly represent the financial condition of Sellers.

viii.    There are no Actions pending or, to each Seller's knowledge, threatened against or by Sellers that challenge or seek to prevent, enjoin or otherwise delay the transactions contemplated by this Agreement. For purposes of this Agreement, "Action" means any claim, action, cause of action, demand, lawsuit, arbitration, inquiry, audit, notice of violation, proceeding, litigation, citation, summons, subpoena or investigation of any nature, civil, criminal, administrative, regulatory or otherwise, whether at law or in equity.

ix.    Material Contracts

1.    Section 10(a)-ix of the Disclosure Schedules lists each Contract (defined below) that is material to the Sellers ("Material Contracts"), including the following:

a.    each Contract of the Sellers involving aggregate consideration in excess of $100,000 and which, in each case, cannot be canceled by the Sellers without penalty;

b.    all Contracts that provide for the indemnification by the Sellers of any person or entity or the assumption of any tax, environmental, or other liability of any person or entity;

c.    all Contracts relating to intellectual property, including all licenses, sublicenses, settlements, coexistence agreements, covenants not to sue, and permissions;

d.    except for Contracts relating to trade payables, all Contracts relating to indebtedness (including, without limitation, guarantees) of the Sellers;

e.    all Contracts that limit or purport to limit the ability of the Sellers to compete in any line of business or with any person or entity or in any geographic area or during any period of time.

f.     Each Material Contract is valid and binding on Sellers, as applicable, in accordance with its terms and is in full force and effect. None of the Sellers nor, to the each Seller's knowledge, any other party thereto is in breach of or default under (or is alleged to be in breach of or default under) in any material respect, or has provided or received any notice of any intention to terminate or amend, any Material Contract. Complete and correct copies of each Material Contract (including all modifications, amendments, and supplements thereto and waivers thereunder) have been made available to Buyer. For purposes of this Agreement, "Contract" means all contracts, leases, deeds, mortgages, licenses, instruments, notes, commitments, undertakings, indentures, joint ventures and all other agreements, commitments and legally binding arrangements, whether written or oral.

x.     Equipment; Assets; Real Property; Title to Assets:

1.     Section 10(a)-x of the Disclosure Schedules lists all equipment and assets in which the Sellers or any combination of Sellers have an ownership or leasehold (or sub-leasehold) interest in and which are used in the operation of the Sellers' Business. Sellers represent and warrant to Buyer that: (1) the equipment and assets identified in Section 10(a)-x of the Disclosure Schedules are all the material assets and equipment owned by the Sellers; (2) all equipment and assets owned by the Sellers identified in Section 10(a)-x of the Disclosure Schedules are free and clear of all Encumbrances other than Permitted Encumbrances; (3) the Sellers own, or have a valid leasehold interest in, one hundred percent (100%) of all equipment and assets identified in Section 10(a)-x of the Disclosure Schedules, and (4) any equipment or other assets identified in Section 10(a)-x of the Disclosure Schedules that Sellers have a leasehold interest in will, immediately at the consummation of the Closing, change to an ownership interest, and that equipment and other assets will be owned by Sellers (and be deemed Purchased Assets under this Agreement) and transfer hereunder to Buyer free and clear of all Encumbrances other than Permitted Encumbrances. For purposes of this Agreement, "Permitted Encumbrances" means (i) liens for taxes not yet due and payable, (ii) mechanics, carriers', workmen's, repairmen's or other like liens arising or incurred in the ordinary course of business

*Execution Version*

consistent with past practice or amounts that are not delinquent and which are not, individually or in the aggregate, material to the business of the Sellers, and (iii) easements, rights of way, zoning ordinances and other similar encumbrances affecting Real Property which are not, individually or in the aggregate, material to the business of the Sellers.

2. Section 10(a)-x of the Disclosure Schedules lists all real property used by the Sellers in which the Sellers have an ownership or leasehold (or subleasehold) interest (together with all buildings, structures, and improvements located thereon, the "Real Property"), including: (i) the street address of each parcel of Real Property; (ii) for Real Property that is leased or subleased by the Sellers, the landlord under the lease, the rental amount currently being paid, and the expiration of the term of such lease or sublease, and any termination or renewal rights of any party to the lease; and (iii) the current use of each parcel of Real Property. Sellers have delivered or made available to Buyer true, correct, and complete copies of all Contracts, title insurance policies, and surveys relating to the Real Property.

xi. Brokers. Except as set forth in Section 10(a)-xi of the Disclosure Schedules, no broker, finder or investment banker is entitled to any brokerage, finder's or other fee or commission in connection with the Transaction based upon arrangements made by or on behalf of Buyer.

xii. Except for the representations and warranties contained in this Section 10(a) (including the related portions of the Disclosure Schedules), neither Sellers nor any other person or entity has made or makes any other express or implied representation or warranty, either written or oral, on behalf of Sellers, including any representation or warranty as to the accuracy or completeness of any information, documents or material regarding the Business and the Purchased Assets furnished or made available to Buyer and its Representatives in any form (including any information, documents, or material delivered to Buyer on behalf of Sellers for purposes of this Agreement or any management presentations made in expectation of the transactions contemplated hereby), or as to the future revenue, profitability, or success of the Business, or any representation or warranty arising from statute or otherwise in applicable law. For purposes of this Agreement, "Representative" means, with respect to any person or entity, any and all directors, officers, employees, consultants, financial advisors, counsel, accountants and other agents of such person or entity.

*Execution Version*

b.  <u>Representations and Warranties of Buyer</u>. Except as set forth in the Disclosure Schedules, Buyer represents and warrants to Sellers that the statements contained in this Section 10(b) are true and correct as of the date hereof.

i.  <u>Organization and Authority of Buyer; Enforceability.</u> Buyer is a limited liability company duly organized and validly existing under the laws of the State of Illinois. Buyer has full organizational power and authority to enter into this Agreement and the transaction documents to be delivered hereunder, to carry out its obligations hereunder and to consummate the Transaction. The execution, delivery and performance by Buyer of this Agreement and the transaction documents to be delivered hereunder and the consummation of the Transaction have been duly authorized by all requisite corporate action on the part of Buyer. This Agreement and the transaction documents to be delivered hereunder have been duly executed and delivered by Buyer, and (assuming due authorization, execution and delivery by Sellers) this Agreement and the transaction documents to be delivered hereunder constitute legal, valid and binding obligations of Sellers, enforceable against Buyer in accordance with their respective terms.

ii.  <u>No Conflicts; Consents</u>. The execution, delivery and performance by Buyer of this Agreement and the transaction documents to be delivered hereunder, and the consummation of the Transaction, do not and will not: (a) violate or conflict with the articles of organization, operating agreement, or other organizational documents of Buyer; (b) violate or conflict with any judgment, order, decree, statute, law, ordinance, rule or regulation applicable to Buyer; (c) conflict with, or result in (with or without notice or lapse of time or both) any violation of, or default under, or give rise to a right of termination, acceleration or modification of any obligation or loss of any benefit under any contract or other instrument to which Buyer or (d) require consent, permit, governmental order, filing or notice which, in the aggregate, would not have a material adverse effect on Buyer's ability to consummate the transactions contemplated hereby. No consent, approval, waiver or authorization is required to be obtained by Buyer from any person or entity (including any governmental authority) in connection with the execution, delivery and performance by Buyer of this Agreement and the consummation of the Transaction.

iii.  <u>Solvency</u>. Immediately after giving effect to the transactions contemplated hereby, Buyer and Guarantor shall be solvent and shall: (a) be able to pay its debts as they become due; (b) own property that has a fair saleable value greater than the amounts required to pay its debts (including a reasonable estimate of the

amount of all liabilities); and (c) have adequate capital to carry on its business. No transfer of property is being made and no obligation is being incurred in connection with the transactions contemplated hereby with the intent to hinder, delay or defraud either present or future creditors of Buyer or Sellers. In connection with the transactions contemplated hereby, Buyer has not incurred, nor plans to incur, debts beyond its ability to pay as they become absolute and matured.

iv. <u>Proceedings</u>. There are no Actions pending or, to Buyer's knowledge, threatened against or by Buyer that challenge or seek to prevent, enjoin or otherwise delay the transactions contemplated by this Agreement.

v. <u>Brokers</u>. No broker, finder or investment banker is entitled to any brokerage, finder's or other fee or commission in connection with the transactions contemplated by this Agreement or any other transaction contemplated herein based upon arrangements made by or on behalf of Buyer.

vi. <u>Independent Investigation</u>. Buyer has conducted its own independent investigation, review and analysis of the Business and the Purchased Assets, and acknowledges that it has been provided adequate access to the personnel, properties, assets, premises, books and records and other documents and data of Sellers for such purpose. Buyer acknowledges and agrees that: (a) in making its decision to enter into this Agreement and to consummate the transactions contemplated hereby, Buyer has relied solely upon its own investigation and the express representations and warranties of Sellers set forth in Section 10(a) of this Agreement (including related portions of the Disclosure Schedules); and (b) neither Sellers nor any other person or entity has made any representation or warranty as to Sellers, the Business, the Purchased Assets or this Agreement, except as expressly set forth in Section 10(a) of this Agreement (including the related portions of the Disclosure Schedules).

11. <u>Employees</u>.

a. Buyer shall, or shall cause an affiliate of Buyer to, offer employment effective on the Closing Date, to all employees, including employees who are absent due to vacation, family leave, short-term disability or other approved leave of absence (the employees who accept such employment and commence employment on the Closing Date, the "<u>Transferred Employees</u>").

*Execution Version*

b.  During the period commencing on the Closing Date and ending on the date which is 12 months from the Closing (or if earlier, the date of the Transferred Employee's termination of employment with Buyer or an Affiliate of Buyer), Buyer shall, or shall cause an affiliate of Buyer to, provide each Transferred Employee with: (i) base salary or hourly wages which are no less than the base salary or hourly wages provided by Sellers immediately prior to the Closing; (ii) benefits plans, retirement and welfare benefits that are no less favorable in the aggregate than those provided by Seller immediately prior to the Closing; and (iv) severance benefits that are no less favorable than the practice, plan or policy in effect for such Transferred Employee immediately prior to the Closing.

c.  Buyer and Seller intend that the transactions contemplated by this Agreement should not constitute a separation, termination or severance of employment of any employee who accepts an employment offer by Buyer that is consistent with the requirements of Section 11(b), including for purposes of any benefit plan that provides for separation, termination or severance benefits, and that each such employee will have continuous employment immediately before and immediately after the Closing. Buyer shall be liable and hold the Seller harmless for: (i) any statutory, common law, contractual or other severance with respect to any employee, other than an employee who has received an offer of employment by Buyer on terms and conditions consistent with Section 11(b) hereof and declines such offer; and (ii) any claims relating to the employment of any Transferred Employee arising in connection with or following the Closing.

12. <u>Indemnification</u>. Subject to the limitations and other provisions of this Agreement, the representations and warranties contained herein shall survive the Closing and shall remain in full force and effect until the date that is twelve (12) months from the Closing Date. None of the covenants or other agreements contained in this Agreement shall survive the Closing Date other than those which by their terms contemplate performance after the Closing Date, and each such surviving covenant and agreement shall survive the Closing for the period contemplated by its terms. Notwithstanding the foregoing, any claims asserted in good faith with reasonable specificity (to the extent known at such time) and in writing by notice from the non-breaching party to the breaching party prior to the expiration date of the applicable survival period shall not thereafter be barred by the expiration of such survival period and such claims shall survive until finally resolved.

a.  <u>Indemnification by Sellers.</u> Sellers shall defend, indemnify, and hold harmless Buyer, its affiliates, and their respective stockholders, directors, officers, and employees from and against all claims, judgments, damages, liabilities, settlements, losses, costs, and expenses, including attorneys' fees and disbursements (collectively, "<u>Losses</u>"), arising from or relating to:

      i.      Any inaccuracy in or breach of any of the representations or warranties of Sellers contained in this Agreement or any document to be delivered hereunder;

      ii.     Any breach or non-fulfillment of any covenant, agreement, or obligation to be performed by Sellers pursuant to this Agreement or any document to be delivered hereunder; or

      iii.    Any Purchased Asset that is excluded from the transactions contemplated herein or any pre-Closing liability that is not an Assumed Liability.

b.      <u>Indemnification by Buyer</u>. Buyers shall defend, indemnify, and hold harmless Sellers, its affiliates, and their respective stockholders, directors, officers, and employees from and against all Losses, arising from or relating to:

      i.      Any inaccuracy in or breach of any of the representations or warranties of Buyer contained in this Agreement or any document to be delivered hereunder;

      ii.     Any breach or non-fulfillment of any covenant, agreement, or obligation to be performed by Buyer pursuant to this Agreement or any document to be delivered hereunder;

      iii.    any Assumed Liability; or

      iv.    Any post-Closing Losses or liabilities in connection with (i) the Benefits Plans that are not terminated by the Sellers post-Closing for the benefit of the Buyer's post-Closing operations, or (ii) COBRA. For purposes herein, "<u>Benefits Plans</u>" mean medical, vision, dental, disability, welfare, or other similar agreements, plans, policies, arrangements or programs whether or not reduced to writing.

c.      <u>Indemnification Procedures; Claims.</u> Whenever any claim shall arise for indemnification hereunder, the Indemnified Party (defined below) shall promptly provide written notice of such claim to the Indemnifying Party (defined below). Such notice by the Indemnified Party shall: (a) describe the claim in reasonable detail; (b) include copies of all material written evidence thereof; and (c) indicate the estimated amount, if reasonably practicable, of the Loss that has been or may be sustained by the Indemnified Party. In connection with any claim giving rise to indemnity hereunder resulting from or arising out of any Action by a person or entity who is not a party to this Agreement, the Indemnifying Party, at its sole cost and expense and upon written notice to the Indemnified Party, may assume the defense of any such Action with counsel reasonably satisfactory to the Indemnified Party. The Indemnified Party shall be entitled to participate in the defense of any such Action, with its counsel and at its own cost and

expense, subject to the Indemnifying Party's right to control the defense thereof. If the Indemnifying Party does not assume the defense of any such Action, the Indemnified Party may, but shall not be obligated to, defend against such Action in such manner as it may deem appropriate, including settling such Action, after giving notice of it to the Indemnifying Party, on such terms as the Indemnified Party may deem appropriate and no action taken by the Indemnified Party in accordance with such defense and settlement shall relieve the Indemnifying Party of its indemnification obligations herein provided with respect to any damages resulting therefrom. Sellers and Buyer shall cooperate with each other in all reasonable respects in connection with the defense of any claim, including: (i) making available (subject to the provisions of Section 13) records relating to such claim; and (ii) furnishing, without expense (other than reimbursement of actual out-of-pocket expenses) to the defending party, management employees of the non-defending party as may be reasonably necessary for the preparation of the defense of such claim. The Indemnifying Party shall not settle any Action without the Indemnified Party's prior written consent (which consent shall not be unreasonably withheld, conditioned or delayed).

d.    The party making a claim under this Section 12 is referred to as the "Indemnified Party," and the party against whom such claims are asserted under this Section 12 is referred to as the "Indemnifying Party." The indemnification provided for in Section 12(a) and Section 12(b) shall be subject to the following limitations:

i.    The Indemnifying Party shall not be liable to the Indemnified Party for indemnification under Section 12(a) or Section 12(b), as the case may be, until the aggregate amount of all Losses in respect of indemnification under Section 12(a) or Section 12(b) exceeds one percent (1)% of the Purchase Price (the "Deductible"), in which event the Indemnifying Party shall only be required to pay or be liable for Losses in excess of the Deductible.

ii.    The aggregate amount of all Losses for which the Indemnifying Party shall be liable pursuant to Section 12(a) shall not exceed fifteen percent of the Purchase Price.

iii.    In no event shall any Indemnifying Party be liable to any Indemnified Party for any punitive, incidental, consequential, special or indirect damages, including loss of future revenue or income, loss of business reputation or opportunity relating to the breach or alleged breach of this Agreement, or diminution of value or any damages based on any type of multiple.

iv.    Sellers shall not be liable under this Section 12 for any Losses based upon or arising out of any inaccuracy in or breach of any of the

*Execution Version*

representations or warranties of Sellers contained in this Agreement if Buyer had actual knowledge of such inaccuracy or breach prior to the Closing.

e. Any Losses payable to a Buyer Indemnified Party pursuant to this Section 12 shall be satisfied: (i) from the Deferred Payment; and (ii) to the extent the amount of Losses exceeds the amounts available to the Buyer Indemnified Party from the Deferred Payment, from the Seller Note. A Buyer Indemnified Party shall not have any right to set off against any other amounts, or to recover any further amounts from Sellers beyond the Deferred Payment and the Seller Note, to satisfy any unsatisfied amounts owed to such Buyer Indemnified Party.

f. The parties acknowledge and agree that from and after the Closing their sole and exclusive remedy with respect to any and all claims (other than claims arising from intentional fraud on the part of a party hereto in connection with the transactions contemplated by this Agreement) for any breach of any representation, warranty, covenant, agreement or obligation set forth herein or otherwise relating to the subject matter of this Agreement shall be pursuant to the indemnification provisions set forth in this Section 12. In furtherance of the foregoing, each party hereby waives, from and after the Closing, to the fullest extent permitted under Law, any and all rights, claims and causes of action for any breach of any representation, warranty, covenant, agreement or obligation set forth herein or otherwise relating to the subject matter of this Agreement it may have against the other parties hereto and their affiliates and each of their respective Representatives arising under or based upon any applicable law, except pursuant to the indemnification provisions set forth in this Section 12. Nothing in this Section 12(f) shall limit any person's or entity's right to seek and obtain any equitable relief to which such person or entity shall be entitled or to seek any remedy on account of any intentional fraud by any party hereto.

13. <u>Confidentiality</u>. Buyer and Sellers agree that this Agreement, including its subject matter, and all related discussions, negotiations, and documentation, will remain confidential and will not be disclosed to any third party without the prior written consent of the other party, except as required by law or as necessary to consummate the transactions contemplated herein.

14. <u>Non-Competition; Non-Solicitation</u>

a. <u>Restricted Period</u>: For five (5) years from the Closing Date (the "<u>Restricted Period</u>"), Sellers shall not, and shall not permit any of their affiliates to:

i. Engage in or assist others in engaging in the manufacturing and assembling of hose products (the "<u>Restricted Business</u>") in the United States of America (the "<u>Territory</u>").

*Execution Version*

    ii.      Have an interest in any entity that engages in the Restricted Business in the Territory in any capacity, including as a partner, stockholder, director, officer, member, manager, employee, contractor, principal, agent, volunteer, intern, advisor, or consultant.

    iii.     Interfere materially with the business relationships between the Buyer and its customers or suppliers related to the Business.

b.    <u>Exceptions</u>:   Sellers may own, solely as an investment, securities of any publicly traded company if they do not control or own 5% or more of any class of securities of such company.

c.    Sellers shall not be in breach of this section for services provided for or on behalf of Buyer or its affiliates after Closing.

d.    <u>Employee Non-Solicitation</u>: During the Restricted Period, Sellers shall not, and shall not permit any of their affiliates to, hire or solicit any current or former employee of the Buyer/Business or encourage them to leave the Buyer/Business, except through general solicitations not directed specifically at such employees. Sellers may hire:

    i.      Any employee terminated by the Buyer.

    ii.     Any employee who has resigned from the Buyer, after 180 days from the date of resignation.

e.    <u>Enforcement</u>: Sellers acknowledge that a breach of this section would cause irreparable harm to Buyer, for which monetary damages may not be adequate. Buyer shall be entitled to seek equitable relief, including temporary restraining orders, injunctions, and specific performance, without posting bond.

f.    <u>Reasonableness and Severability</u>: Sellers acknowledge that the restrictions are reasonable and necessary to protect Buyer's interests. If any covenant is deemed excessive by a court, it shall be reformed to the maximum limitations allowed by law. The covenants in this section are severable, and the invalidity or unenforceability of any provision shall not affect the validity or enforceability of the remaining provisions.

15.    <u>Misdirected Funds</u>:

a.    <u>Sellers' Obligations</u>: Following the Closing, each Seller will:

    i.      Segregate any funds received that are included in the Purchased Assets and payable to Buyer ("<u>Buyer Misdirected Funds</u>").

    ii.     Hold Buyer Misdirected Funds in trust for Buyer.

iii.    Notify Buyer immediately upon receipt of such funds.

iv.    Pay Buyer Misdirected Funds to Buyer within 5 business days following receipt.

b.    <u>Buyer's Obligations</u>: Following the Closing, Buyer will:

i.    Segregate any funds received that are included in the Excluded Assets and payable to Sellers ("<u>Sellers Misdirected Funds</u>").

ii.    Hold Sellers Misdirected Funds in trust for Sellers.

iii.    Notify Sellers immediately upon receipt of such funds.

iv.    Pay Sellers Misdirected Funds to Sellers within 5 business days following receipt.

16.    <u>Further Assurances</u>:    Following the Closing, each party shall execute and deliver additional documents and take further actions as reasonably required to carry out the provisions of this Agreement and give effect to the Transaction.

17.    <u>Miscellaneous</u>

a.    <u>Expenses</u>. Except as otherwise expressly provided herein (including Section 17(c) hereof), all costs and expenses incurred in connection with this Agreement and the transactions contemplated hereby shall be paid by the party incurring such costs and expenses; provided, however, Sellers shall pay all amounts payable to Benchmark International.

b.    <u>Bulk Sales Laws</u>. The parties hereby waive compliance with the provisions of any bulk sales, bulk transfer or similar laws of any jurisdiction that may otherwise be applicable with respect to the sale of any or all of the Purchased Assets to Buyer.

c.    <u>Transfer Taxes</u>. All transfer, sales, use, registration, documentary, stamp, value-added, and other such taxes and fees (including any penalties and interest) incurred in connection with this Agreement and the transaction documents contemplated herein, if any, shall be borne and paid by Buyer when due. Buyer shall, at its own expense, timely file any tax return or other document with respect to such taxes (and seller shall cooperate with respect thereto as necessary)

Each party shall be responsible for its own income, capital gains, or other taxes arising from the transaction. The Seller shall bear full responsibility for any capital gains or income taxes incurred as a result of the sale of the Purchased Assets, and the Buyer shall have no obligation with respect to such taxes.

*Execution Version*

d.  <u>Governing Law</u>. This Agreement shall be governed by and construed in accordance with the laws of the State of Illinois.

e.  <u>Entire Agreement</u>. This Agreement and the other transaction documents constitute the sole and entire agreement of the parties to this Agreement with respect to the subject matter contained herein and therein, and supersede all prior and contemporaneous representations, warranties, understandings and agreements, both written and oral, with respect to such subject matter. Except as set forth in Section 8 of this Agreement, in the event of any inconsistency between the statements in the body of this Agreement and those in the other transaction documents, the Exhibits and the Disclosure Schedules (other than an exception expressly set forth as such in the Disclosure Schedules), the statements in the body of this Agreement will control.

f.  <u>Amendments</u>. This Agreement may be amended or modified only by a written agreement signed by both parties.

g.  <u>Counterparts</u>. This Agreement may be executed in counterparts, each of which shall be deemed an original, but all of which together shall constitute one and the same instrument.

h.  <u>Dispute Resolution</u>. Except as provided in Section 7 and 14, all disputes shall be resolved as set forth herein:

   i.  <u>Mediation</u>: In the event of any dispute, controversy, or claim arising out of or relating to this Agreement, or the breach, termination, or validity thereof, the parties shall first attempt in good faith to resolve the dispute by mediation administered by JAMS Endispute before resorting to arbitration.

   ii.  <u>Arbitration</u>: If the dispute has not been resolved by mediation within ninety (90) days from the initiation of such mediation, the dispute shall be finally resolved by arbitration administered by JAMS Endispute. The arbitration shall take place in Illinois or as other agreed upon. The decision of the arbitrator(s) shall be final and binding upon the parties, and judgment upon the award rendered by the arbitrator(s) may be entered in any court having jurisdiction thereof.

i.  <u>Notices</u>. All notices, requests, demands, and other communications required or permitted hereunder shall be in writing and shall be deemed to have been duly given if delivered by hand or mailed, certified or registered mail with postage prepaid, to the addresses of the parties set forth below or to such other address as either party may designate by like notice:

*Execution Version*

For Sellers:

Technical Metals, Inc.
Hoffman Tool, Inc.
Attn: Gerald Hoffman
1301 West Oak Street
Fairbury, IL 61739

For Buyer:

c/o Manufacturing Revitalization
Corporation of America
Attn: Jason Azevedo
1284 Horizon Bvld
EL Paso, TX 79927

*(Signature Page Below.)*

IN WITNESS WHEREOF, the parties hereto have executed this Asset Purchase Agreement as of the day and year first above written.

TECHNICAL METALS, INC., an Illinois Corporation

By: _____
Name: Gerald Hoffman
Title: President

HOFFMAN TOOL, INC., an Illinois Corporation

By: _____
Name: Gerald Hoffman
Title: President

TECHMETALS, LLC, an Illinois limited liability company

By: _____
Name: Jason Azevedo
Title: Manager

MANUFACTURING REVITALIZATION CORPORATION OF AMERICA, L.P. I, a Delaware limited partnership in its capacity as guarantor for Buyer pursuant to Section 2(b)(ii) of this Agreement.

By: _____
Name: Jason Azevedo
Title: Manager

IN WITNESS WHEREOF, the parties hereto have executed this Asset Purchase Agreement as of the day and year first above written.

TECHNICAL METALS, INC., an Illinois Corporation

By: _____
Name: Gerald Hoffman
Title: President

HOFFMAN TOOL, INC., an Illinois Corporation

By: _____
Name: Gerald Hoffman
Title: President

TECHMETALS, LLC, an Illinois limited liability company

By: _____
Name: Jason Azevedo
Title: Manager

MANUFACTURING REVITALIZATION CORPORATION OF AMERICA, L.P. I, a Delaware limited partnership in its capacity as guarantor for Buyer pursuant to Section 2(b)(ii) of this Agreement.

By: _____
Name: Jason Azevedo
Title: Manager

**Exhibit A**
**Excluded Assets**

- All Cash at Closing
- All Tax assets (including duty and Tax refunds and prepayments) of either Seller
- Any and all real estate including but not limited to the Real Estate Premises
- All personal property of the owners of the Sellers (i.e. certain personal computers, artwork, décor, photographs, clothing, and other personal effects that may be located on the Real Estate Premise from time to time).

**Exhibit B**

**Seller Note**

(See attached.)

**Exhibit C**
**Allocation Schedule[1]**

| Asset Class | General Description | Allocation Methodology | Technical Metals, Inc. | Hoffman Tool, Inc. |
|---|---|---|---|---|
| Class I | Cash and cash equivalents | The actual amount of cash, if any. | $186,745.95 | $146,594.88 |
| Class II | Actively traded personal property, etc. | The amount included for such assets in Actual Net Working Capital. | $0.00 | $0.00 |
| Class III | Accounts receivable, etc. | The amount included for such assets in Actual Net Working Capital. | $2,571,520.22 | $72,165.44 |
| Class IV | Inventory | The amount included for such assets in Actual Net Working Capital. | $4,914,666.00 | $80,146.00 |
| Class V | Property, Plant & Equipment, Land | Agreed Upon Amount | $7,500,000.00 | $800,000.00 |
| Class VI and VII | Intangibles (including goodwill and going concern value) | Remaining Purchase Price not allocated above. | $850,000.00 | $290,802.00 |
| | | TOTALS | $16,022,93217 | $1,389,708.32 |

---

[1] With respect to assets and inventory, the amount is subject to adjustment pursuant to the net working capital calculation set forth in Section 7 of the Agreement.

**Exhibit D**
**Assumed Liabilities**

- Any and all obligations and liabilities of the Assigned Contracts that arise on or after the Closing Date

- Any and all Losses and liabilities in connection with the Alliance Funding Group Equipment Finance Agreement dated December 18, 2024, which will be assigned to Buyer by that certain Lease Assignment & Assumption Agreement by and between Technical Metals, Inc., and TechMetals, LLC, dated as of the date hereof.

- All equipment listed under Equipment Lease Agreement by and between Company and TechMetals, LLC, dated as of the date hereof.

- The following payables of the Sellers:

(See Attached)

# AP Aging Detail - By Doc Date

As On Date | 2/19/2025

| Doc Type | Doc No | Vendor Reference | Doc Date | Due Date | Current($) | 30 Days($) | 60 Days($) | 90 Days($) | 120 Days($) | 120+ Days($) | Total Due($) |
|---|---|---|---|---|---|---|---|---|---|---|---|
| **Vendor Name: Abbey Placements** | | | | | | | | | | | |
| Invoice | 971873 | 26498 | 02/07/2025 | 03/07/2025 | 0.00 | 7,253.24 | 0.00 | 0.00 | 0.00 | 0.00 | 7,253.24 |
| Invoice | 971997 | 26512 | 02/14/2025 | 03/14/2025 | 0.00 | 7,323.44 | 0.00 | 0.00 | 0.00 | 0.00 | 7,323.44 |
| | | | | | 0.00 | 14,576.68 | 0.00 | 0.00 | 0.00 | 0.00 | 14,576.68 |
| **Vendor Name: Above & Beyond Black Oxide** | | | | | | | | | | | |
| Invoice | 971561 | 8438 | 01/03/2025 | 02/02/2025 | 0.00 | 0.00 | 120.00 | 0.00 | 0.00 | 0.00 | 120.00 |
| Invoice | 971745 | 8443 | 01/07/2025 | 02/06/2025 | 0.00 | 0.00 | 120.00 | 0.00 | 0.00 | 0.00 | 120.00 |
| Invoice | 971751 | 8547 | 01/10/2025 | 02/09/2025 | 0.00 | 0.00 | 240.00 | 0.00 | 0.00 | 0.00 | 240.00 |
| Invoice | 971748 | 8566 | 01/15/2025 | 02/14/2025 | 0.00 | 0.00 | 191.40 | 0.00 | 0.00 | 0.00 | 191.40 |
| Invoice | 971749 | 8565 | 01/15/2025 | 02/14/2025 | 0.00 | 0.00 | 278.80 | 0.00 | 0.00 | 0.00 | 278.80 |
| Invoice | 971951 | 8576 | 01/17/2025 | 02/16/2025 | 0.00 | 0.00 | 120.00 | 0.00 | 0.00 | 0.00 | 120.00 |
| Invoice | 972083 | 8620 | 02/01/2025 | 03/03/2025 | 0.00 | 122.88 | 0.00 | 0.00 | 0.00 | 0.00 | 122.88 |
| Invoice | 972084 | 8619 | 02/01/2025 | 03/03/2025 | 0.00 | 970.16 | 0.00 | 0.00 | 0.00 | 0.00 | 970.16 |
| | | | | | 0.00 | 1,093.04 | 1,070.20 | 0.00 | 0.00 | 0.00 | 2,163.24 |
| **Vendor Name: Absolute Machine Tools** | | | | | | | | | | | |
| Invoice | 971691 | 0098965-IN | 01/16/2025 | 02/15/2025 | 0.00 | 0.00 | 160.00 | 0.00 | 0.00 | 0.00 | 160.00 |
| | | | | | 0.00 | 0.00 | 160.00 | 0.00 | 0.00 | 0.00 | 160.00 |
| **Vendor Name: ADVANCEDHEAT TREAT CORP** | | | | | | | | | | | |
| Invoice | 971689 | 360062 | 01/20/2025 | 02/19/2025 | 0.00 | 1,768.57 | 0.00 | 0.00 | 0.00 | 0.00 | 1,768.57 |
| | | | | | 0.00 | 1,768.57 | 0.00 | 0.00 | 0.00 | 0.00 | 1,768.57 |
| **Vendor Name: Aerotek Commercial Staffing** | | | | | | | | | | | |
| Invoice | 971962 | OC17513716 | 02/13/2025 | 03/27/2025 | 0.00 | 4,311.38 | 0.00 | 0.00 | 0.00 | 0.00 | 4,311.38 |
| Invoice | 972051 | OC17524437 | 02/20/2025 | 04/03/2025 | 4,628.72 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 4,628.72 |
| | | | | | 4,628.72 | 4,311.38 | 0.00 | 0.00 | 0.00 | 0.00 | 8,940.10 |
| **Vendor Name: AIRGAS USA, LLC** | | | | | | | | | | | |
| Invoice | 971505 | 9157059008 | 01/06/2025 | 02/05/2025 | 0.00 | 0.00 | 614.34 | 0.00 | 0.00 | 0.00 | 614.34 |
| Invoice | 971531 | 9157166987 | 01/09/2025 | 02/08/2025 | 0.00 | 0.00 | 242.33 | 0.00 | 0.00 | 0.00 | 242.33 |
| Invoice | 971533 | 9157185660 | 01/09/2025 | 02/08/2025 | 0.00 | 0.00 | 246.11 | 0.00 | 0.00 | 0.00 | 246.11 |
| Invoice | 971557 | 9157213821 | 01/10/2025 | 02/09/2025 | 0.00 | 0.00 | 135.55 | 0.00 | 0.00 | 0.00 | 135.55 |
| Invoice | 971645 | 9157308064 | 01/10/2025 | 02/09/2025 | 0.00 | 0.00 | 75.00 | 0.00 | 0.00 | 0.00 | 75.00 |
| Invoice | 971647 | 9157254433 | 01/13/2025 | 03/03/2025 | 0.00 | 0.00 | 631.34 | 0.00 | 0.00 | 0.00 | 631.34 |
| Invoice | 971648 | 9157254459 | 01/13/2025 | 02/12/2025 | 0.00 | 0.00 | 713.65 | 0.00 | 0.00 | 0.00 | 713.65 |
| Invoice | 971685 | 9157519877 | 01/20/2025 | 02/19/2025 | 0.00 | 1,073.47 | 0.00 | 0.00 | 0.00 | 0.00 | 1,073.47 |
| Invoice | 971709 | 9157468407 | 01/20/2025 | 02/19/2025 | 0.00 | 192.87 | 0.00 | 0.00 | 0.00 | 0.00 | 192.87 |
| Invoice | 971768 | 9157667131 | 01/24/2025 | 02/23/2025 | 0.00 | 306.21 | 0.00 | 0.00 | 0.00 | 0.00 | 306.21 |
| Invoice | 971769 | 9157621866 | 01/24/2025 | 02/23/2025 | 0.00 | 1,185.76 | 0.00 | 0.00 | 0.00 | 0.00 | 1,185.76 |
| Invoice | 971762 | 9157678909 | 01/27/2025 | 02/26/2025 | 0.00 | 1,445.45 | 0.00 | 0.00 | 0.00 | 0.00 | 1,445.45 |
| Invoice | 971766 | 9157678936 | 01/27/2025 | 02/26/2025 | 0.00 | 21.15 | 0.00 | 0.00 | 0.00 | 0.00 | 21.15 |
| Invoice | 971849 | 5513914126 | 01/31/2025 | 03/02/2025 | 0.00 | 463.35 | 0.00 | 0.00 | 0.00 | 0.00 | 463.35 |
| Invoice | 971850 | 5513914349 | 01/31/2025 | 03/02/2025 | 0.00 | 2,038.36 | 0.00 | 0.00 | 0.00 | 0.00 | 2,038.36 |
| Invoice | 971901 | 9157979695 | 02/03/2025 | 03/05/2025 | 0.00 | 1,095.28 | 0.00 | 0.00 | 0.00 | 0.00 | 1,095.28 |
| Invoice | 971958 | 9158005776 | 02/05/2025 | 03/07/2025 | 0.00 | 75.04 | 0.00 | 0.00 | 0.00 | 0.00 | 75.04 |
| Invoice | 971959 | 9158005789 | 02/05/2025 | 03/07/2025 | 0.00 | 69.60 | 0.00 | 0.00 | 0.00 | 0.00 | 69.60 |
| Invoice | 971979 | 9158127445 | 02/09/2025 | 03/11/2025 | 0.00 | 241.52 | 0.00 | 0.00 | 0.00 | 0.00 | 241.52 |
| Invoice | 972025 | 9158225955 | 02/11/2025 | 03/13/2025 | 0.00 | 1,051.66 | 0.00 | 0.00 | 0.00 | 0.00 | 1,051.66 |
| | | | | | 0.00 | 9,259.72 | 2,658.32 | 0.00 | 0.00 | 0.00 | 11,918.04 |
| **Vendor Name: All World Machinery** | | | | | | | | | | | |
| Invoice | 971818 | 3460993 | 01/29/2025 | 02/28/2025 | 0.00 | 251.84 | 0.00 | 0.00 | 0.00 | 0.00 | 251.84 |
| Invoice | 971871 | 3461677 | 02/03/2025 | 03/05/2025 | 0.00 | 190.12 | 0.00 | 0.00 | 0.00 | 0.00 | 190.12 |
| Invoice | 971978 | 3462699 | 02/07/2025 | 03/09/2025 | 0.00 | 1,322.00 | 0.00 | 0.00 | 0.00 | 0.00 | 1,322.00 |
| | | | | | 0.00 | 1,763.96 | 0.00 | 0.00 | 0.00 | 0.00 | 1,763.96 |
| **Vendor Name: All-Brite Anodizing Co.** | | | | | | | | | | | |
| Invoice | 971965 | 41163TEC07 | 02/04/2025 | 03/06/2025 | 0.00 | 76.00 | 0.00 | 0.00 | 0.00 | 0.00 | 76.00 |
| | | | | | 0.00 | 76.00 | 0.00 | 0.00 | 0.00 | 0.00 | 76.00 |
| **Vendor Name: ALRO STEEL** | | | | | | | | | | | |
| Invoice | 971444 | FAB7328BB | 01/02/2025 | 02/01/2025 | 0.00 | 0.00 | 3,394.28 | 0.00 | 0.00 | 0.00 | 3,394.28 |
| Invoice | 971504 | FAF8621OS | 01/06/2025 | 02/05/2025 | 0.00 | 0.00 | 129.09 | 0.00 | 0.00 | 0.00 | 129.09 |
| Invoice | 971502 | FAG8772UP | 01/07/2025 | 02/06/2025 | 0.00 | 0.00 | 2,158.38 | 0.00 | 0.00 | 0.00 | 2,158.38 |
| Invoice | 971503 | FAG8773BB | 01/07/2025 | 02/06/2025 | 0.00 | 0.00 | 1,014.68 | 0.00 | 0.00 | 0.00 | 1,014.68 |
| Invoice | 971543 | FAJ8994UP | 01/10/2025 | 02/09/2025 | 0.00 | 0.00 | 624.90 | 0.00 | 0.00 | 0.00 | 624.90 |
| Invoice | 971642 | FAN9512J2 | 01/14/2025 | 02/13/2025 | 0.00 | 0.00 | 3,787.46 | 0.00 | 0.00 | 0.00 | 3,787.46 |
| Invoice | 971643 | FAN9513J2 | 01/14/2025 | 02/13/2025 | 0.00 | 0.00 | 8,887.55 | 0.00 | 0.00 | 0.00 | 8,887.55 |
| Invoice | 971594 | FAO9595BB | 01/15/2025 | 02/14/2025 | 0.00 | 0.00 | 222.67 | 0.00 | 0.00 | 0.00 | 222.67 |
| Invoice | 971595 | FAO9594BB | 01/15/2025 | 02/14/2025 | 0.00 | 0.00 | 1,196.61 | 0.00 | 0.00 | 0.00 | 1,196.61 |
| Invoice | 971678 | FAU8833BB | 01/21/2025 | 02/20/2025 | 0.00 | 217.33 | 0.00 | 0.00 | 0.00 | 0.00 | 217.33 |
| Invoice | 971724 | FAV9291OS | 01/22/2025 | 02/21/2025 | 0.00 | 341.19 | 0.00 | 0.00 | 0.00 | 0.00 | 341.19 |
| Invoice | 971725 | FAV9292CR | 01/22/2025 | 02/21/2025 | 0.00 | 3,034.50 | 0.00 | 0.00 | 0.00 | 0.00 | 3,034.50 |
| Invoice | 971845 | FA49810UP | 01/30/2025 | 03/01/2025 | 0.00 | 3,327.33 | 0.00 | 0.00 | 0.00 | 0.00 | 3,327.33 |
| Invoice | 971846 | FA49809CR | 01/30/2025 | 03/01/2025 | 0.00 | 2,471.50 | 0.00 | 0.00 | 0.00 | 0.00 | 2,471.50 |
| Invoice | 971847 | FA49808UP | 01/30/2025 | 03/01/2025 | 0.00 | 2,185.53 | 0.00 | 0.00 | 0.00 | 0.00 | 2,185.53 |
| Invoice | 971848 | FA58932BB | 01/31/2025 | 03/02/2025 | 0.00 | 2,059.56 | 0.00 | 0.00 | 0.00 | 0.00 | 2,059.56 |
| Invoice | 971996 | FBJ9958BB | 02/10/2025 | 03/12/2025 | 0.00 | 253.25 | 0.00 | 0.00 | 0.00 | 0.00 | 253.25 |
| Invoice | 972024 | FBL9820BB | 02/12/2025 | 03/14/2025 | 0.00 | 471.73 | 0.00 | 0.00 | 0.00 | 0.00 | 471.73 |
| Invoice | 972050 | FBN9190BB | 02/14/2025 | 03/16/2025 | 0.00 | 4,286.48 | 0.00 | 0.00 | 0.00 | 0.00 | 4,286.48 |
| | | | | | 0.00 | 18,648.40 | 21,415.62 | 0.00 | 0.00 | 0.00 | 40,064.02 |

| Doc Type | Doc No | Vendor Reference | Doc Date | Due Date | Current($) | 30 Days($) | 60 Days($) | 90 Days($) | 120 Days($) | 120+ Days($) | Total Due($) |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Vendor Name: Altorfer | | | | | | | | | | | |
| Invoice | 971428 | PC020821944 | 01/01/2025 | 01/31/2025 | 0.00 | 0.00 | 269.16 | 0.00 | 0.00 | 0.00 | 269.16 |
| Invoice | 971569 | PC020822517 | 01/08/2025 | 02/07/2025 | 0.00 | 0.00 | 73.60 | 0.00 | 0.00 | 0.00 | 73.60 |
| | | | | | 0.00 | 0.00 | 342.76 | 0.00 | 0.00 | 0.00 | 342.76 |
| Vendor Name: Aluminum Casting Corp | | | | | | | | | | | |
| Advance | 2212814130276 | | 02/18/2025 | 02/18/2025 | 0.00 | -13,564.38 | 0.00 | 0.00 | 0.00 | 0.00 | -13,564.38 |
| | | | | | 0.00 | -13,564.38 | 0.00 | 0.00 | 0.00 | 0.00 | -13,564.38 |
| Vendor Name: American Pattern | | | | | | | | | | | |
| Invoice | 971690 | 29299-01 | 01/16/2025 | 02/15/2025 | 0.00 | 0.00 | 915.00 | 0.00 | 0.00 | 0.00 | 915.00 |
| Invoice | 972081 | 29299-02 | 02/12/2025 | 03/14/2025 | 0.00 | 10,065.00 | 0.00 | 0.00 | 0.00 | 0.00 | 10,065.00 |
| | | | | | 0.00 | 10,065.00 | 915.00 | 0.00 | 0.00 | 0.00 | 10,980.00 |
| Vendor Name: AMOS INDUSTIRES INC | | | | | | | | | | | |
| Invoice | 971708 | 91510 | 01/16/2025 | 02/15/2025 | 0.00 | 0.00 | 9,420.00 | 0.00 | 0.00 | 0.00 | 9,420.00 |
| | | | | | 0.00 | 0.00 | 9,420.00 | 0.00 | 0.00 | 0.00 | 9,420.00 |
| Vendor Name: ARCBEST | | | | | | | | | | | |
| Invoice | 971817 | 429980714 | 01/27/2025 | 02/26/2025 | 0.00 | 164.70 | 0.00 | 0.00 | 0.00 | 0.00 | 164.70 |
| Invoice | 971857 | 429982545 | 01/29/2025 | 02/28/2025 | 0.00 | 276.40 | 0.00 | 0.00 | 0.00 | 0.00 | 276.40 |
| Invoice | 971957 | 429985366 | 01/31/2025 | 03/02/2025 | 0.00 | 119.84 | 0.00 | 0.00 | 0.00 | 0.00 | 119.84 |
| Invoice | 972027 | 429975612 | 02/01/2025 | 03/03/2025 | 0.00 | 218.59 | 0.00 | 0.00 | 0.00 | 0.00 | 218.59 |
| Invoice | 971956 | 429988325 | 02/04/2025 | 03/06/2025 | 0.00 | 279.86 | 0.00 | 0.00 | 0.00 | 0.00 | 279.86 |
| Invoice | 972026 | 429988547 | 02/04/2025 | 03/06/2025 | 0.00 | 129.01 | 0.00 | 0.00 | 0.00 | 0.00 | 129.01 |
| Invoice | 972066 | 429993282 | 02/13/2025 | 03/15/2025 | 0.00 | 118.43 | 0.00 | 0.00 | 0.00 | 0.00 | 118.43 |
| | | | | | 0.00 | 1,306.83 | 0.00 | 0.00 | 0.00 | 0.00 | 1,306.83 |
| Vendor Name: Baker Manufacturing Company | | | | | | | | | | | |
| Invoice | 971481 | 102628 | 01/06/2025 | 02/05/2025 | 0.00 | 0.00 | 4,069.59 | 0.00 | 0.00 | 0.00 | 4,069.59 |
| | | | | | 0.00 | 0.00 | 4,069.59 | 0.00 | 0.00 | 0.00 | 4,069.59 |
| Vendor Name: BLACKHAWK INDUSTRIAL | | | | | | | | | | | |
| Invoice | 971519 | 10921517 | 01/08/2025 | 02/07/2025 | 0.00 | 0.00 | 670.04 | 0.00 | 0.00 | 0.00 | 670.04 |
| Invoice | 971723 | 10950015 | 01/22/2025 | 02/21/2025 | 0.00 | 670.04 | 0.00 | 0.00 | 0.00 | 0.00 | 670.04 |
| | | | | | 0.00 | 670.04 | 670.04 | 0.00 | 0.00 | 0.00 | 1,340.08 |
| Vendor Name: C H Robinson | | | | | | | | | | | |
| Invoice | 972017 | 6216915909 | 02/08/2025 | 03/10/2025 | 0.00 | 1,225.00 | 0.00 | 0.00 | 0.00 | 0.00 | 1,225.00 |
| | | | | | 0.00 | 1,225.00 | 0.00 | 0.00 | 0.00 | 0.00 | 1,225.00 |
| Vendor Name: Campat Machine Tool | | | | | | | | | | | |
| Invoice | 971593 | 1236909 | 01/15/2025 | 02/14/2025 | 0.00 | 0.00 | 607.26 | 0.00 | 0.00 | 0.00 | 607.26 |
| Invoice | 971856 | 1237003 | 01/22/2025 | 02/21/2025 | 0.00 | 726.63 | 0.00 | 0.00 | 0.00 | 0.00 | 726.63 |
| | | | | | 0.00 | 726.63 | 607.26 | 0.00 | 0.00 | 0.00 | 1,333.89 |
| Vendor Name: Cast Technologies | | | | | | | | | | | |
| Credit Memo | 1900401021982 | 291628 | 01/13/2025 | 01/20/2025 | 0.00 | 0.00 | -169.80 | 0.00 | 0.00 | 0.00 | -169.80 |
| | | | | | 0.00 | 0.00 | -169.80 | 0.00 | 0.00 | 0.00 | -169.80 |
| Vendor Name: CAT HODGE CASTING FACILITY | | | | | | | | | | | |
| Invoice | 971311 | ACZZR210778 | 12/20/2024 | 01/19/2025 | 0.00 | 0.00 | 0.00 | 3,019.68 | 0.00 | 0.00 | 3,019.68 |
| Credit Memo | 1900401022000 | CACZZR202766 | 02/14/2025 | 02/18/2025 | 0.00 | -255.30 | 0.00 | 0.00 | 0.00 | 0.00 | -255.30 |
| Credit Memo | 1900401022001 | CACZZR202767 | 02/14/2025 | 02/18/2025 | 0.00 | -251.64 | 0.00 | 0.00 | 0.00 | 0.00 | -251.64 |
| | | | | | 0.00 | -506.94 | 0.00 | 3,019.68 | 0.00 | 0.00 | 2,512.74 |
| Vendor Name: CATERPILLAR REBILL PROGRAM | | | | | | | | | | | |
| Invoice | 971953 | 99557495 | 02/03/2025 | 03/05/2025 | 0.00 | 49,381.43 | 0.00 | 0.00 | 0.00 | 0.00 | 49,381.43 |
| Invoice | 971954 | 99504582 | 02/07/2025 | 03/09/2025 | 0.00 | 2,791.02 | 0.00 | 0.00 | 0.00 | 0.00 | 2,791.02 |
| | | | | | 0.00 | 52,172.45 | 0.00 | 0.00 | 0.00 | 0.00 | 52,172.45 |
| Vendor Name: Caterpillar, Inc. | | | | | | | | | | | |
| Invoice | 971626 | GCI 643479 | 01/15/2025 | 02/14/2025 | 0.00 | 0.00 | 78.00 | 0.00 | 0.00 | 0.00 | 78.00 |
| Invoice | 971955 | GCI 644355 | 02/05/2025 | 03/07/2025 | 0.00 | 499.20 | 0.00 | 0.00 | 0.00 | 0.00 | 499.20 |
| | | | | | 0.00 | 499.20 | 78.00 | 0.00 | 0.00 | 0.00 | 577.20 |
| Vendor Name: Certified Heat Treating Division O'Brien Steel Service Co. | | | | | | | | | | | |
| Invoice | 971798 | PFIN014682 | 01/28/2025 | 02/27/2025 | 0.00 | 195.00 | 0.00 | 0.00 | 0.00 | 0.00 | 195.00 |
| Invoice | 971799 | PFIN014681 | 01/28/2025 | 02/27/2025 | 0.00 | 636.35 | 0.00 | 0.00 | 0.00 | 0.00 | 636.35 |
| Invoice | 971801 | PFIN014680 | 01/28/2025 | 02/27/2025 | 0.00 | 255.00 | 0.00 | 0.00 | 0.00 | 0.00 | 255.00 |
| Invoice | 971802 | PFIN014678 | 01/28/2025 | 02/27/2025 | 0.00 | 331.25 | 0.00 | 0.00 | 0.00 | 0.00 | 331.25 |
| Invoice | 971941 | PFIN014679 | 01/28/2025 | 02/27/2025 | 0.00 | 276.00 | 0.00 | 0.00 | 0.00 | 0.00 | 276.00 |
| Invoice | 971864 | PFIN014707 | 01/29/2025 | 02/28/2025 | 0.00 | 210.00 | 0.00 | 0.00 | 0.00 | 0.00 | 210.00 |
| Invoice | 971895 | PFIN014746 | 01/31/2025 | 03/02/2025 | 0.00 | 350.00 | 0.00 | 0.00 | 0.00 | 0.00 | 350.00 |
| Invoice | 971896 | PFIN014745 | 01/31/2025 | 03/02/2025 | 0.00 | 405.00 | 0.00 | 0.00 | 0.00 | 0.00 | 405.00 |
| Invoice | 971897 | PFIN014744 | 01/31/2025 | 03/02/2025 | 0.00 | 654.40 | 0.00 | 0.00 | 0.00 | 0.00 | 654.40 |
| Invoice | 971898 | PFIN014743 | 01/31/2025 | 03/02/2025 | 0.00 | 130.00 | 0.00 | 0.00 | 0.00 | 0.00 | 130.00 |
| Invoice | 971899 | PFIN014742 | 01/31/2025 | 03/02/2025 | 0.00 | 125.00 | 0.00 | 0.00 | 0.00 | 0.00 | 125.00 |
| Invoice | 971900 | PFIN014741 | 01/31/2025 | 03/02/2025 | 0.00 | 240.50 | 0.00 | 0.00 | 0.00 | 0.00 | 240.50 |
| Invoice | 971865 | PFIN014706 | 02/04/2025 | 03/06/2025 | 0.00 | 195.00 | 0.00 | 0.00 | 0.00 | 0.00 | 195.00 |
| Invoice | 971942 | PFIN014792 | 02/06/2025 | 03/08/2025 | 0.00 | 563.56 | 0.00 | 0.00 | 0.00 | 0.00 | 563.56 |
| Invoice | 971943 | PFIN014791 | 02/06/2025 | 03/08/2025 | 0.00 | 366.47 | 0.00 | 0.00 | 0.00 | 0.00 | 366.47 |
| Invoice | 971944 | PFIN014790 | 02/06/2025 | 03/08/2025 | 0.00 | 261.82 | 0.00 | 0.00 | 0.00 | 0.00 | 261.82 |
| Invoice | 971945 | PFIN014789 | 02/06/2025 | 03/08/2025 | 0.00 | 601.10 | 0.00 | 0.00 | 0.00 | 0.00 | 601.10 |
| Invoice | 972002 | PFIN014808 | 02/10/2025 | 03/12/2025 | 0.00 | 221.26 | 0.00 | 0.00 | 0.00 | 0.00 | 221.26 |
| Invoice | 972003 | PFIN014807 | 02/10/2025 | 03/12/2025 | 0.00 | 249.50 | 0.00 | 0.00 | 0.00 | 0.00 | 249.50 |
| Invoice | 972042 | PFIN014856 | 02/13/2025 | 03/15/2025 | 0.00 | 1,272.00 | 0.00 | 0.00 | 0.00 | 0.00 | 1,272.00 |
| | | | | | 0.00 | 7,539.21 | 0.00 | 0.00 | 0.00 | 0.00 | 7,539.21 |

| Doc Type | Doc No | Vendor Reference | Doc Date | Due Date | Current($) | 30 Days($) | 60 Days($) | 90 Days($) | 120 Days($) | 120+ Days($) | Total Due($) |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Vendor Name: Chicago Dial | | | | | | | | | | | |
| Invoice | 971739 | 0014272 | 01/17/2025 | 02/16/2025 | 0.00 | 0.00 | 4,416.00 | 0.00 | 0.00 | 0.00 | 4,416.00 |
| Invoice | 971809 | 0014335 | 01/27/2025 | 02/26/2025 | 0.00 | 1,518.00 | 0.00 | 0.00 | 0.00 | 0.00 | 1,518.00 |
| Invoice | 971810 | 0014337 | 01/27/2025 | 02/26/2025 | 0.00 | 1,310.00 | 0.00 | 0.00 | 0.00 | 0.00 | 1,310.00 |
| Invoice | 971811 | 0014336 | 01/27/2025 | 02/26/2025 | 0.00 | 3,066.00 | 0.00 | 0.00 | 0.00 | 0.00 | 3,066.00 |
| | | | | | 0.00 | 5,894.00 | 4,416.00 | 0.00 | 0.00 | 0.00 | 10,310.00 |
| Vendor Name: Cincinnati Tool Steel | | | | | | | | | | | |
| Invoice | 971740 | 59814 | 01/23/2025 | 02/22/2025 | 0.00 | 4,800.20 | 0.00 | 0.00 | 0.00 | 0.00 | 4,800.20 |
| Invoice | 972067 | 66628 | 02/13/2025 | 03/15/2025 | 0.00 | 5,328.40 | 0.00 | 0.00 | 0.00 | 0.00 | 5,328.40 |
| | | | | | 0.00 | 10,128.60 | 0.00 | 0.00 | 0.00 | 0.00 | 10,128.60 |
| Vendor Name: Cintas Corporation #396 | | | | | | | | | | | |
| Invoice | 971564 | 4217823050 | 01/14/2025 | 02/13/2025 | 0.00 | 0.00 | 259.80 | 0.00 | 0.00 | 0.00 | 259.80 |
| Invoice | 971650 | 4218227979 | 01/20/2025 | 02/19/2025 | 0.00 | 522.81 | 0.00 | 0.00 | 0.00 | 0.00 | 522.81 |
| Invoice | 971688 | 4218560074 | 01/21/2025 | 02/20/2025 | 0.00 | 259.80 | 0.00 | 0.00 | 0.00 | 0.00 | 259.80 |
| Invoice | 971728 | 4218948286 | 01/24/2025 | 02/23/2025 | 0.00 | 570.77 | 0.00 | 0.00 | 0.00 | 0.00 | 570.77 |
| Invoice | 971761 | 4219299731 | 01/28/2025 | 02/27/2025 | 0.00 | 259.80 | 0.00 | 0.00 | 0.00 | 0.00 | 259.80 |
| Invoice | 971821 | 4219727381 | 01/31/2025 | 03/02/2025 | 0.00 | 522.81 | 0.00 | 0.00 | 0.00 | 0.00 | 522.81 |
| Invoice | 971862 | 4220048722 | 02/04/2025 | 03/06/2025 | 0.00 | 259.80 | 0.00 | 0.00 | 0.00 | 0.00 | 259.80 |
| Invoice | 971960 | 4220422525 | 02/07/2025 | 03/09/2025 | 0.00 | 570.77 | 0.00 | 0.00 | 0.00 | 0.00 | 570.77 |
| Invoice | 971964 | 4220774370 | 02/11/2025 | 03/13/2025 | 0.00 | 259.80 | 0.00 | 0.00 | 0.00 | 0.00 | 259.80 |
| Invoice | 972033 | 4221154214 | 02/14/2025 | 03/16/2025 | 0.00 | 549.75 | 0.00 | 0.00 | 0.00 | 0.00 | 549.75 |
| Invoice | 972082 | 4221489280 | 02/18/2025 | 03/20/2025 | 0.00 | 259.80 | 0.00 | 0.00 | 0.00 | 0.00 | 259.80 |
| | | | | | 0.00 | 4,035.91 | 259.80 | 0.00 | 0.00 | 0.00 | 4,295.71 |
| Vendor Name: Dalton Corporation | | | | | | | | | | | |
| Credit Memo | 1900401021858 | RMA 11558 | 11/30/2023 | 11/30/2023 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | -20.52 | -20.52 |
| Credit Memo | 1900401021985 | RMA11734 | 01/20/2025 | 01/20/2025 | 0.00 | -78.44 | 0.00 | 0.00 | 0.00 | 0.00 | -78.44 |
| Invoice | 971721 | 25010056 | 01/22/2025 | 02/21/2025 | 0.00 | 15,676.39 | 0.00 | 0.00 | 0.00 | 0.00 | 15,676.39 |
| Credit Memo | 1900401021995 | RMA 11737 | 02/03/2025 | 02/11/2025 | 0.00 | -117.54 | 0.00 | 0.00 | 0.00 | 0.00 | -117.54 |
| Invoice | 971977 | 25020023 | 02/05/2025 | 03/07/2025 | 0.00 | 15,676.39 | 0.00 | 0.00 | 0.00 | 0.00 | 15,676.39 |
| Credit Memo | 1900401021994 | RMA 11738 | 02/07/2025 | 02/07/2025 | 0.00 | -78.34 | 0.00 | 0.00 | 0.00 | 0.00 | -78.34 |
| | | | | | 0.00 | 31,078.46 | 0.00 | 0.00 | 0.00 | -20.52 | 31,057.94 |
| Vendor Name: DECATUR CUSTOM TOOL | | | | | | | | | | | |
| Invoice | 971457 | 1825332 | 01/02/2025 | 02/01/2025 | 0.00 | 0.00 | 22,675.27 | 0.00 | 0.00 | 0.00 | 22,675.27 |
| Invoice | 971447 | 1825355 | 01/03/2025 | 02/02/2025 | 0.00 | 0.00 | 439.45 | 0.00 | 0.00 | 0.00 | 439.45 |
| Invoice | 971480 | 1825360 | 01/03/2025 | 02/02/2025 | 0.00 | 0.00 | 900.80 | 0.00 | 0.00 | 0.00 | 900.80 |
| Invoice | 971527 | 1825828 | 01/09/2025 | 02/08/2025 | 0.00 | 0.00 | 80.25 | 0.00 | 0.00 | 0.00 | 80.25 |
| Invoice | 971541 | 1825993 | 01/10/2025 | 02/09/2025 | 0.00 | 0.00 | 124.06 | 0.00 | 0.00 | 0.00 | 124.06 |
| Invoice | 971554 | 1825962 | 01/10/2025 | 02/09/2025 | 0.00 | 0.00 | 89.35 | 0.00 | 0.00 | 0.00 | 89.35 |
| Credit Memo | 1900401021979 | 1826228 | 01/13/2025 | 01/20/2025 | 0.00 | 0.00 | -310.50 | 0.00 | 0.00 | 0.00 | -310.50 |
| Invoice | 971625 | 1826131 | 01/13/2025 | 02/12/2025 | 0.00 | 0.00 | 361.05 | 0.00 | 0.00 | 0.00 | 361.05 |
| Invoice | 971635 | 1826130 | 01/13/2025 | 02/12/2025 | 0.00 | 0.00 | 1,189.40 | 0.00 | 0.00 | 0.00 | 1,189.40 |
| Credit Memo | 1900401021980 | 1826396 | 01/14/2025 | 01/20/2025 | 0.00 | 0.00 | -1,624.06 | 0.00 | 0.00 | 0.00 | -1,624.06 |
| Credit Memo | 1900401021981 | 1826527 | 01/15/2025 | 01/20/2025 | 0.00 | 0.00 | -3,208.26 | 0.00 | 0.00 | 0.00 | -3,208.26 |
| Invoice | 971654 | 1826765 | 01/17/2025 | 02/16/2025 | 0.00 | 0.00 | 481.40 | 0.00 | 0.00 | 0.00 | 481.40 |
| Invoice | 971652 | 1827009 | 01/20/2025 | 02/19/2025 | 0.00 | 797.44 | 0.00 | 0.00 | 0.00 | 0.00 | 797.44 |
| Invoice | 971653 | 1827011 | 01/20/2025 | 02/19/2025 | 0.00 | 759.50 | 0.00 | 0.00 | 0.00 | 0.00 | 759.50 |
| Invoice | 971808 | 1827127 | 01/21/2025 | 02/20/2025 | 0.00 | 368.82 | 0.00 | 0.00 | 0.00 | 0.00 | 368.82 |
| Invoice | 971743 | 1827281 | 01/22/2025 | 02/21/2025 | 0.00 | 3,462.00 | 0.00 | 0.00 | 0.00 | 0.00 | 3,462.00 |
| Invoice | 971737 | 1827442 | 01/23/2025 | 02/22/2025 | 0.00 | 361.05 | 0.00 | 0.00 | 0.00 | 0.00 | 361.05 |
| Invoice | 971738 | 1827450 | 01/23/2025 | 02/22/2025 | 0.00 | 240.70 | 0.00 | 0.00 | 0.00 | 0.00 | 240.70 |
| Invoice | 971742 | 1827451 | 01/23/2025 | 02/22/2025 | 0.00 | 766.40 | 0.00 | 0.00 | 0.00 | 0.00 | 766.40 |
| Invoice | 971780 | 1827866 | 01/27/2025 | 02/26/2025 | 0.00 | 120.60 | 0.00 | 0.00 | 0.00 | 0.00 | 120.60 |
| Invoice | 971781 | 1827780 | 01/27/2025 | 02/26/2025 | 0.00 | 361.05 | 0.00 | 0.00 | 0.00 | 0.00 | 361.05 |
| Invoice | 971842 | 1828080 | 01/29/2025 | 02/28/2025 | 0.00 | 2,286.65 | 0.00 | 0.00 | 0.00 | 0.00 | 2,286.65 |
| Invoice | 971843 | 1828116 | 01/29/2025 | 02/28/2025 | 0.00 | 842.45 | 0.00 | 0.00 | 0.00 | 0.00 | 842.45 |
| Invoice | 971844 | 1828256 | 01/30/2025 | 03/01/2025 | 0.00 | 210.00 | 0.00 | 0.00 | 0.00 | 0.00 | 210.00 |
| Invoice | 971859 | 1828831 | 02/03/2025 | 03/05/2025 | 0.00 | 24,130.09 | 0.00 | 0.00 | 0.00 | 0.00 | 24,130.09 |
| Invoice | 971987 | 1829542 | 02/10/2025 | 03/12/2025 | 0.00 | 2,768.05 | 0.00 | 0.00 | 0.00 | 0.00 | 2,768.05 |
| Invoice | 972023 | 1829905 | 02/12/2025 | 03/14/2025 | 0.00 | 1,377.00 | 0.00 | 0.00 | 0.00 | 0.00 | 1,377.00 |
| Invoice | 972065 | 1830199 | 02/14/2025 | 03/16/2025 | 0.00 | 521.47 | 0.00 | 0.00 | 0.00 | 0.00 | 521.47 |
| Invoice | 972079 | 1830400 | 02/17/2025 | 03/19/2025 | 0.00 | 293.13 | 0.00 | 0.00 | 0.00 | 0.00 | 293.13 |
| Invoice | 972080 | 1830319 | 02/17/2025 | 03/19/2025 | 0.00 | 1,314.46 | 0.00 | 0.00 | 0.00 | 0.00 | 1,314.46 |
| | | | | | 0.00 | 40,980.86 | 21,198.21 | 0.00 | 0.00 | 0.00 | 62,179.07 |
| Vendor Name: Double D Express, Inc. | | | | | | | | | | | |
| Invoice | 971851 | 121837566 | 01/31/2025 | 03/02/2025 | 0.00 | 950.00 | 0.00 | 0.00 | 0.00 | 0.00 | 950.00 |
| | | | | | 0.00 | 950.00 | 0.00 | 0.00 | 0.00 | 0.00 | 950.00 |
| Vendor Name: DURA BAR METAL SERVICE | | | | | | | | | | | |
| Invoice | 971841 | 5137202 | 01/30/2025 | 03/01/2025 | 0.00 | 6,477.87 | 0.00 | 0.00 | 0.00 | 0.00 | 6,477.87 |
| | | | | | 0.00 | 6,477.87 | 0.00 | 0.00 | 0.00 | 0.00 | 6,477.87 |
| Vendor Name: EARL M JORGENSEN STEEL | | | | | | | | | | | |
| Invoice | 971516 | Z886105423 | 01/07/2025 | 02/06/2025 | 0.00 | 0.00 | 562.62 | 0.00 | 0.00 | 0.00 | 562.62 |
| Invoice | 971526 | S422901423 | 01/09/2025 | 02/08/2025 | 0.00 | 0.00 | 934.97 | 0.00 | 0.00 | 0.00 | 934.97 |
| Invoice | 971634 | S424631423 | 01/14/2025 | 02/13/2025 | 0.00 | 0.00 | 3,502.69 | 0.00 | 0.00 | 0.00 | 3,502.69 |
| Invoice | 971676 | Z886827423 | 01/21/2025 | 02/20/2025 | 0.00 | 3,808.08 | 0.00 | 0.00 | 0.00 | 0.00 | 3,808.08 |

| Doc Type | Doc No | Vendor Reference | Doc Date | Due Date | Current($) | 30 Days($) | 60 Days($) | 90 Days($) | 120 Days($) | 120+ Days($) | Total Due($) |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Invoice | 971736 | S429505423 | 01/23/2025 | 02/22/2025 | 0.00 | 571.36 | 0.00 | 0.00 | 0.00 | 0.00 | 571.36 |
| Invoice | 971782 | Z887140423 | 01/28/2025 | 02/27/2025 | 0.00 | 1,209.01 | 0.00 | 0.00 | 0.00 | 0.00 | 1,209.01 |
| Invoice | 971840 | S431844423 | 01/30/2025 | 03/01/2025 | 0.00 | 750.00 | 0.00 | 0.00 | 0.00 | 0.00 | 750.00 |
| Invoice | 971952 | S435689423 | 02/06/2025 | 03/08/2025 | 0.00 | 686.61 | 0.00 | 0.00 | 0.00 | 0.00 | 686.61 |
| Invoice | 971995 | Z887764423 | 02/11/2025 | 03/13/2025 | 0.00 | 9,557.50 | 0.00 | 0.00 | 0.00 | 0.00 | 9,557.50 |
| | | | | | 0.00 | 16,582.56 | 5,000.28 | 0.00 | 0.00 | 0.00 | 21,582.84 |
| Vendor Name: Ecotech Machine Tool LLC | | | | | | | | | | | |
| Invoice | 971933 | 8762 | 02/04/2025 | 03/06/2025 | 0.00 | 100.00 | 0.00 | 0.00 | 0.00 | 0.00 | 100.00 |
| | | | | | 0.00 | 100.00 | 0.00 | 0.00 | 0.00 | 0.00 | 100.00 |
| Vendor Name: EMPLOYER SOLUTIONS STAFFING GROUP LLC | | | | | | | | | | | |
| Invoice | 971998 | 5551831 | 02/12/2025 | 02/27/2025 | 0.00 | 11,583.12 | 0.00 | 0.00 | 0.00 | 0.00 | 11,583.12 |
| | | | | | 0.00 | 11,583.12 | 0.00 | 0.00 | 0.00 | 0.00 | 11,583.12 |
| Vendor Name: ERIEZ | | | | | | | | | | | |
| Invoice | 971572 | 3757391 | 01/02/2025 | 02/01/2025 | 0.00 | 0.00 | 192.00 | 0.00 | 0.00 | 0.00 | 192.00 |
| | | | | | 0.00 | 0.00 | 192.00 | 0.00 | 0.00 | 0.00 | 192.00 |
| Vendor Name: Estes | | | | | | | | | | | |
| Invoice | 971693 | 078-8140343 | 01/13/2025 | 02/12/2025 | 0.00 | 0.00 | 857.00 | 0.00 | 0.00 | 0.00 | 857.00 |
| Invoice | 971694 | 078-8140329 | 01/14/2025 | 02/13/2025 | 0.00 | 0.00 | 894.00 | 0.00 | 0.00 | 0.00 | 894.00 |
| Invoice | 971695 | 152-8133977 | 01/16/2025 | 02/15/2025 | 0.00 | 0.00 | 396.00 | 0.00 | 0.00 | 0.00 | 396.00 |
| | | | | | 0.00 | 0.00 | 2,147.00 | 0.00 | 0.00 | 0.00 | 2,147.00 |
| Vendor Name: EXPRESS SERVICES INC | | | | | | | | | | | |
| Invoice | 971985 | 31940339 | 02/11/2025 | 03/13/2025 | 0.00 | 602.15 | 0.00 | 0.00 | 0.00 | 0.00 | 602.15 |
| Invoice | 972085 | 31974977 | 02/19/2025 | 03/21/2025 | 602.15 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 602.15 |
| | | | | | 602.15 | 602.15 | 0.00 | 0.00 | 0.00 | 0.00 | 1,204.30 |
| Vendor Name: Fairbury Fastener | | | | | | | | | | | |
| Invoice | 972048 | 609316 | 02/01/2025 | 03/03/2025 | 0.00 | 112.38 | 0.00 | 0.00 | 0.00 | 0.00 | 112.38 |
| Invoice | 971870 | 350138 | 02/04/2025 | 03/06/2025 | 0.00 | 131.81 | 0.00 | 0.00 | 0.00 | 0.00 | 131.81 |
| Invoice | 971981 | K50327 | 02/08/2025 | 03/10/2025 | 0.00 | 458.47 | 0.00 | 0.00 | 0.00 | 0.00 | 458.47 |
| Invoice | 971999 | 350447 | 02/12/2025 | 03/14/2025 | 0.00 | 32.94 | 0.00 | 0.00 | 0.00 | 0.00 | 32.94 |
| Invoice | 972004 | 350444 | 02/12/2025 | 03/14/2025 | 0.00 | 270.35 | 0.00 | 0.00 | 0.00 | 0.00 | 270.35 |
| Invoice | 972028 | 609137 | 02/13/2025 | 03/15/2025 | 0.00 | 2,141.60 | 0.00 | 0.00 | 0.00 | 0.00 | 2,141.60 |
| Invoice | 972043 | 350565 | 02/14/2025 | 03/16/2025 | 0.00 | 153.77 | 0.00 | 0.00 | 0.00 | 0.00 | 153.77 |
| Invoice | 972052 | K11525 | 02/17/2025 | 03/19/2025 | 0.00 | 98.18 | 0.00 | 0.00 | 0.00 | 0.00 | 98.18 |
| Invoice | 972053 | K11526 | 02/17/2025 | 03/19/2025 | 0.00 | 36.75 | 0.00 | 0.00 | 0.00 | 0.00 | 36.75 |
| Invoice | 972076 | 350674 | 02/18/2025 | 03/20/2025 | 0.00 | 29.36 | 0.00 | 0.00 | 0.00 | 0.00 | 29.36 |
| Invoice | 972077 | 350657 | 02/18/2025 | 03/20/2025 | 0.00 | 19.09 | 0.00 | 0.00 | 0.00 | 0.00 | 19.09 |
| Invoice | 972078 | 350673 | 02/18/2025 | 03/20/2025 | 0.00 | 9.98 | 0.00 | 0.00 | 0.00 | 0.00 | 9.98 |
| | | | | | 0.00 | 3,494.68 | 0.00 | 0.00 | 0.00 | 0.00 | 3,494.68 |
| Vendor Name: Fastenal Company | | | | | | | | | | | |
| Invoice | 971461 | ILBLM501216 | 01/03/2025 | 02/02/2025 | 0.00 | 0.00 | 1,436.15 | 0.00 | 0.00 | 0.00 | 1,436.15 |
| Invoice | 971534 | ILBLM501303 | 01/07/2025 | 02/06/2025 | 0.00 | 0.00 | 60.39 | 0.00 | 0.00 | 0.00 | 60.39 |
| Invoice | 971545 | ILBLM501423 | 01/10/2025 | 02/09/2025 | 0.00 | 0.00 | 588.12 | 0.00 | 0.00 | 0.00 | 588.12 |
| Invoice | 971706 | ILBLM501624 | 01/17/2025 | 02/16/2025 | 0.00 | 0.00 | 1,514.42 | 0.00 | 0.00 | 0.00 | 1,514.42 |
| Invoice | 971838 | ILBLM501844 | 01/29/2025 | 02/28/2025 | 0.00 | 258.61 | 0.00 | 0.00 | 0.00 | 0.00 | 258.61 |
| Invoice | 971839 | ILBLM502085 | 01/31/2025 | 03/02/2025 | 0.00 | 558.82 | 0.00 | 0.00 | 0.00 | 0.00 | 558.82 |
| Invoice | 971893 | ILBLM502185 | 02/03/2025 | 03/05/2025 | 0.00 | 15.41 | 0.00 | 0.00 | 0.00 | 0.00 | 15.41 |
| Invoice | 971894 | MN019913683 | 02/03/2025 | 03/05/2025 | 0.00 | 42.90 | 0.00 | 0.00 | 0.00 | 0.00 | 42.90 |
| Invoice | 971984 | ILBLM502334 | 02/07/2025 | 03/09/2025 | 0.00 | 762.03 | 0.00 | 0.00 | 0.00 | 0.00 | 762.03 |
| | | | | | 0.00 | 1,637.77 | 3,599.08 | 0.00 | 0.00 | 0.00 | 5,236.85 |
| Vendor Name: Fasteners Etc | | | | | | | | | | | |
| Invoice | 971471 | 210124 | 01/06/2025 | 02/05/2025 | 0.00 | 0.00 | 66.55 | 0.00 | 0.00 | 0.00 | 66.55 |
| Invoice | 971633 | 210514 | 01/13/2025 | 02/12/2025 | 0.00 | 0.00 | 28.73 | 0.00 | 0.00 | 0.00 | 28.73 |
| Invoice | 971783 | 210464 | 01/24/2025 | 02/23/2025 | 0.00 | 83.40 | 0.00 | 0.00 | 0.00 | 0.00 | 83.40 |
| Invoice | 971974 | 209758 | 02/07/2025 | 03/09/2025 | 0.00 | 177.07 | 0.00 | 0.00 | 0.00 | 0.00 | 177.07 |
| Invoice | 971975 | 210456 | 02/07/2025 | 03/09/2025 | 0.00 | 308.15 | 0.00 | 0.00 | 0.00 | 0.00 | 308.15 |
| Invoice | 971976 | 211081 | 02/07/2025 | 03/09/2025 | 0.00 | 600.25 | 0.00 | 0.00 | 0.00 | 0.00 | 600.25 |
| Invoice | 972005 | 210449 | 02/11/2025 | 03/13/2025 | 0.00 | 772.01 | 0.00 | 0.00 | 0.00 | 0.00 | 772.01 |
| | | | | | 0.00 | 1,940.88 | 95.28 | 0.00 | 0.00 | 0.00 | 2,036.16 |
| Vendor Name: FIRSTWAVE STAFFING SOLUTIONS | | | | | | | | | | | |
| Invoice | 971867 | 5549385 | 02/04/2025 | 03/06/2025 | 0.00 | 1,049.66 | 0.00 | 0.00 | 0.00 | 0.00 | 1,049.66 |
| Invoice | 971991 | 5551252 | 02/11/2025 | 03/14/2025 | 0.00 | 1,519.88 | 0.00 | 0.00 | 0.00 | 0.00 | 1,519.88 |
| Invoice | 972074 | 5552499 | 02/18/2025 | 03/20/2025 | 0.00 | 1,559.10 | 0.00 | 0.00 | 0.00 | 0.00 | 1,559.10 |
| | | | | | 0.00 | 4,128.64 | 0.00 | 0.00 | 0.00 | 0.00 | 4,128.64 |
| Vendor Name: Fitzgerald Equipment Co. | | | | | | | | | | | |
| Invoice | 971632 | 02S8960450 | 01/14/2025 | 02/13/2025 | 0.00 | 0.00 | 702.10 | 0.00 | 0.00 | 0.00 | 702.10 |
| Invoice | 972049 | 02S8979480 | 02/07/2025 | 03/09/2025 | 0.00 | 670.70 | 0.00 | 0.00 | 0.00 | 0.00 | 670.70 |
| | | | | | 0.00 | 670.70 | 702.10 | 0.00 | 0.00 | 0.00 | 1,372.80 |
| Vendor Name: Frazier and Frazier Ind. | | | | | | | | | | | |
| Credit Memo | 1900401021990 | 267177 | 01/27/2025 | 01/30/2025 | 0.00 | -323.54 | 0.00 | 0.00 | 0.00 | 0.00 | -323.54 |
| Invoice | 971816 | 267177 | 01/27/2025 | 02/26/2025 | 0.00 | 23,898.42 | 0.00 | 0.00 | 0.00 | 0.00 | 23,898.42 |
| | | | | | 0.00 | 23,574.88 | 0.00 | 0.00 | 0.00 | 0.00 | 23,574.88 |
| Vendor Name: Gatto Industrial Platers, Inc. | | | | | | | | | | | |
| Invoice | 971631 | 1-650255 | 01/13/2025 | 02/12/2025 | 0.00 | 0.00 | 110.00 | 0.00 | 0.00 | 0.00 | 110.00 |
| Invoice | 971784 | 1-651156 | 01/28/2025 | 02/27/2025 | 0.00 | 525.00 | 0.00 | 0.00 | 0.00 | 0.00 | 525.00 |
| Invoice | 971892 | 1-652071 | 01/31/2025 | 03/02/2025 | 0.00 | 135.00 | 0.00 | 0.00 | 0.00 | 0.00 | 135.00 |
| Invoice | 972075 | 2-653117 | 02/14/2025 | 03/16/2025 | 0.00 | 110.00 | 0.00 | 0.00 | 0.00 | 0.00 | 110.00 |
| | | | | | 0.00 | 770.00 | 110.00 | 0.00 | 0.00 | 0.00 | 880.00 |
| Vendor Name: GFI METAL TREATING | | | | | | | | | | | |

| Doc Type | Doc No | Vendor Reference | Doc Date | Due Date | Current($) | 30 Days($) | 60 Days($) | 90 Days($) | 120 Days($) | 120+ Days($) | Total Due($) |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Invoice | 971540 | 147247 | 01/10/2025 | 02/09/2025 | 0.00 | 0.00 | 2,164.89 | 0.00 | 0.00 | 0.00 | 2,164.89 |
| | | | | | 0.00 | 0.00 | 2,164.89 | 0.00 | 0.00 | 0.00 | 2,164.89 |
| Vendor Name: GRAINGER INDUSTRIAL SUPPLY | | | | | | | | | | | |
| Invoice | 971837 | 9387362826 | 01/28/2025 | 02/27/2025 | 0.00 | 174.70 | 0.00 | 0.00 | 0.00 | 0.00 | 174.70 |
| Invoice | 971966 | 9393757415 | 02/03/2025 | 03/05/2025 | 0.00 | 101.83 | 0.00 | 0.00 | 0.00 | 0.00 | 101.83 |
| | | | | | 0.00 | 276.53 | 0.00 | 0.00 | 0.00 | 0.00 | 276.53 |
| Vendor Name: Great Lake Casting LLC | | | | | | | | | | | |
| Credit Memo | 1900401021861 | 527662 | 12/04/2023 | 12/05/2023 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | -15.26 | -15.26 |
| | | | | | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | -15.26 | -15.26 |
| Vendor Name: GREDE MEADVILLE | | | | | | | | | | | |
| Credit Memo | 1900401021958 | CR 3569 | 11/04/2024 | 11/05/2024 | 0.00 | 0.00 | 0.00 | 0.00 | -145.84 | 0.00 | -145.84 |
| | | | | | 0.00 | 0.00 | 0.00 | 0.00 | -145.84 | 0.00 | -145.84 |
| Vendor Name: GRINDAL COMPANY | | | | | | | | | | | |
| Invoice | 971501 | 128041 | 12/30/2024 | 01/29/2025 | 0.00 | 0.00 | 1,340.00 | 0.00 | 0.00 | 0.00 | 1,340.00 |
| | | | | | 0.00 | 0.00 | 1,340.00 | 0.00 | 0.00 | 0.00 | 1,340.00 |
| Vendor Name: Group O, Inc. | | | | | | | | | | | |
| Invoice | 971687 | PSSI002630 | 12/31/2024 | 01/30/2025 | 0.00 | 0.00 | 3,210.97 | 0.00 | 0.00 | 0.00 | 3,210.97 |
| | | | | | 0.00 | 0.00 | 3,210.97 | 0.00 | 0.00 | 0.00 | 3,210.97 |
| Vendor Name: Hartwig Machine | | | | | | | | | | | |
| Invoice | 971836 | PINV00161470 | 01/30/2025 | 03/01/2025 | 0.00 | 228.00 | 0.00 | 0.00 | 0.00 | 0.00 | 228.00 |
| | | | | | 0.00 | 228.00 | 0.00 | 0.00 | 0.00 | 0.00 | 228.00 |
| Vendor Name: HOFFMAN TOOL, INC | | | | | | | | | | | |
| Invoice | 971551 | 9265 | 01/09/2025 | 02/08/2025 | 0.00 | 0.00 | 1,900.00 | 0.00 | 0.00 | 0.00 | 1,900.00 |
| Invoice | 971552 | 9267 | 01/10/2025 | 02/09/2025 | 0.00 | 0.00 | 1,800.00 | 0.00 | 0.00 | 0.00 | 1,800.00 |
| Invoice | 971553 | 9266 | 01/10/2025 | 02/09/2025 | 0.00 | 0.00 | 7,500.00 | 0.00 | 0.00 | 0.00 | 7,500.00 |
| Invoice | 971786 | 9274 | 01/17/2025 | 02/16/2025 | 0.00 | 0.00 | 2,080.00 | 0.00 | 0.00 | 0.00 | 2,080.00 |
| Invoice | 971785 | 9284 | 01/24/2025 | 02/23/2025 | 0.00 | 950.00 | 0.00 | 0.00 | 0.00 | 0.00 | 950.00 |
| | | | | | 0.00 | 950.00 | 13,280.00 | 0.00 | 0.00 | 0.00 | 14,230.00 |
| Vendor Name: HOLSCHER PRODUCTS INC | | | | | | | | | | | |
| Invoice | 971469 | 0261253-IN | 01/06/2025 | 02/05/2025 | 0.00 | 0.00 | 148.00 | 0.00 | 0.00 | 0.00 | 148.00 |
| Invoice | 971470 | 0261254-IN | 01/06/2025 | 02/05/2025 | 0.00 | 0.00 | 377.60 | 0.00 | 0.00 | 0.00 | 377.60 |
| Invoice | 971536 | 0261401-IN | 01/09/2025 | 02/08/2025 | 0.00 | 0.00 | 120.00 | 0.00 | 0.00 | 0.00 | 120.00 |
| Invoice | 971591 | 0261651-IN | 01/16/2025 | 02/15/2025 | 0.00 | 0.00 | 64.90 | 0.00 | 0.00 | 0.00 | 64.90 |
| Invoice | 971592 | 0261650-IN | 01/16/2025 | 02/15/2025 | 0.00 | 0.00 | 399.75 | 0.00 | 0.00 | 0.00 | 399.75 |
| Invoice | 971787 | 0261894-IN | 01/24/2025 | 02/23/2025 | 0.00 | 87.15 | 0.00 | 0.00 | 0.00 | 0.00 | 87.15 |
| Invoice | 972034 | 0262446-IN | 02/13/2025 | 03/15/2025 | 0.00 | 180.00 | 0.00 | 0.00 | 0.00 | 0.00 | 180.00 |
| Invoice | 972035 | 0262447-IN | 02/13/2025 | 03/15/2025 | 0.00 | 240.00 | 0.00 | 0.00 | 0.00 | 0.00 | 240.00 |
| Invoice | 972063 | 0262444-IN | 02/13/2025 | 03/15/2025 | 0.00 | 69.00 | 0.00 | 0.00 | 0.00 | 0.00 | 69.00 |
| Invoice | 972064 | 0262443-IN | 02/13/2025 | 03/15/2025 | 0.00 | 120.00 | 0.00 | 0.00 | 0.00 | 0.00 | 120.00 |
| | | | | | 0.00 | 696.15 | 1,110.25 | 0.00 | 0.00 | 0.00 | 1,806.40 |
| Vendor Name: HTE Technologies | | | | | | | | | | | |
| Invoice | 972016 | 10746348-00 | 02/03/2025 | 03/05/2025 | 0.00 | 762.00 | 0.00 | 0.00 | 0.00 | 0.00 | 762.00 |
| | | | | | 0.00 | 762.00 | 0.00 | 0.00 | 0.00 | 0.00 | 762.00 |
| Vendor Name: HYDRO PLATERS | | | | | | | | | | | |
| Invoice | 971421 | 202429 | 01/02/2025 | 02/01/2025 | 0.00 | 0.00 | 4,188.80 | 0.00 | 0.00 | 0.00 | 4,188.80 |
| Invoice | 971422 | 202430 | 01/02/2025 | 02/01/2025 | 0.00 | 0.00 | 541.02 | 0.00 | 0.00 | 0.00 | 541.02 |
| Invoice | 971788 | 202565 | 01/20/2025 | 02/19/2025 | 0.00 | 431.20 | 0.00 | 0.00 | 0.00 | 0.00 | 431.20 |
| Invoice | 972062 | 202692 | 02/11/2025 | 03/13/2025 | 0.00 | 392.00 | 0.00 | 0.00 | 0.00 | 0.00 | 392.00 |
| | | | | | 0.00 | 823.20 | 4,729.82 | 0.00 | 0.00 | 0.00 | 5,553.02 |
| Vendor Name: IMAGINEERING FINISHING TECHNOLOGIES | | | | | | | | | | | |
| Invoice | 971950 | 699861 | 01/07/2025 | 02/06/2025 | 0.00 | 0.00 | 686.25 | 0.00 | 0.00 | 0.00 | 686.25 |
| Invoice | 971668 | 698335 | 01/10/2025 | 02/09/2025 | 0.00 | 0.00 | 3,156.75 | 0.00 | 0.00 | 0.00 | 3,156.75 |
| Invoice | 971789 | 698841 | 01/15/2025 | 02/14/2025 | 0.00 | 0.00 | 2,653.50 | 0.00 | 0.00 | 0.00 | 2,653.50 |
| | | | | | 0.00 | 0.00 | 6,496.50 | 0.00 | 0.00 | 0.00 | 6,496.50 |
| Vendor Name: INDUCTION HEAT TREATING THERMET CORP | | | | | | | | | | | |
| Invoice | 971513 | 1-65275 | 01/08/2025 | 02/07/2025 | 0.00 | 0.00 | 2,426.16 | 0.00 | 0.00 | 0.00 | 2,426.16 |
| Invoice | 971630 | 1-65303 | 01/15/2025 | 02/14/2025 | 0.00 | 0.00 | 778.36 | 0.00 | 0.00 | 0.00 | 778.36 |
| Invoice | 971752 | 1-65332 | 01/24/2025 | 02/23/2025 | 0.00 | 415.85 | 0.00 | 0.00 | 0.00 | 0.00 | 415.85 |
| Invoice | 971815 | 1-65339 | 01/27/2025 | 02/26/2025 | 0.00 | 340.00 | 0.00 | 0.00 | 0.00 | 0.00 | 340.00 |
| Invoice | 971825 | 1-65359 | 01/29/2025 | 02/28/2025 | 0.00 | 2,572.10 | 0.00 | 0.00 | 0.00 | 0.00 | 2,572.10 |
| Invoice | 971972 | 2-65405 | 02/07/2025 | 03/09/2025 | 0.00 | 550.00 | 0.00 | 0.00 | 0.00 | 0.00 | 550.00 |
| Invoice | 971994 | 2-65413 | 02/10/2025 | 03/12/2025 | 0.00 | 588.48 | 0.00 | 0.00 | 0.00 | 0.00 | 588.48 |
| | | | | | 0.00 | 4,466.43 | 3,204.52 | 0.00 | 0.00 | 0.00 | 7,670.95 |
| Vendor Name: INXPRESS | | | | | | | | | | | |
| Invoice | 971963 | 16232202ZB10 | 02/10/2025 | 02/21/2025 | 0.00 | 219.91 | 0.00 | 0.00 | 0.00 | 0.00 | 219.91 |
| Invoice | 972055 | 16232202ZB17 | 02/17/2025 | 02/28/2025 | 0.00 | 97.70 | 0.00 | 0.00 | 0.00 | 0.00 | 97.70 |
| | | | | | 0.00 | 317.61 | 0.00 | 0.00 | 0.00 | 0.00 | 317.61 |
| Vendor Name: Jade-Sterling Steel Co | | | | | | | | | | | |
| Invoice | 971699 | 281817 | 01/07/2025 | 02/06/2025 | 0.00 | 0.00 | 8,515.72 | 0.00 | 0.00 | 0.00 | 8,515.72 |
| | | | | | 0.00 | 0.00 | 8,515.72 | 0.00 | 0.00 | 0.00 | 8,515.72 |
| Vendor Name: JNL Tech Inc | | | | | | | | | | | |
| Invoice | 972015 | 250021 | 01/31/2025 | 02/10/2025 | 0.00 | 270.00 | 0.00 | 0.00 | 0.00 | 0.00 | 270.00 |
| | | | | | 0.00 | 270.00 | 0.00 | 0.00 | 0.00 | 0.00 | 270.00 |
| Vendor Name: KENS OIL SERVICE INC | | | | | | | | | | | |
| Invoice | 971714 | K556330 | 01/14/2025 | 02/23/2025 | 0.00 | 0.00 | 315.77 | 0.00 | 0.00 | 0.00 | 315.77 |

| Doc Type | Doc No | Vendor Reference | Doc Date | Due Date | Current($) | 30 Days($) | 60 Days($) | 90 Days($) | 120 Days($) | 120+ Days($) | Total Due($) |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Invoice | 971719 | K556727 | 01/23/2025 | 02/22/2025 | 0.00 | 1,222.41 | 0.00 | 0.00 | 0.00 | 0.00 | 1,222.41 |
| Invoice | 971795 | K556932 | 01/28/2025 | 02/28/2025 | 0.00 | 4,853.75 | 0.00 | 0.00 | 0.00 | 0.00 | 4,853.75 |
| Invoice | 971970 | K557026 | 02/07/2025 | 03/09/2025 | 0.00 | 2,428.10 | 0.00 | 0.00 | 0.00 | 0.00 | 2,428.10 |
| Invoice | 971971 | K555669 | 02/07/2025 | 03/09/2025 | 0.00 | 144.17 | 0.00 | 0.00 | 0.00 | 0.00 | 144.17 |
| Invoice | 972046 | K557879 | 02/14/2025 | 03/16/2025 | 0.00 | 1,523.59 | 0.00 | 0.00 | 0.00 | 0.00 | 1,523.59 |
| | | | | | 0.00 | 10,172.02 | 315.77 | 0.00 | 0.00 | 0.00 | 10,487.79 |
| **Vendor Name: KIRSH FOUNDRY** | | | | | | | | | | | |
| Credit Memo | 1900401021986 | 970376 | 01/22/2025 | 01/22/2025 | 0.00 | -120.68 | 0.00 | 0.00 | 0.00 | 0.00 | -120.68 |
| | | | | | 0.00 | -120.68 | 0.00 | 0.00 | 0.00 | 0.00 | -120.68 |
| **Vendor Name: KVF COMPANY INC** | | | | | | | | | | | |
| Invoice | 971511 | 363608 | 01/08/2025 | 02/07/2025 | 0.00 | 0.00 | 356.95 | 0.00 | 0.00 | 0.00 | 356.95 |
| Invoice | 971512 | 363607 | 01/08/2025 | 02/07/2025 | 0.00 | 0.00 | 172.18 | 0.00 | 0.00 | 0.00 | 172.18 |
| | | | | | 0.00 | 0.00 | 529.13 | 0.00 | 0.00 | 0.00 | 529.13 |
| **Vendor Name: LEMAN PAINT WORKS** | | | | | | | | | | | |
| Invoice | 971835 | 1330 | 01/30/2025 | 03/01/2025 | 0.00 | 840.00 | 0.00 | 0.00 | 0.00 | 0.00 | 840.00 |
| | | | | | 0.00 | 840.00 | 0.00 | 0.00 | 0.00 | 0.00 | 840.00 |
| **Vendor Name: LNS TURBO, INC** | | | | | | | | | | | |
| Invoice | 971476 | 372500002 | 01/03/2025 | 02/02/2025 | 0.00 | 0.00 | 1,138.20 | 0.00 | 0.00 | 0.00 | 1,138.20 |
| | | | | | 0.00 | 0.00 | 1,138.20 | 0.00 | 0.00 | 0.00 | 1,138.20 |
| **Vendor Name: Manpower** | | | | | | | | | | | |
| Invoice | 972009 | 39251694 | 02/09/2025 | 03/15/2025 | 0.00 | 308.87 | 0.00 | 0.00 | 0.00 | 0.00 | 308.87 |
| | | | | | 0.00 | 308.87 | 0.00 | 0.00 | 0.00 | 0.00 | 308.87 |
| **Vendor Name: MARMON KEYSTONE** | | | | | | | | | | | |
| Invoice | 971414 | 2464990 | 12/30/2024 | 01/30/2025 | 0.00 | 0.00 | 78,911.99 | 0.00 | 0.00 | 0.00 | 78,911.99 |
| Invoice | 971590 | 2465527 | 01/03/2025 | 02/02/2025 | 0.00 | 0.00 | 6,092.44 | 0.00 | 0.00 | 0.00 | 6,092.44 |
| Invoice | 971465 | 2465785 | 01/06/2025 | 02/05/2025 | 0.00 | 0.00 | 2,232.85 | 0.00 | 0.00 | 0.00 | 2,232.85 |
| Invoice | 971466 | 2465784 | 01/06/2025 | 02/05/2025 | 0.00 | 0.00 | 841.60 | 0.00 | 0.00 | 0.00 | 841.60 |
| Invoice | 971704 | 2468723 | 01/20/2025 | 02/19/2025 | 0.00 | 7,518.35 | 0.00 | 0.00 | 0.00 | 0.00 | 7,518.35 |
| Invoice | 971705 | 2468724 | 01/20/2025 | 02/19/2025 | 0.00 | 4,271.48 | 0.00 | 0.00 | 0.00 | 0.00 | 4,271.48 |
| Invoice | 971854 | 2471553 | 02/04/2025 | 03/06/2025 | 0.00 | 76,939.91 | 0.00 | 0.00 | 0.00 | 0.00 | 76,939.91 |
| | | | | | 0.00 | 88,729.74 | 88,078.88 | 0.00 | 0.00 | 0.00 | 176,808.62 |
| **Vendor Name: MCMASTER-CARR** | | | | | | | | | | | |
| Invoice | 971500 | 38661922 | 01/06/2025 | 02/05/2025 | 0.00 | 0.00 | 448.40 | 0.00 | 0.00 | 0.00 | 448.40 |
| Invoice | 971535 | 38898422 | 01/09/2025 | 02/08/2025 | 0.00 | 0.00 | 179.34 | 0.00 | 0.00 | 0.00 | 179.34 |
| Invoice | 971555 | 38964834 | 01/10/2025 | 02/09/2025 | 0.00 | 0.00 | 337.44 | 0.00 | 0.00 | 0.00 | 337.44 |
| Invoice | 971629 | 39111495 | 01/14/2025 | 02/13/2025 | 0.00 | 0.00 | 290.43 | 0.00 | 0.00 | 0.00 | 290.43 |
| Invoice | 971589 | 39212031 | 01/15/2025 | 02/14/2025 | 0.00 | 0.00 | 80.40 | 0.00 | 0.00 | 0.00 | 80.40 |
| Invoice | 971718 | 39565426 | 01/22/2025 | 02/21/2025 | 0.00 | 802.18 | 0.00 | 0.00 | 0.00 | 0.00 | 802.18 |
| Invoice | 971735 | 39647158 | 01/23/2025 | 02/22/2025 | 0.00 | 261.44 | 0.00 | 0.00 | 0.00 | 0.00 | 261.44 |
| Invoice | 971855 | 40146092 | 02/03/2025 | 03/05/2025 | 0.00 | 109.46 | 0.00 | 0.00 | 0.00 | 0.00 | 109.46 |
| Invoice | 971988 | 40537713 | 02/10/2025 | 03/12/2025 | 0.00 | 100.97 | 0.00 | 0.00 | 0.00 | 0.00 | 100.97 |
| Invoice | 972037 | 40760880 | 02/13/2025 | 03/15/2025 | 0.00 | 325.25 | 0.00 | 0.00 | 0.00 | 0.00 | 325.25 |
| | | | | | 0.00 | 1,599.30 | 1,336.01 | 0.00 | 0.00 | 0.00 | 2,935.31 |
| **Vendor Name: Metal Technology of Indiana, Inc.** | | | | | | | | | | | |
| Invoice | 971790 | 0052382-IN | 01/28/2025 | 02/27/2025 | 0.00 | 27,300.00 | 0.00 | 0.00 | 0.00 | 0.00 | 27,300.00 |
| | | | | | 0.00 | 27,300.00 | 0.00 | 0.00 | 0.00 | 0.00 | 27,300.00 |
| **Vendor Name: Metals Technology Corp.** | | | | | | | | | | | |
| Invoice | 971473 | 1-323336 | 01/03/2025 | 02/02/2025 | 0.00 | 0.00 | 1,206.28 | 0.00 | 0.00 | 0.00 | 1,206.28 |
| Invoice | 971474 | 1-323337 | 01/03/2025 | 02/02/2025 | 0.00 | 0.00 | 729.78 | 0.00 | 0.00 | 0.00 | 729.78 |
| Invoice | 971820 | 1-325193 | 01/28/2025 | 02/27/2025 | 0.00 | 240.00 | 0.00 | 0.00 | 0.00 | 0.00 | 240.00 |
| | | | | | 0.00 | 240.00 | 1,936.06 | 0.00 | 0.00 | 0.00 | 2,176.06 |
| **Vendor Name: Midwestern Rust Proof, Inc.** | | | | | | | | | | | |
| Invoice | 971703 | 50426 | 01/03/2025 | 02/02/2025 | 0.00 | 0.00 | 208.00 | 0.00 | 0.00 | 0.00 | 208.00 |
| Invoice | 971717 | 50583 | 01/14/2025 | 02/13/2025 | 0.00 | 0.00 | 791.20 | 0.00 | 0.00 | 0.00 | 791.20 |
| Invoice | 971949 | 50833 | 01/23/2025 | 02/22/2025 | 0.00 | 922.40 | 0.00 | 0.00 | 0.00 | 0.00 | 922.40 |
| | | | | | 0.00 | 922.40 | 999.20 | 0.00 | 0.00 | 0.00 | 1,921.60 |
| **Vendor Name: Miscellaneous** | | | | | | | | | | | |
| Invoice | 971876 | IN-73541 | 02/05/2025 | 03/07/2025 | 0.00 | 5,600.00 | 0.00 | 0.00 | 0.00 | 0.00 | 5,600.00 |
| | | | | | 0.00 | 5,600.00 | 0.00 | 0.00 | 0.00 | 0.00 | 5,600.00 |
| **Vendor Name: MSC INDUSTRIAL SUPPLY** | | | | | | | | | | | |
| Invoice | 971627 | 63074639 | 01/13/2025 | 02/12/2025 | 0.00 | 0.00 | 175.90 | 0.00 | 0.00 | 0.00 | 175.90 |
| Invoice | 971628 | 63079789 | 01/13/2025 | 02/12/2025 | 0.00 | 0.00 | 175.90 | 0.00 | 0.00 | 0.00 | 175.90 |
| Invoice | 971599 | 62885669 | 01/15/2025 | 02/14/2025 | 0.00 | 0.00 | 2,256.90 | 0.00 | 0.00 | 0.00 | 2,256.90 |
| Invoice | 971869 | 69636909 | 02/03/2025 | 03/05/2025 | 0.00 | 197.95 | 0.00 | 0.00 | 0.00 | 0.00 | 197.95 |
| | | | | | 0.00 | 197.95 | 2,608.70 | 0.00 | 0.00 | 0.00 | 2,806.65 |
| **Vendor Name: NATIONAL TUBE SUPPLY** | | | | | | | | | | | |
| Invoice | 971538 | 612160 | 01/10/2025 | 02/09/2025 | 0.00 | 0.00 | 320.00 | 0.00 | 0.00 | 0.00 | 320.00 |
| Invoice | 971558 | 612161 | 01/10/2025 | 02/13/2025 | 0.00 | 0.00 | 5,064.29 | 0.00 | 0.00 | 0.00 | 5,064.29 |
| Invoice | 971624 | 612512 | 01/13/2025 | 02/12/2025 | 0.00 | 0.00 | 1,749.00 | 0.00 | 0.00 | 0.00 | 1,749.00 |
| | | | | | 0.00 | 0.00 | 7,133.29 | 0.00 | 0.00 | 0.00 | 7,133.29 |
| **Vendor Name: NDT Specialists, Inc** | | | | | | | | | | | |
| Invoice | 971861 | 2412259 | 01/28/2025 | 02/27/2025 | 0.00 | 502.50 | 0.00 | 0.00 | 0.00 | 0.00 | 502.50 |
| | | | | | 0.00 | 502.50 | 0.00 | 0.00 | 0.00 | 0.00 | 502.50 |
| **Vendor Name: New Era Coatings LLC** | | | | | | | | | | | |
| Invoice | 971698 | 2025-025 | 01/14/2025 | 02/13/2025 | 0.00 | 0.00 | 1,904.54 | 0.00 | 0.00 | 0.00 | 1,904.54 |
| | | | | | 0.00 | 0.00 | 1,904.54 | 0.00 | 0.00 | 0.00 | 1,904.54 |
| **Vendor Name: Norfolk Iron** | | | | | | | | | | | |
| Invoice | 971623 | 05497693 | 01/17/2025 | 02/16/2025 | 0.00 | 0.00 | 2,225.78 | 0.00 | 0.00 | 0.00 | 2,225.78 |

| Doc Type | Doc No | Vendor Reference | Doc Date | Due Date | Current($) | 30 Days($) | 60 Days($) | 90 Days($) | 120 Days($) | 120+ Days($) | Total Due($) |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Invoice | 971993 | 05498788 | 02/11/2025 | 03/13/2025 | 0.00 | 1,596.24 | 0.00 | 0.00 | 0.00 | 0.00 | 1,596.24 |
| Invoice | 972047 | 05498912 | 02/14/2025 | 03/16/2025 | 0.00 | 1,051.63 | 0.00 | 0.00 | 0.00 | 0.00 | 1,051.63 |
| | | | | | 0.00 | 2,647.87 | 2,225.78 | 0.00 | 0.00 | 0.00 | 4,873.65 |
| Vendor Name: Northern Iron & Machine | | | | | | | | | | | |
| Invoice | 971622 | 550000806 | 01/13/2025 | 02/12/2025 | 0.00 | 0.00 | 5,302.64 | 0.00 | 0.00 | 0.00 | 5,302.64 |
| | | | | | 0.00 | 0.00 | 5,302.64 | 0.00 | 0.00 | 0.00 | 5,302.64 |
| Vendor Name: Northern Safety Co., Inc. | | | | | | | | | | | |
| Invoice | 971983 | 906677114 | 01/31/2025 | 03/02/2025 | 0.00 | 76.56 | 0.00 | 0.00 | 0.00 | 0.00 | 76.56 |
| | | | | | 0.00 | 76.56 | 0.00 | 0.00 | 0.00 | 0.00 | 76.56 |
| Vendor Name: NORTHFIELD MANUFACTURING INC | | | | | | | | | | | |
| Invoice | 971791 | 115075 | 01/15/2025 | 02/14/2025 | 0.00 | 0.00 | 3,425.35 | 0.00 | 0.00 | 0.00 | 3,425.35 |
| | | | | | 0.00 | 0.00 | 3,425.35 | 0.00 | 0.00 | 0.00 | 3,425.35 |
| Vendor Name: Nussbaum Ace Hardware | | | | | | | | | | | |
| Invoice | 971858 | B420709 | 02/03/2025 | 03/05/2025 | 0.00 | 9.99 | 0.00 | 0.00 | 0.00 | 0.00 | 9.99 |
| Invoice | 971918 | B420988 | 02/05/2025 | 03/07/2025 | 0.00 | 11.99 | 0.00 | 0.00 | 0.00 | 0.00 | 11.99 |
| Invoice | 972054 | B422075 | 02/17/2025 | 03/19/2025 | 0.00 | 23.13 | 0.00 | 0.00 | 0.00 | 0.00 | 23.13 |
| | | | | | 0.00 | 45.11 | 0.00 | 0.00 | 0.00 | 0.00 | 45.11 |
| Vendor Name: O'Brien Steel Service | | | | | | | | | | | |
| Invoice | 972032 | IN00108982 | 01/30/2025 | 03/01/2025 | 0.00 | 169.59 | 0.00 | 0.00 | 0.00 | 0.00 | 169.59 |
| Invoice | 972031 | IN00109764 | 02/06/2025 | 03/08/2025 | 0.00 | 169.59 | 0.00 | 0.00 | 0.00 | 0.00 | 169.59 |
| Credit Memo | 1900401021998 | | 02/14/2025 | 02/14/2025 | 0.00 | -169.59 | 0.00 | 0.00 | 0.00 | 0.00 | -169.59 |
| | | | | | 0.00 | 169.59 | 0.00 | 0.00 | 0.00 | 0.00 | 169.59 |
| Vendor Name: Pat Mooney INC | | | | | | | | | | | |
| Invoice | 971620 | 3366522-IN | 01/14/2025 | 02/13/2025 | 0.00 | 0.00 | 97.00 | 0.00 | 0.00 | 0.00 | 97.00 |
| Invoice | 971915 | 3366775-IN | 01/20/2025 | 02/19/2025 | 0.00 | 3,357.66 | 0.00 | 0.00 | 0.00 | 0.00 | 3,357.66 |
| Invoice | 971920 | 3367380-IN | 02/04/2025 | 03/06/2025 | 0.00 | 815.98 | 0.00 | 0.00 | 0.00 | 0.00 | 815.98 |
| | | | | | 0.00 | 4,173.64 | 97.00 | 0.00 | 0.00 | 0.00 | 4,270.64 |
| Vendor Name: Petersen Chev-Buick | | | | | | | | | | | |
| Invoice | 972000 | 96201 | 02/12/2025 | 03/14/2025 | 0.00 | 456.36 | 0.00 | 0.00 | 0.00 | 0.00 | 456.36 |
| | | | | | 0.00 | 456.36 | 0.00 | 0.00 | 0.00 | 0.00 | 456.36 |
| Vendor Name: PHEASANT RIDGE LANDSCAPING | | | | | | | | | | | |
| Invoice | 971948 | 8254 | 01/31/2025 | 02/15/2025 | 0.00 | 900.00 | 0.00 | 0.00 | 0.00 | 0.00 | 900.00 |
| | | | | | 0.00 | 900.00 | 0.00 | 0.00 | 0.00 | 0.00 | 900.00 |
| Vendor Name: PLS Logistics | | | | | | | | | | | |
| Invoice | 971775 | T-31439189-0000 | 01/23/2025 | 02/22/2025 | 0.00 | 36,400.00 | 0.00 | 0.00 | 0.00 | 0.00 | 36,400.00 |
| | | | | | 0.00 | 36,400.00 | 0.00 | 0.00 | 0.00 | 0.00 | 36,400.00 |
| Vendor Name: Plymouth Foundry, Inc | | | | | | | | | | | |
| Invoice | 971716 | 317347 | 01/21/2025 | 02/20/2025 | 0.00 | 34,034.47 | 0.00 | 0.00 | 0.00 | 0.00 | 34,034.47 |
| | | | | | 0.00 | 34,034.47 | 0.00 | 0.00 | 0.00 | 0.00 | 34,034.47 |
| Vendor Name: Portland Forge | Premier Forge Group | | | | | | | | | | | |
| Invoice | 971824 | 277347 | 01/30/2025 | 03/01/2025 | 0.00 | 34,888.24 | 0.00 | 0.00 | 0.00 | 0.00 | 34,888.24 |
| Invoice | 971989 | 277415 | 02/10/2025 | 03/12/2025 | 0.00 | 12,264.73 | 0.00 | 0.00 | 0.00 | 0.00 | 12,264.73 |
| | | | | | 0.00 | 47,152.97 | 0.00 | 0.00 | 0.00 | 0.00 | 47,152.97 |
| Vendor Name: PT Solutions | | | | | | | | | | | |
| Invoice | 971506 | 011890004 | 01/06/2025 | 02/05/2025 | 0.00 | 0.00 | 153.40 | 0.00 | 0.00 | 0.00 | 153.40 |
| Invoice | 971563 | 011891819 | 01/07/2025 | 02/06/2025 | 0.00 | 0.00 | 834.30 | 0.00 | 0.00 | 0.00 | 834.30 |
| Invoice | 971826 | 011890747 | 01/07/2025 | 02/06/2025 | 0.00 | 0.00 | 482.02 | 0.00 | 0.00 | 0.00 | 482.02 |
| Invoice | 971548 | 011902933 | 01/09/2025 | 02/08/2025 | 0.00 | 0.00 | 1,010.93 | 0.00 | 0.00 | 0.00 | 1,010.93 |
| Invoice | 971544 | 011903180 | 01/10/2025 | 02/09/2025 | 0.00 | 0.00 | 482.02 | 0.00 | 0.00 | 0.00 | 482.02 |
| Invoice | 971616 | 011917393 | 01/14/2025 | 02/13/2025 | 0.00 | 0.00 | 170.62 | 0.00 | 0.00 | 0.00 | 170.62 |
| Invoice | 971617 | 011913913 | 01/14/2025 | 02/13/2025 | 0.00 | 0.00 | 390.54 | 0.00 | 0.00 | 0.00 | 390.54 |
| Invoice | 971618 | 011913623 | 01/14/2025 | 02/13/2025 | 0.00 | 0.00 | 1,622.03 | 0.00 | 0.00 | 0.00 | 1,622.03 |
| Invoice | 971619 | 011911429 | 01/14/2025 | 02/13/2025 | 0.00 | 0.00 | 5.38 | 0.00 | 0.00 | 0.00 | 5.38 |
| Invoice | 971587 | 011921258 | 01/15/2025 | 02/14/2025 | 0.00 | 0.00 | 153.40 | 0.00 | 0.00 | 0.00 | 153.40 |
| Invoice | 971588 | 011921257 | 01/15/2025 | 02/14/2025 | 0.00 | 0.00 | 4.99 | 0.00 | 0.00 | 0.00 | 4.99 |
| Invoice | 971584 | 011921928 | 01/16/2025 | 02/15/2025 | 0.00 | 0.00 | 70.32 | 0.00 | 0.00 | 0.00 | 70.32 |
| Invoice | 971585 | 011921703 | 01/16/2025 | 02/15/2025 | 0.00 | 0.00 | 223.51 | 0.00 | 0.00 | 0.00 | 223.51 |
| Invoice | 971586 | 011921694 | 01/16/2025 | 02/15/2025 | 0.00 | 0.00 | 961.80 | 0.00 | 0.00 | 0.00 | 961.80 |
| Invoice | 971697 | 011922049 | 01/16/2025 | 02/15/2025 | 0.00 | 0.00 | 194.28 | 0.00 | 0.00 | 0.00 | 194.28 |
| Invoice | 971701 | 011927376 | 01/17/2025 | 02/16/2025 | 0.00 | 0.00 | 847.70 | 0.00 | 0.00 | 0.00 | 847.70 |
| Invoice | 971807 | 011928269 | 01/17/2025 | 02/16/2025 | 0.00 | 0.00 | 383.14 | 0.00 | 0.00 | 0.00 | 383.14 |
| Invoice | 971696 | 011935085 | 01/20/2025 | 02/19/2025 | 0.00 | 6,960.00 | 0.00 | 0.00 | 0.00 | 0.00 | 6,960.00 |
| Invoice | 971734 | 011948887 | 01/22/2025 | 02/21/2025 | 0.00 | 18.99 | 0.00 | 0.00 | 0.00 | 0.00 | 18.99 |
| Invoice | 971819 | 011944216 | 01/22/2025 | 02/21/2025 | 0.00 | 133.00 | 0.00 | 0.00 | 0.00 | 0.00 | 133.00 |
| Invoice | 971732 | 011949159 | 01/23/2025 | 02/22/2025 | 0.00 | 1,211.00 | 0.00 | 0.00 | 0.00 | 0.00 | 1,211.00 |
| Invoice | 971733 | 011949158 | 01/23/2025 | 02/22/2025 | 0.00 | 484.40 | 0.00 | 0.00 | 0.00 | 0.00 | 484.40 |
| Invoice | 971792 | 011958040 | 01/24/2025 | 02/23/2025 | 0.00 | 24.88 | 0.00 | 0.00 | 0.00 | 0.00 | 24.88 |
| Invoice | 971793 | 011958534 | 01/27/2025 | 02/26/2025 | 0.00 | 3,633.00 | 0.00 | 0.00 | 0.00 | 0.00 | 3,633.00 |
| Invoice | 971823 | 011963223 | 01/27/2025 | 02/26/2025 | 0.00 | 6.90 | 0.00 | 0.00 | 0.00 | 0.00 | 6.90 |
| Invoice | 971794 | 011969569 | 01/28/2025 | 02/27/2025 | 0.00 | 494.40 | 0.00 | 0.00 | 0.00 | 0.00 | 494.40 |
| Invoice | 971812 | 011969786 | 01/29/2025 | 02/28/2025 | 0.00 | 3.45 | 0.00 | 0.00 | 0.00 | 0.00 | 3.45 |
| Invoice | 971813 | 011969795 | 01/29/2025 | 02/28/2025 | 0.00 | 3,996.30 | 0.00 | 0.00 | 0.00 | 0.00 | 3,996.30 |
| Invoice | 971814 | 011969801 | 01/29/2025 | 02/28/2025 | 0.00 | 242.20 | 0.00 | 0.00 | 0.00 | 0.00 | 242.20 |
| Invoice | 971833 | 011975363 | 01/30/2025 | 03/01/2025 | 0.00 | 784.62 | 0.00 | 0.00 | 0.00 | 0.00 | 784.62 |
| Invoice | 971863 | 011986904 | 01/31/2025 | 03/02/2025 | 0.00 | 222.97 | 0.00 | 0.00 | 0.00 | 0.00 | 222.97 |
| Invoice | 971879 | 011987096 | 02/01/2025 | 03/03/2025 | 0.00 | 388.91 | 0.00 | 0.00 | 0.00 | 0.00 | 388.91 |
| Credit Memo | 1900401021991 | 000917942 | 02/05/2025 | 02/05/2025 | 0.00 | -482.02 | 0.00 | 0.00 | 0.00 | 0.00 | -482.02 |

| Doc Type | Doc No | Vendor Reference | Doc Date | Due Date | Current($) | 30 Days($) | 60 Days($) | 90 Days($) | 120 Days($) | 120+ Days($) | Total Due($) |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Credit Memo | 1900401021993 | | 02/05/2025 | 02/07/2025 | 0.00 | -388.91 | 0.00 | 0.00 | 0.00 | 0.00 | -388.91 |
| Invoice | 971947 | 012003959 | 02/06/2025 | 03/08/2025 | 0.00 | 847.70 | 0.00 | 0.00 | 0.00 | 0.00 | 847.70 |
| Invoice | 971969 | 012010331 | 02/07/2025 | 03/09/2025 | 0.00 | 960.62 | 0.00 | 0.00 | 0.00 | 0.00 | 960.62 |
| Invoice | 971986 | 012020030 | 02/10/2025 | 03/12/2025 | 0.00 | 335.14 | 0.00 | 0.00 | 0.00 | 0.00 | 335.14 |
| Invoice | 972022 | 012020031 | 02/10/2025 | 03/12/2025 | 0.00 | 10.76 | 0.00 | 0.00 | 0.00 | 0.00 | 10.76 |
| Invoice | 972021 | 012020804 | 02/11/2025 | 03/13/2025 | 0.00 | 93.82 | 0.00 | 0.00 | 0.00 | 0.00 | 93.82 |
| Invoice | 972041 | 012025423 | 02/11/2025 | 03/13/2025 | 0.00 | 377.98 | 0.00 | 0.00 | 0.00 | 0.00 | 377.98 |
| Invoice | 972019 | 012025693 | 02/12/2025 | 03/14/2025 | 0.00 | 363.30 | 0.00 | 0.00 | 0.00 | 0.00 | 363.30 |
| Invoice | 972020 | 012025657 | 02/12/2025 | 03/14/2025 | 0.00 | 310.95 | 0.00 | 0.00 | 0.00 | 0.00 | 310.95 |
| Invoice | 972038 | 012031458 | 02/12/2025 | 03/14/2025 | 0.00 | 266.10 | 0.00 | 0.00 | 0.00 | 0.00 | 266.10 |
| Invoice | 972039 | 012033303 | 02/13/2025 | 03/15/2025 | 0.00 | 330.49 | 0.00 | 0.00 | 0.00 | 0.00 | 330.49 |
| Invoice | 972061 | 012036607 | 02/13/2025 | 03/15/2025 | 0.00 | 200.89 | 0.00 | 0.00 | 0.00 | 0.00 | 200.89 |
| Invoice | 972060 | 012038365 | 02/14/2025 | 03/16/2025 | 0.00 | 418.98 | 0.00 | 0.00 | 0.00 | 0.00 | 418.98 |
| | | | | | 0.00 | 22,250.82 | 7,990.38 | 0.00 | 0.00 | 0.00 | 30,241.20 |
| **Vendor Name: Rochester Metal Products** | | | | | | | | | | | |
| Credit Memo | 1900401021978 | 269439 | 01/07/2025 | 01/13/2025 | 0.00 | 0.00 | -80.53 | 0.00 | 0.00 | 0.00 | -80.53 |
| Invoice | 971537 | 269501 | 01/09/2025 | 02/08/2025 | 0.00 | 0.00 | 3,677.75 | 0.00 | 0.00 | 0.00 | 3,677.75 |
| Invoice | 971598 | 269613 | 01/15/2025 | 02/14/2025 | 0.00 | 0.00 | 3,073.22 | 0.00 | 0.00 | 0.00 | 3,073.22 |
| Invoice | 971834 | 269855 | 01/29/2025 | 02/28/2025 | 0.00 | 4,262.19 | 0.00 | 0.00 | 0.00 | 0.00 | 4,262.19 |
| Credit Memo | 1900401021996 | | 02/05/2025 | 02/11/2025 | 0.00 | -123.97 | 0.00 | 0.00 | 0.00 | 0.00 | -123.97 |
| Credit Memo | 1900401021997 | | 02/05/2025 | 02/11/2025 | 0.00 | -37.84 | 0.00 | 0.00 | 0.00 | 0.00 | -37.84 |
| | | | | | 0.00 | 4,100.38 | 6,670.44 | 0.00 | 0.00 | 0.00 | 10,770.82 |
| **Vendor Name: SANDRAY PRECISION GRINDING INC** | | | | | | | | | | | |
| Invoice | 971665 | 101925 | 01/17/2025 | 02/16/2025 | 0.00 | 0.00 | 868.50 | 0.00 | 0.00 | 0.00 | 868.50 |
| | | | | | 0.00 | 0.00 | 868.50 | 0.00 | 0.00 | 0.00 | 868.50 |
| **Vendor Name: Scot Industries** | | | | | | | | | | | |
| Invoice | 971568 | 511969B | 01/09/2025 | 01/09/2025 | 0.00 | 0.00 | 12,357.28 | 0.00 | 0.00 | 0.00 | 12,357.28 |
| | | | | | 0.00 | 0.00 | 12,357.28 | 0.00 | 0.00 | 0.00 | 12,357.28 |
| **Vendor Name: SLAGEL FINISHING LLC** | | | | | | | | | | | |
| Invoice | 971614 | 005417 | 01/13/2025 | 02/12/2025 | 0.00 | 0.00 | 144.10 | 0.00 | 0.00 | 0.00 | 144.10 |
| Invoice | 971615 | 005415 | 01/13/2025 | 02/12/2025 | 0.00 | 0.00 | 752.73 | 0.00 | 0.00 | 0.00 | 752.73 |
| Invoice | 971597 | 005445 | 01/15/2025 | 02/14/2025 | 0.00 | 0.00 | 330.34 | 0.00 | 0.00 | 0.00 | 330.34 |
| Invoice | 971891 | 005452 | 01/16/2025 | 02/15/2025 | 0.00 | 0.00 | 306.46 | 0.00 | 0.00 | 0.00 | 306.46 |
| Invoice | 971692 | 005488 | 01/21/2025 | 02/20/2025 | 0.00 | 117.76 | 0.00 | 0.00 | 0.00 | 0.00 | 117.76 |
| Invoice | 971715 | 005491 | 01/22/2025 | 02/21/2025 | 0.00 | 51.43 | 0.00 | 0.00 | 0.00 | 0.00 | 51.43 |
| Invoice | 971731 | 005504 | 01/23/2025 | 02/22/2025 | 0.00 | 160.38 | 0.00 | 0.00 | 0.00 | 0.00 | 160.38 |
| Invoice | 971946 | 005540 | 02/04/2025 | 03/06/2025 | 0.00 | 195.16 | 0.00 | 0.00 | 0.00 | 0.00 | 195.16 |
| Invoice | 971968 | 005575 | 02/07/2025 | 03/09/2025 | 0.00 | 97.20 | 0.00 | 0.00 | 0.00 | 0.00 | 97.20 |
| Invoice | 971992 | 005592 | 02/11/2025 | 03/13/2025 | 0.00 | 72.93 | 0.00 | 0.00 | 0.00 | 0.00 | 72.93 |
| Invoice | 972029 | 005599 | 02/11/2025 | 03/13/2025 | 0.00 | 102.96 | 0.00 | 0.00 | 0.00 | 0.00 | 102.96 |
| | | | | | 0.00 | 797.82 | 1,533.63 | 0.00 | 0.00 | 0.00 | 2,331.45 |
| **Vendor Name: Spray Tech** | | | | | | | | | | | |
| Invoice | 971560 | 10318 | 01/13/2025 | 02/12/2025 | 0.00 | 0.00 | 138.65 | 0.00 | 0.00 | 0.00 | 138.65 |
| | | | | | 0.00 | 0.00 | 138.65 | 0.00 | 0.00 | 0.00 | 138.65 |
| **Vendor Name: STRAUB METAL INTERNATIONAL** | | | | | | | | | | | |
| Invoice | 971832 | 105149 | 01/31/2025 | 03/02/2025 | 0.00 | 2,436.75 | 0.00 | 0.00 | 0.00 | 0.00 | 2,436.75 |
| | | | | | 0.00 | 2,436.75 | 0.00 | 0.00 | 0.00 | 0.00 | 2,436.75 |
| **Vendor Name: Sunnen Products** | | | | | | | | | | | |
| Invoice | 971666 | 1837654 | 01/14/2025 | 02/13/2025 | 0.00 | 0.00 | 364.50 | 0.00 | 0.00 | 0.00 | 364.50 |
| | | | | | 0.00 | 0.00 | 364.50 | 0.00 | 0.00 | 0.00 | 364.50 |
| **Vendor Name: SWD** | | | | | | | | | | | |
| Invoice | 971612 | 1-1601568 | 01/10/2025 | 02/09/2025 | 0.00 | 0.00 | 239.30 | 0.00 | 0.00 | 0.00 | 239.30 |
| Invoice | 971613 | 1-160567 | 01/10/2025 | 02/09/2025 | 0.00 | 0.00 | 249.00 | 0.00 | 0.00 | 0.00 | 249.00 |
| Invoice | 972044 | 2-1610087 | 02/13/2025 | 03/15/2025 | 0.00 | 163.00 | 0.00 | 0.00 | 0.00 | 0.00 | 163.00 |
| Invoice | 972045 | 2-1610086 | 02/13/2025 | 03/15/2025 | 0.00 | 124.00 | 0.00 | 0.00 | 0.00 | 0.00 | 124.00 |
| | | | | | 0.00 | 287.00 | 488.30 | 0.00 | 0.00 | 0.00 | 775.30 |
| **Vendor Name: Tri-City Heat Treat** | | | | | | | | | | | |
| Invoice | 971509 | 1-201400 | 01/07/2025 | 02/06/2025 | 0.00 | 0.00 | 554.10 | 0.00 | 0.00 | 0.00 | 554.10 |
| Invoice | 971510 | 1-201401 | 01/07/2025 | 02/06/2025 | 0.00 | 0.00 | 1,052.50 | 0.00 | 0.00 | 0.00 | 1,052.50 |
| Invoice | 971967 | 2-202249 | 02/06/2025 | 03/08/2025 | 0.00 | 536.70 | 0.00 | 0.00 | 0.00 | 0.00 | 536.70 |
| Invoice | 972059 | 2-202437 | 02/13/2025 | 03/15/2025 | 0.00 | 485.00 | 0.00 | 0.00 | 0.00 | 0.00 | 485.00 |
| | | | | | 0.00 | 1,021.70 | 1,606.60 | 0.00 | 0.00 | 0.00 | 2,628.30 |
| **Vendor Name: TTC North America LLC** | | | | | | | | | | | |
| Invoice | 972058 | 23691 | 02/13/2025 | 03/15/2025 | 0.00 | 67.00 | 0.00 | 0.00 | 0.00 | 0.00 | 67.00 |
| | | | | | 0.00 | 67.00 | 0.00 | 0.00 | 0.00 | 0.00 | 67.00 |
| **Vendor Name: Tubular Steel Inc.** | | | | | | | | | | | |
| Invoice | 971822 | RC157718 | 01/29/2025 | 02/28/2025 | 0.00 | 1,109.57 | 0.00 | 0.00 | 0.00 | 0.00 | 1,109.57 |
| | | | | | 0.00 | 1,109.57 | 0.00 | 0.00 | 0.00 | 0.00 | 1,109.57 |
| **Vendor Name: TURN-KEY ENVIRONMENTAL** | | | | | | | | | | | |
| Invoice | 972001 | 66993 | 02/07/2025 | 03/09/2025 | 0.00 | 2,598.72 | 0.00 | 0.00 | 0.00 | 0.00 | 2,598.72 |
| | | | | | 0.00 | 2,598.72 | 0.00 | 0.00 | 0.00 | 0.00 | 2,598.72 |
| **Vendor Name: U Line** | | | | | | | | | | | |
| Invoice | 971730 | 187924334 | 01/15/2025 | 02/14/2025 | 0.00 | 0.00 | 87.97 | 0.00 | 0.00 | 0.00 | 87.97 |
| Invoice | 972040 | 188888475 | 02/06/2025 | 03/08/2025 | 0.00 | 188.35 | 0.00 | 0.00 | 0.00 | 0.00 | 188.35 |
| | | | | | 0.00 | 188.35 | 87.97 | 0.00 | 0.00 | 0.00 | 276.32 |
| **Vendor Name: United States Brass & Copper** | | | | | | | | | | | |

| Doc Type | Doc No | Vendor Reference | Doc Date | Due Date | Current($) | 30 Days($) | 60 Days($) | 90 Days($) | 120 Days($) | 120+ Days($) | Total Due($) |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Invoice | 971890 | 20RCI81215 | 01/29/2025 | 02/28/2025 | 0.00 | 9,524.40 | 0.00 | 0.00 | 0.00 | 0.00 | 9,524.40 |
| | | | | | 0.00 | 9,524.40 | 0.00 | 0.00 | 0.00 | 0.00 | 9,524.40 |
| Vendor Name: VERITIV OPERATING COMPANY | | | | | | | | | | | |
| Invoice | 971559 | 021-62771178 | 01/06/2025 | 02/05/2025 | 0.00 | 0.00 | 210.00 | 0.00 | 0.00 | 0.00 | 210.00 |
| | | | | | 0.00 | 0.00 | 210.00 | 0.00 | 0.00 | 0.00 | 210.00 |
| Vendor Name: WAUPACA FOUNDRY, INC. | | | | | | | | | | | |
| Credit Memo | 1900401021983 | 85938101 | 01/16/2025 | 01/20/2025 | 0.00 | 0.00 | -182.07 | 0.00 | 0.00 | 0.00 | -182.07 |
| Credit Memo | 1900401021984 | 85943901 | 01/17/2025 | 01/20/2025 | 0.00 | 0.00 | -60.69 | 0.00 | 0.00 | 0.00 | -60.69 |
| Advance | 2212814130249 | | 02/10/2025 | 02/10/2025 | 0.00 | -7,133.84 | 0.00 | 0.00 | 0.00 | 0.00 | -7,133.84 |
| | | | | | 0.00 | -7,133.84 | -242.76 | 0.00 | 0.00 | 0.00 | -7,376.60 |
| Vendor Name: White Distribution & Supply | | | | | | | | | | | |
| Invoice | 971508 | WDS2003303 | 01/06/2025 | 02/05/2025 | 0.00 | 0.00 | 270.90 | 0.00 | 0.00 | 0.00 | 270.90 |
| Invoice | 971611 | WDS2004874 | 01/13/2025 | 02/12/2025 | 0.00 | 0.00 | 143.30 | 0.00 | 0.00 | 0.00 | 143.30 |
| Invoice | 971661 | WDS2006410 | 01/20/2025 | 02/19/2025 | 0.00 | 60.25 | 0.00 | 0.00 | 0.00 | 0.00 | 60.25 |
| Invoice | 971662 | WDS2006409 | 01/20/2025 | 02/19/2025 | 0.00 | 253.11 | 0.00 | 0.00 | 0.00 | 0.00 | 253.11 |
| Invoice | 971663 | WDS2006408 | 01/20/2025 | 02/19/2025 | 0.00 | 88.88 | 0.00 | 0.00 | 0.00 | 0.00 | 88.88 |
| Invoice | 971889 | WDS2009826 | 02/03/2025 | 03/05/2025 | 0.00 | 967.50 | 0.00 | 0.00 | 0.00 | 0.00 | 967.50 |
| | | | | | 0.00 | 1,369.74 | 414.20 | 0.00 | 0.00 | 0.00 | 1,783.94 |
| Vendor Name: XPO Logistic | | | | | | | | | | | |
| Invoice | 971664 | 690-209892 | 01/16/2025 | 02/15/2025 | 0.00 | 0.00 | 209.66 | 0.00 | 0.00 | 0.00 | 209.66 |
| Invoice | 971729 | 690-326910 | 01/20/2025 | 02/19/2025 | 0.00 | 170.85 | 0.00 | 0.00 | 0.00 | 0.00 | 170.85 |
| Invoice | 971774 | 690-476636 | 01/22/2025 | 02/21/2025 | 0.00 | 161.64 | 0.00 | 0.00 | 0.00 | 0.00 | 161.64 |
| Invoice | 972018 | 281-368975 | 02/07/2025 | 03/09/2025 | 0.00 | 183.18 | 0.00 | 0.00 | 0.00 | 0.00 | 183.18 |
| | | | | | 0.00 | 515.67 | 209.66 | 0.00 | 0.00 | 0.00 | 725.33 |
| | | | | | 5,230.87 | 586,534.54 | 272,737.31 | 3,019.68 | -145.84 | -35.78 | 867,340.78 |

**Exhibit E**

**Bill of Sale**

(See attached.)

BILL OF SALE

For good and valuable consideration, the receipt and adequacy of which are hereby acknowledged, Technical Metals, Inc., an Illinois corporation, and Hoffman Tool, Inc., an Illinois corporation (each a "**Seller**" and collectively, "**Sellers**"), do hereby grant, bargain, transfer, sell, assign, convey and deliver to TechMetals, LLC, an Illinois Limited Liability Company ("**Buyer**"), all of its right, title, and interest in and to the Purchased Assets, as such term is defined in the Asset Purchase Agreement, dated as of February 20, 2025 (the "**Purchase Agreement**"), by and between Sellers and Buyer, to have and to hold the same unto Buyer, its successors and assigns, forever.

Buyer acknowledges that Sellers make no representation or warranty with respect to the assets being conveyed hereby except as specifically set forth in the Purchase Agreement.

IN WITNESS WHEREOF, Sellers have duly executed this Bill of Sale as of February 20, 2025.

**TECHNICAL METALS, INC.**

By: _____
Name: Gerald Hoffman
Title: President

**HOFFMAN TOOL**, INC.

By: _____
Name: Gerald Hoffman
Title: President

**<u>Exhibit F</u>**

**<u>Assignment Agreement</u>**

(See attached.)

ASSIGNMENT AND ASSUMPTION AGREEMENT

This Assignment and Assumption Agreement (the "**Agreement**"), effective as of February 20, 2025 (the "**Effective Date**"), is by and between Technical Metals, Inc., an Illinois corporation, and Hoffman Tool, Inc., an Illinois corporation (each a "**Seller**" and collectively, "**Sellers**"), and TechMetals, LLC, an Illinois Limited Liability Company ("**Buyer**").

**WHEREAS**, Sellers and Buyer have entered into a certain Asset Purchase Agreement, dated as of February 20, 2025 (the "**Purchase Agreement**"), pursuant to which, among other things, Sellers have agreed to assign all of its rights, title and interests in, and Buyer has agreed to assume all of Sellers' duties and obligations under, the Assigned Contracts (as defined in the Purchase Agreement).

**NOW**, **THEREFORE**, in consideration of the mutual covenants, terms, and conditions set forth herein, and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties agree as follows:

1.      Definitions. All capitalized terms used in this Agreement but not otherwise defined herein are given the meanings set forth in the Purchase Agreement.

2.      Assignment and Assumption. Sellers hereby sell, assign, grant, convey and transfer to Buyer all of Sellers' right, title and interest in and to the Assigned Contracts. Buyer hereby accepts such assignment and assumes all of Sellers' duties and obligations under the Assigned Contracts and agrees to pay, perform and discharge, as and when due, all of the obligations of Sellers under the Assigned Contracts accruing on and after the Effective Date.

3.      Terms of the Purchase Agreement. The terms of the Purchase Agreement, including, but not limited to, the representations, warranties, covenants, agreements and indemnities relating to the Assigned Contracts are incorporated herein by this reference. The parties hereto acknowledge and agree that the representations, warranties, covenants, agreements and indemnities contained in the Purchase Agreement shall not be superseded hereby but shall remain in full force and effect to the full extent provided therein. In the event of any conflict or inconsistency between the terms of the Purchase Agreement and the terms hereof, the terms of the Purchase Agreement shall govern.

4.      Governing Law. This Agreement shall be governed by and construed in accordance with the internal laws of the State of Illinois without giving effect to any choice or conflict of law provision or rule (whether of the State of Illinois or any other jurisdiction).

5.      Counterparts. This Agreement may be executed in counterparts, each of which shall be deemed an original, but all of which together shall be deemed to be one and the same agreement. A signed copy of this Agreement delivered by facsimile, email or other means of electronic transmission shall be deemed to have the same legal effect as delivery of an original signed copy of this Agreement.

6.      Further Assurances. Each of the parties hereto shall execute and deliver, at the reasonable request of the other party hereto, such additional documents, instruments, conveyances

and assurances and take such further actions as such other party may reasonably request to carry out the provisions hereof and give effect to the transactions contemplated by this Agreement.

[SIGNATURE PAGE FOLLOWS]

IN WITNESS WHEREOF, the parties have executed this Agreement to be effective as of the date first above written.

**TECHNICAL METALS, INC.**

By: _____
Name: Gerald Hoffman
Title: President

**HOFFMAN TOOL**, **INC**.

By: _____
Name: Gerald Hoffman
Title: President

**TECHMETALS, LLC**

By: _____
Name:
Title:

**Exhibit G**

**Lease Agreement**

(See attached.)

## LEASE AGREEMENT

**THIS LEASE AGREEMENT** (this "**Lease**") is made and entered into as of the Lease Execution Date (defined below), by and between **GERALD HOFFMAN** and **GERALD L. HOFFMAN LIVING TRUST dated March 16, 2010** (collectively, "**Landlord**") and **TECHMETALS, LLC**, an Illinois limited liability company ("**Tenant**").

1.       **Definitions and Basic Provisions**. The definitions and basic provisions set forth below are incorporated herein by reference for all purposes:

| | |
|---|---|
| **Lease Execution Date:** | February 20, 2025. Landlord and Tenant intend that each shall have vested rights immediately upon the signing of this Lease by both parties and that this Lease shall be fully binding and in full force from and after the date hereof. |
| **Commencement Date:** | The Lease Term shall commence upon the Lease Execution Date ("**Commencement Date**"). |
| **Tenant Address:** | TechMetals, LLC<br>1301 W. Oak Street<br>Fairbury, IL 61739<br>Attn: Chris Karic<br>Email: c.karic@mrca.net |
| **Landlord Address for Notices:** | Gerald Hoffman<br>27 4R Drive<br>Fairbury, IL 61739<br>Email:jhoffman@technical-metals.com<br>cc: jward@technical-metals.com |
| **Landlord Address for Rent Payments:** | Same as address for Notices |
| **Land:** | The tract of land situated at 1301 and 1303 W. Oak Street, Fairbury, Illinois 61739 consisting of approximately 6.53 acres of land with Livingston County Parcel Numbers 25-25-09-200-025, -043, -026 and -032. |
| **Premises:** | The Land and the Improvements located on the Land. |
| **Improvements:** | Any buildings or other structures and equipment existing on the Premises as of the Lease Execution Date. |
| **Term:** | One hundred twenty (120) calendar months, commencing on the Commencement Date and ending one hundred twenty (120) full calendar months thereafter (the "**Expiration Date**"). If the Commencement Date is not the first day of a calendar month, then the Term shall be extended by the number of days between the Commencement Date and the end of the month in which the Commencement Date occurs. As used in this Lease, a "**Lease Month**" shall refer to any calendar month during the Term. As used in this Lease, a "**Lease Year**" shall refer to each twelve- |

| | |
|---|---|
| | month period commencing on January 1 and ending on December 31 during the Term. |
| **Base Rental:** | The below amounts which Tenant agrees to pay in advance and without demand, offset, or reduction starting on the Commencement Date and thereafter on the first day of each subsequent calendar month throughout the Term until the Expiration Date. If the Commencement Date is a date other than the first (1st) day of a calendar month, or the Expiration Date is a date other than the last day of a calendar month, then Tenant shall be required to pay only a pro rata share of Base Rental due for such partial month. Tenant shall be responsible for any and all local or state taxes including, without limitation, any sales, franchise, or excise tax assessed upon such Base Rental. |
| | The Monthly Base Rental from the Commencement Date through the sixth (6th) Lease Month shall be $25,000.00. The Monthly Base Rental for the seventh (7th) Lease Month through the twelfth (12th) Lease Month shall be $35,000.00. The Monthly Base Rental shall be a Fair Market Rent, as defined herein, and thereafter, the Monthly Base Rental shall increase three percent (3%) each year. The "**Fair Market Rent**" shall be the greater of (i) $36,050.00, or (ii) the fair market rent, as determined by a certified appraiser selected by Landlord. |
| **Security Deposit:** | $35,000.00 |
| **Sole Permitted Use:** | Metal fabrication, which shall be in compliance with the terms and provisions of this Lease and all Laws (defined herein). |
| | The following uses are expressly prohibited on the Premises: (i) the storage of Hazardous Materials; (ii) storage of abandoned or damaged vehicles; (iii) any junkyard, dumping, disposing, incineration or reduction of garbage); (iv) any use that causes or is reasonably likely to cause damage to the Premises or the Land, any of Landlord's equipment, facilities, or other systems therein, or property or vehicles of others in the Land; (v) billboards or other advertising for off-Premises use; (vi) any use which emits or results in a strong, unusual or obnoxious odor, noise, or sound, or which emits offensive fumes, dust, or vapors; and (vii) any use prohibited by applicable Laws. |
| **Tenant's Proportionate Share:** | 100% |

**2.      Lease of Premises**.  In consideration of the obligation of Tenant to pay Rent (defined below) as herein provided and in consideration of the other terms, covenants, and conditions hereof, Landlord demises and leases to Tenant, and Tenant leases and takes from Landlord, the Premises, in as is condition, for the Term, all upon and subject to the terms and conditions set forth herein.

**3.      Services and Utilities**.  Tenant shall pay directly to the service provider the costs of all utilities and services supplied to the Premises, together with any taxes thereon.  Failure to any extent to furnish or any stoppage of said utilities and services resulting from any cause shall not render Landlord liable for any damages to either person, property, or business, nor be construed as an eviction of Tenant, nor entitle Tenant to any abatement of Rent or relieve Tenant from fulfillment of any covenant or agreement contained herein.

2

**4.** **Use of Premises; Signage; Surrender of Premises.**  Tenant will not occupy or use any portion of the Premises for any purpose other than the Sole Permitted Use. Tenant is required to ensure that all motor vehicles parked in the Parking Area are free of leaks of Hazardous Materials. Tenant shall not place any sign upon the Premises without Landlord's prior written consent, which may be granted or withheld in Landlord's sole discretion.  All of Tenant's signage on the Premises is at Tenant's sole cost including, but not limited to, installation, maintenance, and removal thereof, and is subject to the prior written approval of Landlord, which shall not be unreasonably withheld, and compliance with all Laws. At the earlier of the expiration or termination of this Lease, Tenant will deliver to Landlord: (i) the Premises in the condition that existed as of the Commencement Date (ordinary wear and tear and condemnation excepted), and (ii) all forms of access to the Premises to Landlord (e.g. keys). Prior to such surrender of the Premises, Tenant must remove all of its trade equipment, machinery, inventory, signage, and personal property from the Premises at Tenant's cost (the **"*Tenant's Personalty*"**). All items not so removed will be deemed to have been abandoned by Tenant and are subject to the terms of Section 19.

**5.** **Additional Charges.**

(i)     During the Term, Tenant shall pay to Landlord without demand, offset, or reduction, as the "***Additional Charges***": (i) all costs and expenses incurred or accrued for all Taxes (defined below) applicable to the Premises, and any portion thereof, specifically excluding the personal property taxes levied upon Tenant's Personalty and all other personal property of Tenant contained in the Premises which are Tenant's sole responsibility, (ii) premiums, charges, fees, and other costs and expenses incurred by Landlord pursuant to Section 31(ii), (iii) all costs and expenses incurred or accrued in each calendar year in connection with the ownership, operation, maintenance, management, repair and protection of the Land, including all impositions, operating charges, management fees, administrative fees, maintenance charges, construction costs, and any other charges, costs and expenses which may arise under any provision of this Lease. The term "***Taxes***" includes real estate taxes, franchise or margin taxes, assessments, excises, association dues, fees, levies, charges, and other taxes of every kind and nature whatsoever, general and special, extraordinary and ordinary, foreseen and unforeseen, including interest on installment payments, which may be levied or assessed against or arise in connection with ownership, use, occupancy, rental, leasing, operation or possession of the Land and any improvements thereon, or paid as rent under any ground lease. Taxes shall also include the costs and expenses incurred by Landlord to contest, review or negotiate any tax or assessment applicable to the Land.

(ii)     Landlord shall deliver to Tenant, from time to time, a written estimate of Additional Charges for a certain calendar year and an estimate of Tenant's share thereof. Tenant shall pay such estimated amount in advance in equal monthly installments together with payments of Base Rental. After the end of each calendar year, Landlord shall deliver to Tenant a statement, together with supporting invoices and other materials, setting forth the actual Additional Charges paid by Landlord. If the actual Additional Charges were different that the estimated Additional Charges, the parties, within thirty (30) days thereafter, shall make payment to each other, as necessary.

**6.** **Payments and Performance**. Time is of the essence in the performance of all of Tenant's and Landlord's obligations under this Lease. Base Rental, Tenant's Additional Charges, Tenant's Costs and any amount which becomes owing by Tenant to Landlord hereunder are collectively referred to in the Lease as "***Rent***" and shall bear interest at the highest lawful rate per annum from the due date until paid, or at the rate of twelve percent (12%), whichever is lower, from the due date until paid. In addition, at Landlord's option, but only to the extent allowed by applicable Law and not in excess of the amount allowed by applicable Law, Tenant shall pay a late charge in the amount (as solely determined by Landlord) of up to 10% of any installment of Rent hereunder that is not paid within three (3) business days of the date on which it is due to compensate Landlord for the additional expense involved in handling delinquent payments. Payment of Base Rental and all other Rent shall be made to Landlord at its address stated in

3

Section I or to such other automatic clearing house, persons or place as Landlord may from time to time designate in writing. Notwithstanding any provision of this Lease to the contrary, Landlord's failure to deliver an estimate of Additional Charges, as statement of actual Additional Charges, or any other statement or invoice with respect to any installment of Rent shall not be deemed to be a waiver of any installment of Additional Charges or Rent.

7.      **Condition of the Premises**. By accepting the Premises on the Commencement Date, Tenant shall be deemed to have accepted the same and to have acknowledged that the same comply fully with Landlord's covenants and obligations hereunder.  **EXCEPT AS OTHERWISE EXPRESSLY PROVIDED HEREIN AND WITHOUT LIMITING THE GENERALITY OF THE TERMS AND PROVISIONS OF THE LEASE, TENANT FURTHER ACKNOWLEDGES THAT NEITHER LANDLORD NOR ANY AGENT OR REPRESENTATIVE OF LANDLORD HAS MADE ANY REPRESENTATION, WARRANTY, ASSURANCE OR COVENANT AS TO, AND TENANT EXPRESSLY DISCLAIMS ANY WARRANTY AS TO, THE CONDITION (INCLUDING, BUT NOT LIMITED TO, THE PHYSICAL CHARACTERISTICS) OF THE PREMISES AND THE LAND AND: (A) THE FITNESS OR SUITABILITY OF THE PREMISES OR THE LAND FOR ANY PURPOSE INCLUDING, BUT NOT LIMITED TO, TENANT'S INTENDED COMMERCIAL PURPOSE, AND (B) THE COMPLIANCE OF OR BY THE PREMISES OR THE LAND OR THEIR OPERATION WITH ANY LAWS. TENANT REPRESENTS AND WARRANTS TO LANDLORD THAT TENANT HAS CONDUCTED ALL SUCH INVESTIGATIONS AS ARE NECESSARY OR APPROPRIATE TO CONFIRM THE ACCEPTABILITY OF THE PHYSICAL CONDITION AND CHARACTERISTICS, THE SIZE AND DIMENSIONS, AND THE SUITABILITY OF THE PREMISES AND THE LAND FOR TENANT'S INTENDED USE, AND THAT TENANT IS NOT RELYING UPON OR OTHERWISE BASING ITS DECISION TO LEASE THE PREMISES AND THE LAND ON ANY REPRESENTATIONS OR WARRANTIES AS TO SUCH MATTERS MADE BY OR ON BEHALF OF LANDLORD. TENANT ACCEPTS THE PREMISES AND THE LAND IN THEIR "AS IS" CONDITION. ALL PROPERTY OF TENANT OR ANY OTHER PARTY, LOCATED IN THE PREMISES, AND THE LAND, IS AT THE RISK OF TENANT AND NEITHER LANDLORD NOR LANDLORD'S AGENTS, EMPLOYEES, REPRESENTATIVES OR AFFILIATES SHALL BE LIABLE FOR ANY LOSS, DAMAGE, OR THEFT THEREOF. LANDLORD'S DUTIES AND WARRANTIES ARE LIMITED TO THOSE SET FORTH IN THE LEASE, AND SHALL NOT INCLUDE ANY IMPLIED DUTIES OR WARRANTIES, ALL OF WHICH ARE HEREBY DISCLAIMED BY LANDLORD AND WAIVED BY TENANT. TENANT'S OBLIGATION TO PAY RENT HEREUNDER IS NOT DEPENDENT UPON THE CONDITION OF THE PREMISES OR THE LAND OR THE PERFORMANCE BY LANDLORD OF ITS OBLIGATIONS HEREUNDER, AND, EXCEPT AS OTHERWISE EXPRESSLY PROVIDED HEREIN, TENANT SHALL CONTINUE TO PAY RENT, WITHOUT ABATEMENT, SETOFF OR DEDUCTION, NOTWITHSTANDING ANY BREACH BY LANDLORD OF ITS DUTIES OR OBLIGATIONS HEREUNDER, WHETHER EXPRESS OR IMPLIED. TENANT WAIVES ITS STATUTORY LIEN AND ANY RIGHT IT MAY HAVE TO TERMINATE THIS LEASE BASED ON ANY ALLEGED BREACH Of ANY EXPRESS OR IMPLIED WARRANTIES.**

8.      **Repair and Maintenance by Tenant**. Tenant, at Tenant's expense, shall repair, replace and maintain in good condition all portions of the Premises and any Improvements, including, without limitation, any roof, walls, floors, heating, ventilating, or air conditioning equipment, foundations, concrete paving, gravel, gates, key pads, storage tanks, mechanical, electrical, drainage, plumbing, and other systems and utility lines up to points of public connection, and all adjacent sidewalks, landscaping, driveways, parking lots, fences and signs located in the areas which are adjacent to and included within the Premises, if any. Such repairs and replacements include capital expenditures and repairs whose benefit may extend beyond the Term.  If Tenant fails to perform any repair or replacement for which Tenant is responsible, Landlord may perform such work and be reimbursed by Tenant within ten (10) days after written demand

4

therefor. Landlord shall incur no expense, nor have any obligation of any kind whatsoever in connection with the maintenance, repair, or replacement of the Premises, and Tenant expressly waives the benefits of any statute now or hereafter in effect which would otherwise afford Tenant the right to make repairs at Landlord's expense or to terminate this Lease because of Landlord's failure to keep the Premises in good order, condition and repair.

9.      **Assignment and Subletting**. Tenant will not, without Landlord's prior written consent, in Landlord's sole discretion: (i) assign or transfer this Lease or any estate or interest herein or sublease any portion of the Premises, whether directly or by operation of Law; (ii) if Tenant is an entity other than a corporation whose stock is publicly traded, permit the transfer of an ownership interest in Tenant so as to result in a change in the current control of Tenant; (iii) grant any license, concession, or other right of occupancy of any portion of the Premises; or (iv) permit the use of the Premises by any parties other than Tenant. Landlord's consent to an assignment, subletting or occupancy shall not relieve Tenant from any liability under this lease or from obtaining Landlord's consent to any further assignment, subletting or occupancy.

10.     **Alterations and Additions by Tenant**. Tenant shall make no alterations in or additions to the Premises without the prior written consent of Landlord which may be withheld in its sole and absolute discretion.

11.     **Legal Use; Violations of Insurance Coverage; Nuisance**. Tenant will not occupy or use any portion of the Premises for any purpose other than the Sole Permitted Use and any purpose directly, commonly, and reasonably associated with the Sole Permitted Use that are in compliance with all Laws.

12.     **Laws and Regulations**. Tenant at its sole expense will use and maintain the Premises in a clean, safe, and healthful condition and will comply with all applicable laws, ordinances, orders, rules, permits (including but not limited to permits commonly associated with industrial use or occupancy in the Fairbury, Illinois area or Livingston County, statutes, requirements, and regulations of any governmental authority having jurisdiction over the use, conditions, or occupancy of the Premises (**"*Laws*"**), as a result of its Sole Permitted Use.

13.     **Indemnity, Liability and Loss or Damage**. LANDLORD SHALL NOT BE LIABLE TO TENANT OR TENANT'S AGENTS, EMPLOYEES, GUESTS, INVITEES, INDEPENDENT CONTRACTORS, OR ANY PERSON CLAIMING BY, THROUGH OR UNDER TENANT FOR ANY INJURY TO PERSON, LOSS OF OR DAMAGE TO PROPERTY, OR FOR LOSS OF OR DAMAGE TO TENANT'S BUSINESS, OCCASIONED BY OR THROUGH THE ACTS OR OMISSIONS OF LANDLORD, OR BY ANY CAUSE WHATSOEVER EXCEPT FOR ANY THEREOF AND TO THE EXTENT ARISING FROM OR OUT OF LANDLORD'S GROSS NEGLIGENCE OR WILLFUL WRONGDOING. UNLESS AND TO THE EXTENT ARISING FROM OR OUT OF LANDLORD'S GROSS NEGLIGENCE OR WILLFUL WRONGDOING, LANDLORD SHALL NOT BE LIABLE FOR, AND, SUBJECT TO SECTION 30, TENANT SHALL INDEMNIFY AND HOLD HARMLESS LANDLORD, LANDLORD'S AFFILIATES, AND THEIR RESPECTIVE OFFICERS, EMPLOYEES, AGENTS, CONTRACTORS, EMPLOYEES, INVITEES, AND LICENSEES (THE "***LANDLORD PROTECTED PARTIES***"), HARMLESS FROM ALL SUITS, ACTIONS, DAMAGES, LIABILITY AND EXPENSE IN CONNECTION WITH LOSS OF LIFE, BODILY OR PERSONAL INJURY OR PROPERTY DAMAGE, OR ANY BREACH OF THIS LEASE, ARISING FROM OR OUT OF (I) ANY OCCURRENCE IN, UPON, AT OR FROM THE PREMISES, (II) THE OCCUPANCY OR USE BY TENANT OR ITS AGENTS, CONTRACTORS, EMPLOYEES, INVITEES, OR LICENSEES, OF THE PREMISES OR ANY PART THEREOF, (III) THE PRESENCE OF ANY HAZARDOUS MATERIALS ON, BENEATH, OR FROM THE PREMISES BY TENANT AND ITS OFFICERS, EMPLOYEES, AGENTS, GUESTS, INVITEES, REPRESENTATIVES, INDEPENDENT CONTRACTORS, AND

5

ASSIGNS (THE "***TENANT PROTECTED PARTIES***") OR ANY THIRD-PARTY, AND ANY CLEAN-UP OR REMEDIATION THEREOF, OR (IV) OCCASIONED WHOLLY OR IN PART BY ANY NEGLIGENT OR WILLFUL ACTION OR OMISSION OF TENANT, ITS AGENTS, CONTRACTORS, EMPLOYEES, INVITEES, OR LICENSEES. If Landlord shall be made a party to any action commenced by or against Tenant, Tenant shall protect and hold Landlord harmless therefrom and on demand pay all costs, expenses, and reasonable attorney's fees incurred by Landlord in connection therewith, except to the extent caused by the gross negligence or willful wrongdoing of Landlord. The indemnities set forth in this Lease shall survive termination or expiration of this Lease.

**14.**     **Rules**. TENANT WILL COMPLY FULLY, AND WILL CAUSE TENANT'S AGENTS, EMPLOYEES, AND INVITEES TO COMPLY fully with all rules and regulations of the Land provided by Landlord at any time (the **"*Rules and Regulations*"**), which Landlord may change as Landlord may deem advisable. In the event of any conflict between the Lease and the Rules and Regulations, the Lease will control.

**15.**     **Landlord's Access**. Landlord and its agents and representatives shall have the right to enter into and upon any and all parts of the Premises at reasonable hours only after providing Tenant with 24-hours written notice (or, in an emergency, at any hour and without notice) to inspect same or clean or make repairs or alterations or additions to the Premises or the Land as Landlord may deem necessary, or to comply with any requirements imposed upon the Landlord by any governmental entities, all to be determined in Landlord's sole and absolute discretion. Landlord may temporarily close gates, doors, and interrupt or temporarily suspend Premises services and facilities in accordance with this Section 15 provided that Landlord will take reasonable steps to minimize any interference with Tenant's business operations in the Premises, and Tenant shall not be entitled to any abatement or reduction of Rent by reason thereof. Furthermore, Landlord and Landlord's representatives and agents shall have the right to enter the Premises at reasonable times after reasonable prior notice for the purpose of showing the same to prospective purchasers, lenders, or tenants.

**16.**     **Casualty.**

        a.        If the Premises are damaged or destroyed by fire, earthquake, or other identifiable event of sudden, unexpected or unusual nature (each, a "***Casualty***"), Tenant shall give immediate written notice thereof to Landlord.

        b.        If such damage was caused by a Casualty covered by the insurance carried by Landlord, and such damage can be repaired within one hundred eighty (180) days from the commencement of repairs, then Landlord shall repair and restore the Premises to substantially the same condition as existed at the time of such Casualty.  If the Premises shall be damaged: (i) by a Casualty not covered by the insurance carried by Landlord; or (ii) to an extent that it cannot be repaired within one hundred eighty (180) days from the commencement of repairs, then Landlord shall have the option to terminate this Lease by so notifying the Tenant within thirty (30) days after Landlord's receipt of notice of such Casualty.  Failure to give notice within such thirty (30) day period shall be deemed an election not to terminate this Lease, and Landlord shall proceed to repair and restore the Leased Premises and the Land as aforesaid. Tenant agrees that during any period of reconstruction or repair of the Leased Premises it will continue the operation of its business within the Leased Premises to the extent practicable.

        c.        To the extent Landlord actually receives rent loss insurance applicable to the Premises, the monthly installments of Base Rental required to be paid by Tenant shall be abated during Landlord's periods of repair and restoration of the Premises in proportion to the portions of the Premises, if any, which are rendered untenantable by the Casualty until Landlord's repairs and restoration of the Premises are completed, or if the Premises are not repaired and restored, until the termination date hereof.  There shall

6

be no abatement of Additional Charges and other charges provided for herein. No damages, compensation, or claims shall be payable by Landlord for loss of the use of the whole or any part of the Premises, Tenant's personal property, or any inconvenience, loss of business or annoyance arising from any repair and reconstruction.  If the damage results from a cause not insured by rent loss insurance payable to Landlord, Tenant shall not be entitled to any abatement or reduction of any Base Rental or other sums due hereunder. If this Lease is terminated as provided in Section 16(b), all Rent shall be apportioned and paid up to the termination date, any Rent paid and attributable to the period after such termination shall be refunded to Tenant, and the parties hereto shall have no further obligations hereunder.  Landlord shall not be liable for the cost and expense of the repair or replacement of any alterations, Improvements, additions, fixtures, furniture, equipment, furnishings, or other personal property which Tenant is obligated to insure or which it may be entitled to remove from the Premises pursuant to the terms hereof. Notwithstanding anything to the contrary contained herein, there shall be no Rent abatement if the Premises are unusable due to damage or destruction caused by or related to the fault or negligence of Tenant or its employees, agents, contractors or subcontractors.  Tenant agrees that Landlord may, but shall not be obligated to, provide and maintain rental loss, business income, business interruption or similar insurance during the Term.

d.    Anything contained in the foregoing to the contrary notwithstanding, Landlord shall have no obligation whatsoever to repair, reconstruct, or restore the Premises when the damage resulting from any Casualty covered under this Section 16 occurs during the last eighteen (18) months of the Term.  If Landlord elects not to repair, reconstruct or restore the Premises, Tenant may, at its option, terminate this Lease, such termination to be effective as of the date of the Casualty and any Rent paid and attributable to the period after such termination date shall be refunded to Tenant.

e.    Anything contained in the foregoing to the contrary notwithstanding, in the event any mortgagee (each, a "*Landlord's Mortgagee*") of Landlord holding any lien or security interest in the Premises or the Land for the performance of an obligation of Landlord shall not concur in the application of any insurance proceeds to the repair or reconstruction of the Premises, Landlord shall not be obligated to repair or reconstruct the Premises and may, at its option, terminate this Lease, such termination to be effective as of the date of the Casualty and any Rent paid and attributable to the period after such termination date shall be refunded to Tenant.

f.    Landlord's obligation to rebuild and repair under this Section 16 is limited to restoring the Premises to substantially the condition in which the same existed prior to such Casualty, exclusive of any alterations, additions, Improvements, fixtures, and equipment installed by Tenant. Tenant agrees that promptly after completion of such work by Landlord, Tenant will proceed with reasonable diligence and at Tenant's sole cost and expense to restore, repair, and replace all alterations, additions, Improvements, fixtures and equipment installed by Tenant and all furnishings, inventory, signs, and personal property located at the Premises.

**17.    Condemnation**. If the Premises or any portion thereof is taken under the power of eminent domain or sold by Landlord under the threat of the exercise of said power (all of which is herein referred to as "*condemnation*"), this Lease shall terminate as to the part so taken as of the date the condemning authority takes title or possession, whichever occurs first. If more than twenty-five percent (25%) of the Premises is taken by condemnation, either Landlord or Tenant may terminate this Lease as of the date the condemning authority takes possession by notice in writing of such election within twenty (20) days after Landlord shall have notified Tenant of the taking or, in the absence of such notice, then within twenty (20) days after the condemning authority shall have taken possession. If this Lease is not terminated by either Landlord or Tenant then it shall remain in full force and effect as to the portion of the Premises remaining, provided the monthly Base Rental and Additional Charges shall be reduced based on the re-measurement of the Premises, as the case may be. If this Lease is not terminated, Landlord agrees, at Landlord's sole cost, to restore the Premises as soon as reasonably possible but only to the extent of condemnation proceeds actually

received. All awards for the taking of any part of the Premises or any payment made under the threat of the exercise of eminent domain shall be the property of Landlord, whether made as compensation for diminution of value of the Premises, or for the taking of the fee, or as severance damages; *provided, however*, that Tenant shall be entitled to any award for loss of or damage to Tenant's Personalty to the extent it will not reduce Landlord's award.

18.     **Landlord's Lien and Security Interest**. Landlord shall have a Landlord's statutory lien, and in addition thereto Landlord shall have, and Tenant grants unto Landlord, a security interest in all the Tenant's Personalty and other property of Tenant now or hereafter placed in, upon, or about the Premises that is owned directly and solely by Tenant (i.e. that is not leased by Tenant or owned by a party other than Tenant), as security for all the obligations of Tenant under this Lease. Tenant shall not remove any of said property from the Premises until all Tenant's obligations under this Lease have been satisfied in full. Upon the occurrence of an event of default by Tenant, Landlord may, in addition to any other remedies provided herein, enter upon the Premises and take possession of any and all goods, wares, equipment, fixtures, furniture, Improvements and other personal property of Tenant situated on the Premises, without liability for trespass or conversion, and sell the same at public or private sale, with or without having such property at the sale, after giving Tenant reasonable notice of the time and place of any public sale or of the time after which any private sale is to be made; and at any such sale Landlord or its assigns may purchase unless otherwise prohibited by Law. The proceeds from any such disposition, less all expenses connected with the taking of possession, holding and selling of the property (including reasonable attorney's fees and other expenses), shall be applied as a credit against the indebtedness secured by the security interest granted in this paragraph. Any surplus shall be paid to Tenant or as otherwise required by Law and Tenant shall pay any deficiencies forthwith to Landlord. Upon request by Landlord, Tenant agrees to execute and deliver to Landlord a financing statement in form sufficient to perfect the security interest of Landlord in the aforementioned property. Upon request by Landlord, Tenant shall provide the name and address of any entity that has, or claims to have, an interest (including, without limitation, a security interest) in any property located on the Premises and a description of such property. Failure to provide such list shall result in a presumption that all property located in the Premises belongs to Tenant free from all claims. Without intending to exclude any other manner of giving Tenant any required notice, any requirement of reasonable notice to Tenant of Landlord's intention to dispose of any collateral pursuant to the enforcement of said security interest shall be met if such notice is given in the manner prescribed in this Lease at least five (5) days before the time of any such disposition. Landlord shall have all the rights and remedies of a secured party under Law.

19.     **Abandoned Property**. All Tenant's Personalty remaining in the Premises after the termination or expiration of the Term or after the abandonment of the Premises by Tenant may be treated by Landlord as having been abandoned by Tenant and Landlord may, at its election, thereafter take possession of such property and either (i) declare same to be the property of Landlord, or (ii) at the cost and expense of Tenant, store and/or dispose of such property in any manner and for whatever consideration, Landlord, in its sole discretion, shall deem advisable. Nothing contained herein shall prejudice or impair Landlord's rights as a lienholder and secured party under Section 18 hereof, and the rights granted to Landlord under this paragraph shall be cumulative of its rights as a lienholder and secured party.

20.     **Holding Over**.  If the Premises are not vacated and surrendered in accordance with this Lease, on the date required by this Lease, Tenant shall be liable to Landlord for (a) all losses, costs, liabilities and damages which Landlord incurs by reason thereof, including consequential damages and reasonable attorneys' fees, and Tenant shall indemnify, defend and hold harmless Landlord against all claims made by any succeeding tenants against Landlord or otherwise resulting from the failure of Tenant (and all other occupants) timely to vacate and surrender the Premises in accordance with this Lease, and (b) two hundred percent (200%) of the Base Rental payable under this Lease for the last year of the Term together with all Additional Charges payable hereunder (which Landlord and Tenant presently agree is the Base Rental to

8

which Landlord would be entitled, is presently contemplated by them as being fair and reasonable under such circumstances and is not a penalty). In no event, however, shall this Section be construed as permitting Tenant (and all other occupants) to remain in possession of the Premises after the Expiration Date.

21.    **No Recording.** Tenant agrees that it shall not record this Lease or any memorandum hereof in the public records of Livingston County, Illinois.

22.    **Entire Agreement**. This Lease contains the entire agreement between the parties hereto with respect to the subject matter hereof and supersedes all prior and contemporaneous agreements, understandings, promises, and representations made by either party to the other concerning the subject matter hereof and the terms applicable hereto. This Lease shall not be altered, waived, amended, or extended, except by a written agreement signed by the parties hereto, unless otherwise expressly provided herein.

23.    **Transfer of Landlord's Rights**. Landlord may freely assign its interest hereunder without consent by Tenant. If Landlord transfers its interest in the Premises, Landlord shall automatically be released from any further obligations hereunder, and Tenant agrees to look solely to the successor in interest of Landlord for the performance of such obligations provided such successor assumes all of Landlord's obligations under this Lease in writing.

24.    **Default**.

(i)    The following events shall be deemed to be events of default (herein so called) by Tenant under this Lease:

(a)    The failure by Tenant to make any payment of Rent or any other payment required to be made by Tenant hereunder, as and when due.

(b)    The failure by Tenant to observe or perform any of the covenants, conditions, or provisions of this Lease, other than as described in this Section 24(i) above, where such failure continues for a period of thirty (30) days after written notice thereof from Landlord to Tenant.

(c)    A breach of the representation and warranty made by Tenant in Section 29.

(d)    The failure by Tenant to permit Landlord or its agents or representatives access as and when required pursuant to Section 15.

(e)    The failure by Tenant to obtain or maintain the insurance required to be maintained by Tenant pursuant to Section 31.

(f)    The making by Tenant of any general assignment, or general arrangement for the benefit of creditors; (ii) the filing by or against Tenant of a petition to have Tenant adjudged a bankrupt or a petition for reorganization or arrangement under any law relating to bankruptcy (unless, in the case of a petition filed against Tenant, the same is dismissed within sixty (60) days); (iii) the appointment of a trustee or receiver to take possession of substantially all of Tenant's assets located at the Premises or of Tenant's interest in this Lease, where possession is not restored to Tenant within thirty (30) days; or (iv) the attachment, execution or other judicial seizure of substantially all of Tenant's assets located at the Premises or of Tenant's interest in this Lease, where such seizure if not discharged within thirty (30) days.

9

(ii)     Upon the occurrence of any event of default, Landlord shall have the option to do any one or more of the following without any further notice or demand, in addition to and not in limitation of any other remedy permitted by Law or by this Lease:

(a)     Terminate Tenant's right to possession of the Premises by any lawful means (including, but not limited to, altering locks or other security devices at the Premises), with or without terminating the Lease, and Tenant shall immediately surrender possession of the Premises to Landlord, according to the provisions of this Lease. In the event Landlord terminates the Lease, Landlord shall be entitled to recover from Tenant all damages incurred by Landlord by reason of Tenant's default including, but not limited to, the cost of recovering possession of the Premises; expense of reletting, including necessary renovation and alteration of the Premises, reasonable attorney's fees, and any real estate commission actually paid; all Rent and other indebtedness accrued to the date of such termination, including any late fees, interest, or other sums charged by Landlord pursuant to the Lease; an amount equal to the then present value of the future Rent and all other indebtedness as would otherwise have been required to be paid by Tenant to Landlord during the period following the termination of the Lease measured from the date of such termination to the Expiration Date; and that portion of the leasing commission or construction allowance paid by Landlord applicable to the unexpired Term. In connection with the exercise by Landlord of its rights and remedies hereunder, to the extent (but no further) that Landlord is required by applicable law to mitigate damages, Landlord agrees to mitigate its damages, with Tenant hereby agreeing that Landlord has mitigated its damages if Landlord places the Premises on its inventory of available premises available on the Land, Landlord makes such inventory available to brokers who request same, and Landlord shows the Premises to prospective tenants (or their brokers) who request to see it. Any reletting of the Premises shall be on such terms and conditions as Landlord in its sole discretion may determine (including without limitation a term different than the remaining Term, rental concessions, alterations and repair of the Premises, lease of less than the entire Premises to any tenant and leasing any or all other portions of the Land before reletting the Premises). Landlord shall not be liable for, nor shall Tenant's obligations hereunder be diminished because of, Landlord's failure to relet the Premises or collect rent due in respect of such reletting. Unpaid installments of Rent or other sums shall bear interest at the highest lawful rate per annum from the due date until paid, or at the rate of six percent (6%) over the prime rate of interest published in the Wall Street Journal at the time unpaid Rent (whichever is lower) from the due date until paid. If Landlord exercises its right to alter locks to the Premises, Landlord shall only be required to provide Tenant with a new key during Landlord's regular business hours, provided that in no event shall Landlord be required to provide Tenant a new key until such time as Tenant cures all defaults under the Lease. Landlord shall not be obligated to place a written notice on the Premises on the front door thereof explaining Landlord's action or stating the name, address or telephone number of any individual or company from which a new key may be obtained. Tenant agrees that Tenant shall be presumed to have abandoned the Premises if Tenant informs Landlord in writing or orally that Tenant intends to cease conducting its business in the Premises for a period of more than seven (7) consecutive days.

(b)     Except as otherwise expressly stated in this Lease, the terms and conditions of this paragraph shall apply. Upon the abandonment of the Premises by Tenant, or upon the termination of either this Lease or Tenant's right to possession of the Premises, Landlord may, at its sole election, remove and store, at a location acceptable to Landlord, any property of Tenant that remains on the Premises. The costs of such storage shall be at the expense of Tenant and payable to Landlord upon demand. Tenant specifically authorizes Landlord to deliver any of such property to third parties, at Tenant's sole cost and expense, who make claims against such property or who claim to have a valid security interest in such property superior to the claim of Landlord. Landlord is entitled to rely (without any duty to investigate or corroborate independently such claim) upon any evidence of the rights and claims of such third parties presented to Landlord, which evidence Landlord believes in its sole judgment gives such third parties the right to possess the property, and Tenant releases Landlord and the Landlord Parties from any and all suits, actions, legal or administrative proceedings, demands, claims, liabilities, fees, fines, penalties, losses, damages, expenses

10

or costs, including interest, court costs and attorneys' fees that Tenant may have because of any action or omission (including negligence) by such parties in connection with the return or delivery of such property to third parties. In addition to Landlord's other rights and remedies under this Lease or the law, as may exist from time to time, if Tenant does not physically claim and actually remove any and all Tenant's Personalty left on or in the Premises after Tenant abandons the Premises, or Landlord terminates either the Lease or Tenant's right of possession, and then within fourteen (14) days after the date on which Landlord gives written notice to Tenant at Tenant's last known address as reflected in records of Landlord stating that Landlord has recovered possession of the Premises and intends to dispose of the remaining Tenant's Personalty located therein, after such fourteen (14) day period, Landlord may deem such remaining Tenant's Personalty abandoned and dispose in any way of all or any portion thereof as Landlord deems fit. Nothing contained herein, however, shall be deemed to be construed to be a waiver or subordination of Landlord's statutory or contractual liens hereunder, and Landlord shall not be obligated to return any of Tenant's Personalty remaining in the Premises after abandonment if such property is covered by any of Landlord's liens.

(c)     Maintain Tenant's right to possession, in which case this Lease shall continue in effect whether or not Tenant has abandoned the Premises. In such event, Landlord may enforce all of Landlord's rights and remedies under this Lease, including the right to recover Rent as it becomes due hereunder.

(d)     Pursue any other remedy now or hereafter available to Landlord under the laws or judicial decisions of the State of Illinois.

(e)     Landlord may do whatever Tenant is obligated to do by the provisions of this Lease (and in the event of imminent harm or danger to either person or property, may do so immediately and without waiting for Tenant to perform), and Tenant agrees to reimburse Landlord within ten (10) business days upon demand for any expenses which Landlord may incur in its actions pursuant to this subparagraph, and Landlord shall not be liable for damages resulting to Tenant from such action, except to the extent caused by the gross negligence or willful misconduct of Landlord or otherwise.

(f)     Pursuit of any of the foregoing remedies shall not preclude pursuit of any of the other remedies herein provided or any other remedies provided by Law or equity. Any reletting by Landlord shall be without notice to Tenant, and if Landlord has not terminated this Lease, the reletting may be in the name of Tenant or Landlord, as Landlord shall elect. Any reletting shall be for such term or terms (which may be greater or less than the period which, in the absence of a termination of this Lease, would otherwise constitute the balance of the Term) and on such terms and conditions (which may include free rent, rental concessions or tenant inducements of any nature) as Landlord in its absolute discretion may determine, and Landlord may collect and receive any rents payable by reason of such reletting. In the event of any reletting, Tenant shall pay to Landlord on demand the cost of renovating, repairing and altering the Premises for a new tenant or tenants, and the cost of advertisements, brokerage fees, reasonable attorney's fees and other costs and expenses incurred by Landlord in connection with such reletting. If any Rent actually collected by Landlord upon any such reletting for any calendar month are in excess of the amount of Rent payable by Tenant under this Lease for the same calendar month, the amount of such excess shall belong solely to Landlord and Tenant shall have no right with respect thereto. If it is necessary for Landlord to institute suit against Tenant to collect the Rent due hereunder or any deficiency between the Rent payable by Tenant under this Lease for a calendar month and the Rent actually collected by Landlord for such calendar month, Landlord shall have the right to allow such deficiency to accumulate and to bring an action upon several or all of such rental deficiencies at one time. No suit shall prejudice in any way the right of Landlord to bring a similar action for any subsequent rental deficiency or deficiencies.

11

(g)     In the event of any default by Landlord, Tenant will give Landlord written notice specifying such default with particularity, and Landlord shall thereupon have thirty (30) days (or such longer period as may be required in the exercise of due diligence) in which to cure any such default. Unless and until Landlord fails to so cure any default after such notice, Tenant shall not have any remedy or cause of action by reason thereof. If Landlord fails to timely cure its default, Tenant may, as its sole and exclusive remedy, bring an action against Landlord to collect the actual (but not any punitive or consequential) damages suffered by Tenant as a result of such default. In no event shall Tenant have the right to terminate this Lease due to Landlord's default.

25.     **Waiver; Attorney's Fees**. No act or thing done by Landlord or its agents during the Term shall be deemed an acceptance of an attempted surrender of the Premises, and no agreement to accept a surrender of the Premises shall be valid unless made in writing and signed by Landlord. No reentry or taking possession of the Premises by Landlord shall be construed as an election on its part to terminate this Lease, unless a written notice of such intention, signed by Landlord, is given by Landlord to Tenant. Landlord's acceptance of Rent following an event of default hereunder shall not be construed as Landlord's waiver of such event of default. No waiver by either party of any violation or breach of any of the terms, provisions and covenants herein contained shall be deemed or construed to constitute a waiver of any other violation or breach of any of the terms, provisions and covenants herein contained. Forbearance by either party to enforce one or more of the remedies herein provided upon an event of default shall not be deemed or construed to constitute a waiver of any other violation or default. The failure of Landlord to enforce any of the Rules and Regulations described in this Lease against Tenant or any other tenant of the Land shall not be deemed a waiver of any such Rules and Regulations. No provision of this Lease shall be deemed to have been waived by either party unless such waiver is in writing and is signed by that party. The rights granted to Landlord in this Lease shall be cumulative of every other right or remedy which Landlord may otherwise have at law or in equity. The exercise of one or more rights or remedies by Landlord shall not prejudice or impair the concurrent or subsequent exercise of other rights or remedies by Landlord. If either party brings any action under this Lease or consults or places this Lease or any amount payable by the other party hereunder with an attorney for the enforcement of any of a party's rights hereunder, then the other party agrees to pay on demand from the party the reasonable attorney's fees and other costs and expenses incurred by party in connection therewith.

26.     **Quiet Possession**. Landlord covenants that Tenant, provided Tenant is not in default hereunder, shall and may peacefully and quietly have, hold, and enjoy the Premises without any disturbance from Landlord subject to the terms of this Lease and all matters filed of record.

27.     **Severability**. If any clause or provision of this Lease is illegal, invalid or unenforceable under present or future Laws effective during the Term, the remainder of this Lease shall not be affected thereby, and in lieu of each clause or provision that is illegal, invalid or unenforceable, there be added a clause or provision as similar in terms to such illegal, invalid or unenforceable clause or provision as may be possible and be legal, valid and enforceable.

28.     **Security Deposit**. The Security Deposit shall be held by Landlord without liability for interest and as security for the performance by Tenant of Tenant's covenants and obligations under this Lease, it being expressly understood that the Security Deposit shall not be considered an advance payment of Rent or a measure of Landlord's damages in case of default by Tenant upon the occurrence of any event of default by Tenant or upon termination of this Lease. Landlord may commingle the Security Deposit with other funds. Landlord may, from time to time, without prejudice to any other remedy, use the Security Deposit to the extent necessary to make good any arrearages of Rent or to satisfy any other covenant or obligation of Tenant hereunder. Following any such application of the Security Deposit, Tenant shall pay to Landlord on demand the amount so applied to restore the Security Deposit to its original amount. If Tenant is not in default at the termination of this Lease, the balance of the Security Deposit remaining after any such

12

application shall be returned by Landlord to Tenant within 60 days following the expiration of the Term. If Landlord transfers its interest in the Premises during the Term, Landlord may assign the Security Deposit to the transferee and thereafter shall have no further liability for the return of, or any other matter relating to, such Security Deposit.

29.     **Representations**.

a.      *Standing; Authority.* The parties represent and warrant to one another that each is and will remain during the Term a duly formed and existing entity qualified to do business in Illinois, that each party has full right and authority to execute and deliver this Lease, and that each person signing on behalf of each party is authorized to do so.

b.      *OFAC.* Neither party nor, to that party's actual knowledge, any of its respective partners, members, shareholders, owners, employees, officers, directors, representatives, or agents is or will become a person or entity with whom U.S. persons or entities are restricted from doing business under regulations of the Office of Foreign Assets Control of the Department of the Treasury (including those named on the OFAC's Specially Designated Nationals and Blocked Persons List) or under any statute, executive order (including Executive Order 13224, Blocking Property and Prohibiting Transactions with Persons Who Commit, Threaten to Commit, or Support Terrorism, effective September 24, 2001), or other governmental action.

30.     **No Subrogation; Waiver of Property Claims**. Landlord and Tenant each waives any claim it might have against the other for any damage to or theft, destruction, loss, or loss of use of any property, whether purchased or not, to the extent the same is insured against under any insurance policy described herein that covers the Land, the Premises, Landlord's or Tenant's fixtures, personal property, any Improvements, or business, or is required to be insured against under the terms hereof, regardless of whether the negligence of the other party caused such Loss (defined below).  Additionally, Tenant waives any claim it may have against Landlord for any Loss to the extent such Loss is caused by a terrorist act, whether certified by the U.S. Government or non-certified.  Each party shall cause its insurance carrier to endorse all applicable policies waiving the carrier's rights of recovery under subrogation or otherwise against the other party to the extent such waiver is not already included in such party's policies.  Notwithstanding any provision in this Lease to the contrary, Landlord, its agents, employees and contractors shall not be liable to Tenant or to any party claiming by, through or under Tenant for (and Tenant hereby releases Landlord and its servants, agents, contractors, employees and invitees from any claim or responsibility for) any damage to or destruction, loss, or loss of use, or theft of any property of Tenant, its affiliates, or their respective employees, agents, contractors, or invitees (each, a "***Tenant Party***"; collectively, "***Tenant Parties***") located in or about the Land or any related complex, caused by casualty, theft, fire, third parties or any other matter or cause, regardless of whether the negligence of any party caused such loss in whole or in part.  Tenant acknowledges that Landlord shall not carry insurance on, and shall not be responsible for damage to, any property of any Tenant Party located in or about the Land or any related complex.  Notwithstanding anything to the contrary in this Lease, Landlord shall not be liable to Tenant, and Tenant hereby waives and releases all claims against Landlord and its representatives and agents, for any damages arising from any act, omission or neglect of any other tenant in the Land or any related complex and in no event shall Landlord or its representatives and agents be liable for any injury or interruption to Tenant's business or any loss of income under any circumstances.

31.     **Insurance**. As used in this Section 31, the term "***insuring party***" shall mean the party who has the obligation to obtain the insurance required hereunder. Tenant shall, as part of the Additional Charges for the Premises, pay the cost of all insurance required hereunder in accordance with Section 5.

13

(i)      **Tenant's Insurance**. Effective as of the earlier of (a) the date Tenant enters or occupies the Premises, or (b) the Commencement Date, and continuing throughout the Term, Tenant shall maintain the following insurance policies:

(a)      commercial general liability insurance (including property damage, bodily injury and personal injury coverage) in amounts of $1,000,000 per occurrence and $2,000,000 in the annual aggregate on a per location basis in primary coverage, with an additional $5,000,000 per occurrence and $5,000,000 in the annual aggregate on a per location basis in umbrella/excess liability coverage or, following the expiration of the initial Term, such other amounts as Landlord may from time to time reasonably require, insuring Tenant (and naming the Landlord Insured Parties as additional insureds), against liability for injury to or death of a person or persons or damage to property arising from the use and occupancy of the Premises, operations, independent contractors, products-completed operations, personal injury, advertising injury, liability under assumed contracts, and without implying any consent by Landlord to the installation thereof, the installation, operation, maintenance, repair or removal of Tenant's fixtures and other equipment (and if the use and occupancy of the Premises include any activity or matter that is or may be excluded from coverage under a commercial general liability policy [e.g., the sale, service, distribution or consumption of alcoholic beverages], Tenant shall obtain such endorsements to the commercial general liability policy or otherwise obtain insurance to insure all liability arising from such activity or matter [including liquor liability, if applicable] in such amounts as Landlord may reasonably require);

(b)      cause of loss-special risk form (formerly "all-risk") or its equivalent insurance (including sprinkler leakage, theft, boiler and machinery, ordinance and law, sewer back-up, pipe burst, wind driven rain, water leakage, flood, earthquake, windstorm and collapse coverage) covering the full value of all Improvements in the Premises, naming Landlord and any Landlord's Mortgagee as additional loss payees as their interests may appear;

(c)      cause of loss-special risk form (formerly "all-risk") or its equivalent insurance covering the full value of all furniture, trade fixtures, equipment and personal property (including property of Tenant or others) in the Premises or on behalf of a Tenant Party;

(d)      builder's risk or property insurance during the course of construction with an installation floater where applicable;

(e)      commercial auto liability insurance (if applicable) covering automobiles owned, non-owned, hired or used by Tenant in carrying on its business with limits not less than $1,000,000 combined single limit for each accident, insuring Tenant (and naming the Landlord Insured Parties as additional insureds);

(f)      worker's compensation insurance of $1,000,000 (or such larger amount as required by applicable state law), including provisions for voluntary benefits as required in labor agreements, and employer's liability insurance with limits of not less than $1,000,000 each accident, $1,000,000 disease policy limit, and $1,000,000 disease each employee;

(g)      business interruption and extra expense insurance in an amount typically carried by prudent tenants engaged in similar operations, but in no event in an amount less than the annual Basic Rent then in effect;

(h)      environmental impairment liability insurance insuring Tenant (and naming the Landlord Insured Parties as additional insureds) against all liability for environmental damage, including third party property damage and bodily injury liability, as well as the cost of investigation and remediation

14

(and insuring pollution hazards from cargo), arising from the use and occupancy of the Premises and (without implying any consent by Landlord to the installation thereof) the installation, operation, maintenance, repair or removal of Tenant's fixtures and equipment), with limits of not less than $2,000,000 per claim and $2,000,000 in the aggregate.

(i)     Whenever Tenant shall undertake any alterations, additions, improvement or other work in, to, or about the Premises as permitted under Lease, Tenant's insurance must extend to and include coverage for injuries to persons and damage to property arising in connection with such work, including without limitation liability under any applicable structural work act, and such other insurance as Landlord shall reasonably require. In addition to Tenant's insurance, all contractors hired by or through Tenant, who enter the Premises, are to have insurance meeting the requirements set forth herein, all issued by acceptable underwriters and otherwise meeting the requirements of this Section 31. Tenant shall provide Landlord with certificates of insurance in a form reasonably acceptable to Landlord for each such contractor prior to such contractor entering the Premises.

(ii)    **Landlord's Insurance.** Throughout the Term of this Lease, Landlord shall maintain, as a minimum, the following insurance policies: (a) property insurance for the building's replacement value (excluding property required to be insured by Tenant), less a commercially reasonable deductible if Landlord so chooses, and (b) commercial general liability insurance in an amount as Landlord deems appropriate.  Landlord may, but is not obligated to, maintain such other insurance and additional coverages as it may deem necessary.  The cost of all insurance carried by Landlord with respect to the Land, together with any deductible amounts payable thereunder, shall be included in Additional Charges.  The foregoing insurance policies and any other insurance carried by Landlord shall be for the sole benefit of Landlord and under Landlord's sole control, and Tenant shall have no right or claim to any proceeds thereof or any other rights thereunder.  Tenant acknowledges that Landlord shall not carry insurance on, and shall not be responsible for, damage to, protecting from further loss or damage to, or repairs to Tenant's personal property, which includes furniture, furnishings, fixtures or equipment, or any Improvements in the Premises, including any tenant finish work or any other Improvements, by whomsoever constructed.  Any insurance required to be maintained by Landlord may be taken out under a blanket insurance policy or policies covering other buildings, property or insureds in addition to any Improvements and Landlord.  In such event, the costs of any such blanket insurance policy or policies shall be reasonably allocated to the Land and the other properties covered by such policy or policies as reasonably determined by Landlord and included as part of Additional Charges.

(iii)   **Other Insurance.**  Tenant shall cause all Tenant Parties to procure and maintain insurance coverage (and naming the Landlord Insured Parties as additional insureds) against such risks, in such amounts, and with such companies as Landlord may reasonably require, including reasonable insurance similar to insurance Tenant is obligated to maintain pursuant to this Section 31, taking into consideration the nature of the work or access by such party.

(iv)   **Landlord Insured Parties.**  As used herein, "***Landlord Insured Parties***" shall mean Landlord, Landlord's property management company, as each of the foregoing may be changed by Landlord from time-to-time, and their associated, affiliated, and subsidiary companies, owners, directors, officers, managing agents, and fiduciaries, as they exist, and Landlord's Mortgagee (and Landlord shall have the right, from time to time, to require any of the foregoing to be specifically listed as an additional insured upon notice to Tenant), and any other party that Landlord may reasonably designate in writing from time to time.  The additional insureds will be entitled to the limits stated in this Lease, or the full limits of the insurance policies maintained by Tenant, whichever are greater.  Tenant's insurance shall be primary and non-contributory when any policy issued to Landlord provides duplicate or similar coverage, and in such circumstance Landlord's policy will be excess over Tenant's policy.  Tenant shall furnish to Landlord certificates of such insurance and such other evidence satisfactory to Landlord of the maintenance of all

15

insurance coverages required hereunder at least two business days prior to the earlier of the Commencement Date or the date Tenant enters or occupies the Premises (in any event, within ten days of the effective date of coverage), and at least two business days prior to each renewal of said insurance, and Tenant shall ensure that each of its policies requires the insurance company to notify Landlord at least two business days before cancellation or material change of such policy, or if that is not possible, Tenant shall so notify Landlord in writing at least five days before such cancellation or material change.  All such insurance policies shall be in form reasonably satisfactory to Landlord and issued by companies with an A.M. Best rating of A:VIII or better.  However, no review or approval of any insurance certificate or policy by Landlord shall derogate from or diminish Landlord's rights or Tenant's obligations hereunder.  If Tenant fails to comply with the foregoing insurance requirements or to deliver to Landlord the certificates or evidence of coverage required herein, Landlord, in addition to any other remedy available pursuant to this Lease or otherwise, may, but shall not be obligated to, after two business days' prior written notice to Tenant, obtain such insurance and Tenant shall pay to Landlord on demand the premium costs thereof, plus an administrative fee of 15% of such cost.

**32.**     **Binding Effect**. The provisions of this Lease shall be binding upon and inure to the benefit of Landlord and Tenant, respectively, and to their respective heirs, personal representatives, successors.

**33.**     **Notices**. Any notice, consent, request, demand, or other communication required or permitted to be given under this Lease must be in writing and shall be deemed sufficiently given, delivered, and made when (i) delivered in person, (ii) sent by private courier or national overnight delivery service with proof of delivery and courier fees paid by sender, or (iii) sent by e-mail at the address specified for such party in Section 1.

**34.**     **Subordination**. This Lease and all rights of Tenant hereunder are subject and subordinate to any ground lease, deed of trust, mortgage or other instrument of security which does now or may hereafter cover the Land or any interest of Landlord therein, and to all advances made on the security thereof, and to all increases, renewals, modifications, consolidations, replacements and extensions of any of such deed of trust, mortgage or instrument of security. This Section is self-operative and no further instrument of subordination is required. Notwithstanding the foregoing, Tenant shall, within five (5) business days following the receipt of written request by Landlord, a ground lessee, or by the holder of any deed of trust or mortgage covering the Land or any interest of Landlord therein, execute, acknowledge, and deliver to Landlord all instruments and certificates that, in the judgment of Landlord, may be necessary or proper to confirm or evidence such subordination. Notwithstanding the generality of the foregoing provisions, Tenant agrees that any such ground lessee or mortgagee shall have the right at any time to subordinate any such ground lease, deed of trust, mortgage or other instrument of security to this Lease on such terms and subject to such conditions as such ground lessee or mortgagee may deem appropriate in its discretion. Tenant further covenants and agrees upon demand by Landlord's mortgagee at any time, before or after the institution of any proceedings for the foreclosure of any such deed of trust, mortgage or other instrument of security, or sale of the Land pursuant to any such deed of trust, mortgage or other instrument of security or voluntary sale, to attorn to the purchaser upon any such sale and to recognize and attorn to such purchaser as Landlord under this Lease, which agreement shall survive any such foreclosure sale or trustee's sale. Tenant agrees to execute, acknowledge, and deliver to a ground lessee or Landlord's mortgagee all instruments and certificates that Landlord's mortgagee may request to confirm or evidence such attornment.

**35.**     **Joint and Several Liability**. If there is more than one Tenant named in this Lease (or in any future amendment hereto or due to an assignment hereof), the obligations hereunder imposed upon Tenant shall be joint and several.

**36.**     **Certain Rights Reserved to Landlord**. This Lease does not grant any rights to light or air over or about the Land. Landlord excepts and reserves exclusively to itself the use of the areas within the Premises

16

used for the installation of utility lines and other installations serving occupants of the Land and any other areas of the Premises which Landlord must access in order to fulfill its obligations under the Lease as determined by Landlord in its commercially reasonable discretion. Landlord also has the right to make other physical changes to the Premises as Landlord deems appropriate, provided the changes do not unreasonably and materially affect Tenant's ability to use the Premises for the Sole Permitted Use. Landlord shall also have the right, but not the obligation, to temporarily close the Land, or any portion thereof, if Landlord reasonably determines that there is an imminent danger of significant damage to the Land or of bodily injury to Landlord's employees or the occupants of the Land only for as long as the danger persists in the reasonable discretion of Landlord. Any exercise of such rights will not entitle Tenant to any abatement or reduction of Rent.

37. **Estoppel Certificates.** Tenant agrees to furnish from time to time, within five (5) business days following the receipt of written request by Landlord, a ground lessee, or by the holder of any deed of trust or mortgage covering the Land or any interest of Landlord therein, an estoppel certificate signed by Tenant confirming and containing factual certifications and representations as to this Lease as Landlord, such ground lessee, or such holder may reasonably request.

38. **Mechanic's Liens**. Neither party will encumber the other party's respective interest in and to or any part of the Land except that Landlord may encumber its interest in the Land to any lender of Landlord subject to the provisions of Section 34. If, in connection with any act or omission of Tenant or Tenant's employees, agents or contractors, a mechanic's lien, financing statement or other lien or violation is filed against Landlord, or any part of the Land or the Premises, Tenant shall, at Tenant's expense, have it removed by bonding or otherwise within thirty (30) days after Tenant receives notice of the filing.

39. **Taxes and Tenant's Personalty**. Tenant shall be liable for all taxes levied or assessed against the Tenant's Personalty.

40. **Landlord's Liability**. The liability of Landlord to Tenant for any default by Landlord under the terms of this Lease shall be limited to Tenant's actual direct and recoverable only from the interest of Landlord in the Land, and none of the Landlord Protected Parties shall be personally liable for any deficiency. IN NO EVENT SHALL LANDLORD BE LIABLE TO THE TENANT FOR INDIRECT, SPECIAL, PUNITIVE, OR CONSEQUENTIAL DAMAGES, EVEN IF ADVISED OF SUCH LIABILITY. Tenant acknowledges and understands that it has waived any right to claim consequential or punitive damages.

41. **Counterparts.** This Lease may be executed in multiple counterparts, and facsimile/electronic copies and signatures shall be accepted as originals.

42. **No Waiver**. No delay on the part of either party in exercising any right under the Lease will operate as a waiver of such right or any other right of the party under the Lease, nor will any delay, omission or waiver on any occasion be deemed a bar to or a waiver of the same or any other right on any other future occasion.

43. **No Third-Party Beneficiary**. This Lease is for the sole benefit of Landlord, its successors and assigns, and Tenant, its permitted successors, and assigns, and it is not for the benefit of any third party.

44. **Number and Gender.** Words of any gender used in this Lease shall be held and construed to include any other gender, and words in the singular number shall be held to include the plural, unless the context otherwise requires.

45. **Force Majeure.** Whenever a period of time is prescribed for the taking of an action by Landlord or Tenant, the period of time for the performance of such action shall be extended by the number of days

17

that the performance is actually delayed or made impracticable due to labor strikes, acts of God, severe weather conditions (including but not limited to rainstorms, windstorms, and flooding), shortages of labor or materials, war, terrorist attacks (including bio-chemical attacks), civil disturbances, acts of the public enemy, governmental embargo restrictions, epidemics, pandemics, and other causes beyond the reasonable control of the performing party, including, but not limited to, actions or inactions on the part of local, state or federal governmental authorities. Notwithstanding anything to the contrary, the above-described events shall not extend any period of time for the payment of Rent or other sums payable by Tenant, nor shall it be used to vitiate Tenant's obligation to maintain insurance hereunder or perform its indemnity, defense, and hold harmless obligations hereunder.

46.    **Landlord's Fees; Determination of Fees.** Whenever Tenant requests Landlord to take any action or give any consent required or permitted under this Lease, Tenant will reimburse Landlord for Landlord's reasonable costs incurred in reviewing the proposed action or consent, including without limitation reasonable attorneys', engineers' or architects' fees, within 10 days after Landlord's delivery to Tenant of a statement of such costs, without regard to whether Landlord consents to any such proposed action. Each provision of this Lease determining charges and amounts payable by Tenant is commercially reasonable and constitutes a statement of the amount of the charge or a method by which the charge is to be computed.

47.    **APPLICABLE LAW; CONSENT TO JURISDICTION**. THIS LEASE SHALL BE GOVERNED BY AND CONSTRUED IN ACCORDANCE WITH THE LAWS OF THE STATE OF ILLINOIS AND THE LAWS OF THE UNITED STATES APPLICABLE TO TRANSACTIONS IN THE STATE OF ILLINOIS. THE PARTIES IRREVOCABLY AGREE THAT ANY LEGAL ACTION OR PROCEEDING AGAINST IT WITH RESPECT TO THIS LEASE MAY BE MAINTAINED IN THE COURTS OF LIVINGSTON COUNTY, ILLINOIS, AND EACH PARTY CONSENTS TO THE JURISDICTION AND VENUE OF SUCH COURTS.

48.    **WAIVER OF JURY TRIAL AND CONSUMER RIGHTS.** TO THE MAXIMUM EXTENT PERMITTED BY LAW, LANDLORD AND TENANT EACH WAIVE RIGHT TO TRIAL BY JURY IN ANY LITIGATION ARISING OUT OF OR WITH RESPECT TO THIS LEASE. AFTER CONSULTATION WITH AN ATTORNEY OF TENANT'S OWN SELECTION, TENANT VOLUNTARILY ADOPTS THIS WAIVER.

49.    **Hazardous and Toxic Materials.** Tenant and Tenant's employees, agents, contractors, and invitees shall not incorporate into, or use or otherwise place, dispose of, or release anywhere on, beneath or from the Premises, any hazardous or toxic materials, which include asbestos containing materials, hydrocarbons, petroleum, gasoline, and/or crude oil or any products, byproducts or fractions thereof, and all other materials, substances, wastes and chemicals classified as hazardous or toxic substances, materials, wastes or chemicals or otherwise regulated under then-current applicable Laws (collectively, the "**Hazardous Materials**"). If Tenant, its employees, agents, or contractors, or any third-party violates the provisions of this paragraph or otherwise contaminate the Premises with any Hazardous Materials, then Tenant shall, at its sole cost and expense, immediately clean up, remove and dispose of the Hazardous Materials, or remove or remediate the contamination in compliance with all applicable Laws and then prevalent industry practice and standards and shall repair any damage to the Premises. Landlord shall have the right, but not the obligation, to clean up, remove and dispose of the Hazardous Materials or remove or remediate the contamination in accordance with this Section 49 and to repair the damage to the Premises without waiting for Tenant's failure to comply with this Section 49 to ripen into a default pursuant to Section 24(i) hereof.

50.    **Landlord's Consent.** Notwithstanding anything to the contrary contained herein, in any action by Tenant asserting that Landlord has unreasonably withheld its consent where Landlord is required by this

18

Lease to be reasonable, Tenant's sole and exclusive remedy shall be for declaratory or injunctive relief, and Tenant hereby express waives all claims for monetary damages, or to modify or terminate this Lease.

**51.    Security Services.** Tenant acknowledges and agrees that Landlord is not obligated to provide any security services with respect to the Premises or the Land, and that Landlord shall not be liable to Tenant for, and Tenant waives any claim against Landlord with respect to, (x) any loss by theft or any other damage suffered or incurred by Tenant in connection with any unauthorized entry into the Premises or the Land or any other breach of security with respect to the Premises or the Land, or (y) any loss by theft or any other damage suffered or incurred by Tenant as a result of any deficiency or malfunction in the construction or installation of the Premises' and/or Land's fencing, automatic gates and/or lights. For avoidance of doubt, Landlord shall not be required to make or maintain any of the improvements or provide any of the services described above in this Section 51.

**52.    No Solicitation.** Tenant agrees not to use the Premises for the solicitation of employees or labor from other tenants leasing a portion of the Land.

**53.    Broker.**  Landlord and Tenant each represent that they have not dealt with any broker in connection with this Lease. Landlord and Tenant shall indemnify, defend and hold each other harmless from and against any claims for any brokerage commissions or other compensation which are made by any broker alleging to have dealt with Landlord or Tenant in connection with this lease, and all costs, expenses, liabilities and damages in connection therewith, including reasonable attorneys' fees.

**54.    Confidentiality.** Tenant acknowledges that the terms and conditions of this Lease are to remain confidential for Landlord's benefit, and may not be disclosed by Tenant to anyone, by any manner or means, directly or indirectly, without Landlord's prior written consent. The consent by Landlord to any disclosures shall not be deemed to be a waiver on the part of Landlord of any prohibition against any future disclosure. Tenant agrees that any press releases regarding Tenant's intended occupancy and/or actual occupancy of the Land must be mutually satisfactory to both Landlord and Tenant prior to the publication of such press release.

**55.    Option to Purchase.**

   a.  Term of Option.  At any time during the first six (6) Lease Months of the Term (the "**Option Term**"), provided Tenant is not in default under any provision of this Lease, Tenant or its assignee pursuant to Section 55(d)(f) only (the "**Buyer**"), shall have the option to purchase the Land and the Premises (the "**Option to Purchase**") pursuant to the terms of this Section 55.  If an Event of Default occurs during the Option Term or thereafter, regardless of whether the Option to Purchase has been exercised, and Landlord elects to terminate the Lease, the Option to Purchase shall terminate contemporaneously with the Lease, and the parties to the Lease and the Option to Purchase, including any assignees thereto pursuant to Section 55(d)(f) will have no further rights or obligations under the Lease or the Option to Purchase except those rights and obligations which expressly survive such termination under this Lease.  Upon written request of the Buyer, Landlord may elect to extend the Option Term for an additional six (6) months in its sole discretion, and such extension shall be effected by delivering written notice of the same to Buyer.

   b.  Exercise of Option.  Buyer shall have the right to exercise the Option to Purchase by delivering to Landlord written notice (the "**Option Notice**") during the Option Term, unless sooner terminated.  Upon Landlord's receipt of the Option Notice, the parties will make diligent efforts to close the conveyance of the Premises (the "**Closing**") within sixty (60) days after delivery of the Option Notice. During such time, Buyer may obtain a survey and a Phase I environmental

19

assessment. Any additional diligence activities beyond those associated The date on which the Closing occurs shall be the "**Closing Date**." If Buyer exercises the Option to Purchase but fails to complete the purchase of the Land and Premises on the Closing Date, Landlord shall have the right to pursue any and all rights and remedies available at law, including the right to seek specific performance of the Option to Purchase.

c. <u>Purchase Price and Option Fee</u>. The purchase price for the Land and Premises shall be the fair market value of the same (the "**Purchase Price**"), which shall be determined by appraisal sourced by Landlord (the "**Appraisal**"), using an appraiser reasonably satisfactory to both parties, to be conducted promptly after the Option Notice is received by Landlord. If Buyer is dissatisfied with the Appraisal, Buyer shall obtain an additional appraisal to be presented to Landlord. After doing the same, if the parties cannot agree on the fair market value of the Land the Premises, a third appraisal shall be sourced and the parties shall agree, at such time, that the Purchase Price shall be either (i) the appraisal value provided by the first two appraisers which the third appraiser thinks is most accurate; or (ii) the average of the appraisal value provided by the third appraiser and the appraisal value of the first two appraisals which is closest to third appraisal.

d. <u>Purchase Price Credit</u>. If the Option to Purchase is exercised during the first six (6) months of the Term, and Closing occurs, Buyer shall receive a credit toward the Purchase Price in the amount equal to $11,000 for each Lease Month which has lapsed as of the Closing Date.

e. <u>Closing Deliverables</u>.

   i. At Closing, Landlord shall deliver the following to Buyer:

      1. A duly executed special warranty deed (the "**Deed**"), including appropriate language confirming that the Land and Premises are being sold AS-IS/WHERE-IS and without any express or implied warranties as to the condition of the same;

      2. A certificate of Landlord's non-foreign status made and executed with Section 1445 of the Internal Revenue Code (the "**FIRPTA Certificate**"); and

      3. such other documents, certificates and other instruments as would be usual in respect of the transaction contemplated by this Agreement, or otherwise in the reasonable opinion of counsel, are reasonably necessary for the proper consummation of this transaction to validly complete the sale and transfer to Buyer of all of the right, title and interest of Landlord in and to the Premises.

   ii. At Closing, Buyer shall deliver the Purchase Price, and any documents, certificates and other instruments as would be usual in respect of the transaction contemplated by this Agreement, or otherwise in the reasonable opinion of counsel, are reasonably necessary for the proper consummation of this transaction to validly complete the sale and transfer to Buyer of all of the right, title and interest of Landlord in and to the Premises.

   iii. After Closing, Buyer shall be responsible for recording the Deed with the County Clerk for Livingston County, Illinois, as well as the payment of all costs or fees

associated therewith (including, but not limited to, the recording fees and the payment of any state or municipal real property transfer taxes associated with the conveyance of the Premises to buyer).

f.  <u>Assignment of Option</u>.  Tenant shall have the right to assign its rights solely regarding the Option to Purchase under this Section 55 to any party without the consent of Landlord; provided, however, that Tenant shall enter into an assignment and assumption agreement whereby its assignee shall assume Tenant's obligations under this Section 55 and shall provide Landlord with a copy of the same.  Notwithstanding anything to the contrary in this Section, Tenant's right to assign this Lease, or any of its rights under this Lease (other than the Option to Purchase), shall be governed solely by Section 9 of this Lease.

g.  <u>Assignment and Assumption of Lease</u>.  If Tenant shall assign its rights in the Option to Purchase pursuant to Section 55(f) above, and Tenant and its assignee agree that this Lease shall survive Closing; Tenant and its assignee shall provide, as an additional Closing Deliverable, an assignment and assumption agreement pertaining to the Lease, in a form acceptable to Landlord, by which Tenant's assignee, as Buyer, assumes all of Landlord's rights, duties and obligations under this Lease and pursuant to which both Tenant and Buyer release. Landlord from all further rights and obligations pursuant to the same.

h.  <u>1031 Exchange</u>.  Both Landlord and Buyer may desire to exchange title in the Premises for other property of like kind within the meaning of Section 1031 of the Internal Revenue Code of 1986, as amended, and the Treasury Regulations promulgated thereunder (the "Exchange"). Landlord and Buyer shall have the right to assign their respective rights, but not their obligations hereunder, to a qualified intermediary as provided in Treas. Reg. Section 1.1031(k)-1(g)(4), on or before the Closing.  Each party agrees to indemnify the other against any liability, claim or cost whatsoever related to an Exchange made by such party.

**56.    Lender Agreements; Lender Access**.   Landlord and Tenant hereby acknowledge that in connection with Tenant's business and use of the Premises, Tenant has obtained loans from one or more lenders, which loans are secured by equipment and other matters which are located on the Premises, and Landlord has entered into separate agreements with said lenders granting the lenders the right to enter and/or take temporary possession of the Premises. Tenant hereby agrees that Landlord shall have the right to grant access to the Premises to any lender with which Landlord has a separate access agreement or waiver, and Landlord shall incur no liability whatsoever to Tenant for any loss or damage caused to or incurred by Tenant by reason of Landlord granting such access.

[*Signature Page Follows*]

21

**IN WITNESS WHEREOF**, Landlord and Tenant have executed this Lease on the Lease Execution Date.

**LANDLORD:**

Signed by:

*Gerald L. Hoffman*

5BCCBDDEC68E499...

**GERALD HOFFMAN**

**GERALD L. HOFFMAN LIVING TRUST dated March 16, 2010**

Signed by:

By: _____ *Gerald L. Hoffman* _____

5BCCBDDEC68E499...

Name: Gerald Hoffman

Title: Trustee

**TENANT:**

**TECHMETALS, LLC**, an Illinois limited liability company

By: _____

Name: _____

Title: _____

**IN WITNESS WHEREOF**, Landlord and Tenant have executed this Lease on the Lease Execution Date.

**LANDLORD:**

_____

**GERALD HOFFMAN**


**GERALD L. HOFFMAN LIVING TRUST dated March 16, 2010**


By:_____

Name: Gerald Hoffman

Title: Trustee




**TENANT:**




**TECHMETALS, LLC**, an Illinois limited liability company

By: _____
         C1ACE99F8B7D429...

Name: _____Jason Azevedo_____

Title: __Manager_____

**Exhibit H**

**Guarantee**

(See attached.)

## GUARANTY AND SURETYSHIP AGREEMENT

This GUARANTY AND SURETYSHIP AGREEMENT (this "**Guaranty**"), dated as of February 20, 2025, is made by Manufacturing Revitalization Corporation of America L.P. I, a Delaware limited partnership ("**Guarantor**"), in favor and for the benefit of Technical Metals Inc., an Illinois corporation ("**TMI**"), and Hoffman Tool, Inc., an Illinois corporation ("**Hoffman**") (collectively with TMI, "**Beneficiary**").

Reference is made to: (i) that certain Asset Purchase Agreement dated as of February 20, 2025, by and among TechMetals, LLC, an Illinois limited liability company ("**Obligor**"), Beneficiary, and Guarantor (the "**APA**"); and (ii) that certain related Promissory Note also dated as of February 20, 2025, by and between Obligor and Beneficiary (the "**Note**") (collectively with the APA, the "**Underlying Agreement**"). In consideration of the substantial direct and indirect benefits derived by Guarantor from the transactions under the Underlying Agreement, and in order to induce Beneficiary to provide financing as outlined in the Underlying Agreement, Guarantor, the parent company of Obligor, for good and valuable consideration, receipt of which is hereby acknowledged, and intending to be legally bound hereby, agrees as follows:

1. <u>Guaranty</u>. Guarantor absolutely, unconditionally and irrevocably guarantees, as primary obligor and not merely as surety, the full and punctual payment and performance of all present and future obligations, liabilities, covenants and agreements required to be observed and performed or paid or reimbursed by Obligor under or relating to the Underlying Agreement, plus all costs, expenses and fees (including the reasonable fees and expenses of Beneficiary's counsel) in any way relating to the enforcement or protection of Beneficiary's rights hereunder (collectively, the "**Obligations**").

2. <u>Guaranty Absolute and Unconditional</u>. Guarantor agrees that its Obligations under this Guaranty are irrevocable, continuing, absolute, and unconditional, and shall not be discharged or impaired or otherwise affected by, and Guarantor hereby irrevocably waives any defenses to enforcement it may have (now or in the future) by reason of:

(a) Any illegality, invalidity or unenforceability of any Obligation or the Underlying Agreement or any related agreement or instrument, or any law, regulation, decree, or order of any jurisdiction or any other event affecting any term of the Obligations.

(b) Any change in the time, place or manner of payment or performance of, or in any other term of the Obligations, or any rescission, waiver, release, assignment, amendment, or other modification of the Underlying Agreement.

(c) Any taking, exchange, substitution, release, impairment, amendment, waiver, modification, or non-perfection of any collateral or any other guaranty for the Obligations, or any manner of sale, disposition, or application of proceeds of any collateral or other assets to all or part of the Obligations.

(d) Any default, failure, or delay, willful or otherwise, in the performance of the Obligations.

(e)     Any change, restructuring, or termination of the corporate structure, ownership, or existence of Guarantor or Obligor or any insolvency, bankruptcy, reorganization, or other similar proceeding affecting Obligor or its assets or any resulting restructuring, release, or discharge of any Obligations.

(f)     Any failure of Beneficiary to disclose to Guarantor any information relating to the business, condition (financial or otherwise), operations, performance, properties, or prospects of Obligor now or hereafter known to Beneficiary, as Guarantor hereby waives any duty of Beneficiary to disclose such information (or any claim thereof).

(g)     The failure of any other guarantor or third party to execute or deliver this Guaranty or any other guaranty or agreement, or the release or reduction of liability of Guarantor or any other guarantor or surety with respect to the Obligations.

(h)     The failure of Beneficiary to assert any claim or demand or to exercise or enforce any right or remedy under the provisions of any Underlying Agreement or otherwise.

(i)     The existence of any claim, set-off, counterclaim, recoupment, or other rights that Guarantor or Obligor may have against Beneficiary (other than a defense of payment or performance).

(j)     Any other circumstance (including, without limitation, any statute of limitations), act, omission, or manner of administering the Underlying Agreement or any existence of or reliance on any representation by Beneficiary that might vary the risk of Guarantor or otherwise operate as a defense available to, or a legal or equitable discharge of, Guarantor.

3.     Certain Waivers; Acknowledgments. Guarantor further acknowledges and agrees as follows:

(a)     Guarantor hereby unconditionally and irrevocably waives any right to revoke this Guaranty and acknowledges that this Guaranty is continuing in nature and applies to all presently existing and future Obligations, until the complete, irrevocable, and indefeasible payment and satisfaction in full of the Obligations.

(b)     This Guaranty is a guaranty of payment and performance and not of collection. Beneficiary shall not be obligated to enforce or exhaust its remedies against Obligor or under the Underlying Agreement before proceeding to enforce this Guaranty.

(c)     This Guaranty is a direct guaranty and independent of the obligations of Obligor under the Underlying Agreement. Beneficiary may resort to Guarantor for payment and performance of the Obligations whether or not Beneficiary shall have resorted to any collateral therefor or shall have proceeded against Obligor or any other guarantors with respect to the Obligations. Beneficiary may, at Beneficiary's option, proceed against Guarantor and Obligor, jointly and severally, or against Guarantor only without having obtained a judgment against Obligor.

(d)      Guarantor hereby unconditionally and irrevocably waives promptness, diligence, notice of acceptance, presentment, demand for performance, notice of non-performance, default, acceleration, protest or dishonor, and any other notice with respect to any of the Obligations and this Guaranty and any requirement that Beneficiary protect, secure, perfect ,or insure any lien or any property subject thereto.

(e)      Notwithstanding anything contained herein to the contrary, the Obligations of Guarantor shall be limited to the maximum amount so as to not constitute a fraudulent transfer or conveyance for purposes of the United States Bankruptcy Code (11 U.S.C. §§ 101, *et seq.*) or any applicable state law or otherwise to the extent applicable to this Guaranty and the Obligations of Guarantor hereunder.

(f)      Guarantor agrees that its guaranty hereunder shall continue to be effective or be reinstated, as the case may be, if at any time all or part of any payment of any Obligation is voided, rescinded, or recovered, or must otherwise be returned by Beneficiary upon the insolvency, bankruptcy, or reorganization of Obligor.

4.      Subrogation. Guarantor waives and shall not exercise any rights that it may acquire by way of subrogation, contribution, reimbursement, or indemnification for payments made under this Guaranty until all Obligations shall have been indefeasibly paid and discharged in full.

5.      Representations and Warranties. To induce Beneficiary to enter into the Underlying Agreement, Guarantor represents and warrants that: (a) Guarantor is a duly organized and validly existing corporation in good standing under the laws of the jurisdiction of its organization; (b) this Guaranty constitutes Guarantor's valid and legally binding agreement in accordance with its terms; (c) the execution, delivery, and performance of this Guaranty have been duly authorized by all necessary action and will not violate any order, judgment, or decree to which Guarantor or any of its assets may be subject; and (d) Guarantor is currently solvent and will not be rendered insolvent by providing this Guaranty.

6.      Notices. All notices, requests, consents, demands, and other communications hereunder (each, a "**Notice**") shall be in writing and delivered to the parties at the addresses set forth herein or to such other address as may be designated by the receiving party in a Notice given in accordance with this section. All Notices shall be delivered by personal delivery, nationally recognized overnight courier, facsimile or email, or certified or registered mail (return receipt requested, postage prepaid). Except as otherwise provided in this Guaranty, a Notice is effective only (a) with written confirmation of delivery or transmission; (b) upon receipt of the receiving party; and (c) if the party giving the Notice has complied with the requirements of this section.

7.      Assignment. This Guaranty shall be binding upon and inure to the benefit of the parties hereto and their respective successors and assigns; provided, however, that Guarantor may not, without the prior written consent of Beneficiary, assign any of its rights, powers or obligations hereunder. Beneficiary may assign this Guaranty and its rights hereunder without the consent of Guarantor. Any attempted assignment in violation of this section shall be null and void.

8.      Governing Law; Service of Process. THIS GUARANTY SHALL BE GOVERNED BY AND CONSTRUED UNDER THE LAWS OF THE STATE OF ILLINOIS, WITHOUT

REFERENCE TO ANY CHOICE OF LAW DOCTRINE. EACH PARTY IRREVOCABLY CONSENTS TO SERVICE OF PROCESS IN THE MANNER PROVIDED FOR NOTICES IN SECTION 6 HEREOF AND AGREES THAT NOTHING HEREIN SHALL AFFECT THE RIGHT OF ANY PARTY HERETO TO SERVE PROCESS IN ANY MANNER PERMITTED BY APPLICABLE LAW.

9.      Waiver of Jury Trial. EACH PARTY HEREBY IRREVOCABLY WAIVES ANY AND ALL RIGHTS TO TRIAL BY JURY WITH RESPECT TO ANY LEGAL PROCEEDING ARISING OUT OF OR RELATING TO THIS GUARANTY OR ANY OF THE OBLIGATIONS HEREUNDER.

10.      Cumulative Rights. Each right, remedy, and power hereby granted to Beneficiary or allowed it by applicable law or other agreement shall be cumulative and not exclusive of any other, and may be exercised by Beneficiary at any time or from time to time.

11.      Severability. If any provision of this Guaranty is to any extent determined by final decision of a court of competent jurisdiction to be unenforceable, the remainder of this Guaranty shall not be affected thereby, and each provision of this Guaranty shall be valid and enforceable to the fullest extent permitted by law.

12.      Entire Agreement; Amendments; Headings; Effectiveness. This Guaranty constitutes the sole and entire agreement of Guarantor and Beneficiary with respect to the subject matter hereof and supersedes all previous agreements or understandings, oral or written, with respect to such subject matter. No amendment or waiver of any provision of this Guaranty shall be valid and binding unless it is in writing and signed, in the case of an amendment, by both parties, or in the case of a waiver, by the party against which the waiver is to be effective. Section headings are for convenience of reference only and shall not define, modify, expand, or limit any of the terms of this Guaranty. Delivery of this Guaranty by facsimile or in electronic (i.e., pdf or tif) format shall be effective as delivery of a manually executed original of this Guaranty.

*[THE REMAINDER OF THIS PAGE IS LEFT BLANK INTENTIONALLY. THE SIGNATURE PAGE FOLLOWS.]*

IN WITNESS WHEREOF, Guarantor has executed this Guaranty and Suretyship Agreement as of the day and year first above written.

**ATTEST/WITNESS**

By: _____
Name: _____
Title: _____

**GUARANTOR**:

Manufacturing Revitalization Corporation of America, L.P. I, a Delaware Limited Partnership

By _____
C1ACE99F8B7D429...

Name: Jason Azevedo

Title: Authorized Representative for Red White Blue Enterprises, LLC which is the Manager of Manufacturing Revitalization Corporation of America L.P. I

IN WITNESS WHEREOF, Guarantor has executed this Guaranty and Suretyship Agreement as of the day and year first above written.

**ATTEST/WITNESS**

By: _Keven Azevedo_

Name: ___Keven Azevedo___

Title: ___Manager___

**GUARANTOR**:

Manufacturing Revitalization Corporation of America, L.P. I, a Delaware Limited Partnership

By_____

Name: _____

Title: Authorized Representative for Red White Blue Enterprises, LLC which is the Manager of Manufacturing Revitalization Corporation of America L.P. I

**Exhibit I**

**Young Employment Agreement**

(See attached.)

**<u>Employment Agreement</u>**

This Employment Agreement ("Agreement") is made between **TechMetals, LLC**, an Illinois limited liability company ("Company"), and **Rebecca Young** ("Employee"), collectively referred to as the "Parties."

In consideration of the mutual covenants contained herein and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties hereto agree as follows:

1. <u>Employment</u>:

The Company shall employ Employee, and Employee hereby accepts employment with the Company, upon the terms and conditions set forth in this Agreement.

2. <u>Term of Employment</u>:

The term of this Agreement shall commence on the closing of that certain Asset Purchase Agreement between TechMetals, LLC, Hoffman Tool. Inc., and Technical Metals, Inc. (the "APA") and continue for a period of three (3) years unless terminated earlier in accordance with the provisions of this Agreement. At the end of the initial term, the Parties may mutually agree to renew this Agreement for an additional term under negotiated terms.

3. <u>Position and Duties</u>:

Employee shall serve in the role of General Manager, reporting to Jason Azevedo and Keven Azevedo (managers). The Employee will perform duties customary to this role, including but not limited to:

- Overseeing production quality and operations
- Coordinating with other department heads
- Preparing reports on productivity and financials
- Supervising staff and ensuring compliance with company policies and safety regulations
- The Employee agrees to devote their full business time, attention, skills, and best efforts to the performance of their duties and to act in the best interests of the Company.
- The Company may assign additional duties as necessary, which are reasonably within the scope of the position.

4. <u>Compensation</u>:

    a. <u>Salary</u>: The Employee shall receive an annual salary of $150,000.00, consistent with the responsibilities of the position. Payment will be made according to the Company's standard payroll practices, with applicable withholdings and deductions as required by law.

    b. <u>Bonus</u>: <u>Employee shall be eligible for bonuses consistent with the financial success of</u>

the Company to be determined on an ad-hoc basis by the Parties.

c.  Benefits:   The Employee shall be entitled to participate in the Company's benefits programs, consistent with company policy, including but not limited to:

- Health, dental, and vision insurance
- Retirement plan with Company matching contributions
- Paid vacation, holidays, and sick leave, in accordance with company policy
- Other benefits typically offered to employees in similar positions.

Benefits will be effective immediately and should there be any gaps in coverage in connection with the transfer of ownership, Company will reimburse Employee for any COBRA costs associated with the continuation of benefits until the Company's benefits are in effect.

d.  Reimbursements: The Company shall reimburse Employee for: (i) all reasonable business expenses incurred by her in the course of performing her duties and responsibilities under this Agreement which are consistent with the Company's policies in effect from time to time with respect to travel, subject to the Company's requirements with respect to reporting and documentation of such expenses.

5.  Confidential Information:

The Employee acknowledges that during the course of employment, they will have access to confidential information, trade secrets, and proprietary data of the Company. The Employee agrees not to disclose such information to any third party or use it for any purpose other than the performance of her duties, both during and after the term of this Agreement.

6.  Non-Compete and Non-Solicitation:

a.  Non-Compete: For a period of twelve (12) months following the termination of employment, the Employee agrees not to engage, directly or indirectly, in any business that competes with the Company's operations within 50 miles of the Company's principal place of business.

b.  Non-Solicitation: During employment and for twelve (12) months following termination, the Employee agrees not to solicit or recruit any employees or customers with whom she had contact or about which she has confidential information of the Company for the purpose of diverting business away from the Company.

7.  Termination of Employment:

a.  This Agreement may be terminated by either Party under the following circumstances:

i.   At Expiration of Employment Period. Employee's employment with the

Company shall terminate upon the expiration of the three-year term of the Agreement, unless the parties mutually agree in writing to extend the agreement.

ii.  <u>For Cause</u>: The Company may terminate this Agreement immediately for cause upon written notice to Employee.  For purposes of this Agreement, the Company has cause if the Company, after review of all ascertainable facts and circumstances, makes a reasonable determination of Employee's gross misconduct, willful neglect of duties, breach of confidentiality, or any act detrimental to the Company's business.

iii.  <u>Without Cause</u>: Either Party may terminate this Agreement without cause by providing 60 days written notice to the other Party. Should the Company terminate Employee's employment without cause, the Company shall provide Employee the full amount compensation and benefits outlined in paragraph 4 above for the remaining duration of the three year term of the Agreement.  For example, if the Company terminates Employee's employment without cause after 1 year, the Company shall continue to provide Employee the compensation and benefits outlined in paragraph 4 above for two years.

b.  Upon termination for any reason, the Employee shall be entitled to receive payment for accrued but unpaid salary, vacation, and any other earned benefits, in accordance with Company policy.

8.  <u>Post-Employment Involvement</u>:

Upon completion of the term of this Agreement, the Company may offer the Employee a consultancy or advisory role, subject to mutually agreed terms. Compensation and duties for any such post-employment engagement will be negotiated separately.

9.  <u>Governing Law and Dispute Resolution</u>:

This Agreement shall be governed by and construed in accordance with the laws of the State of Illinois, without regard to its conflict of law principles. In the event of any dispute or claim arising out of this Agreement, the Parties agree to submit to first mediation with each party to bear their fees and costs, followed by binding arbitration in Illinois, under the rules of JamsEndispute. Any judgment on the award rendered by the arbitrator(s) may be entered in a court of competent jurisdiction.

10.  <u>Severability</u>:

Whenever possible, each provision of this Agreement shall be interpreted in such manner as to be effective and valid under applicable law, but if any provision of this Agreement is held to be invalid, illegal or unenforceable in any respect under any applicable law or rule in any jurisdiction, such invalidity, illegality or unenforceability shall not affect any other provision of this Agreement

or any action in any other jurisdiction, but this Agreement shall be reformed, construed and enforced in such jurisdiction as if such invalid, illegal or unenforceable provision had never been contained herein.

11. Entire Agreement:

This Agreement constitutes the entire understanding between the Parties regarding the employment of the Employee and supersedes all prior agreements, understandings, and communications, whether written or oral, regarding the subject matter hereof.

12. Counterparts:

This Agreement may be executed in separate counterparts (including by means of electronic signature pages or signature pages exchanged in PDF or other electronic format), each of which is deemed to be an original and all of which taken together constitute one and the same agreement.

13. Amendment:

This Agreement may be amended or modified only by a written document signed by both Parties.

**IN WITNESS WHEREOF**, the Parties have executed this Employment Agreement as of the date first written above.

**Company:**

TECHMETALS, LLC, an Illinois limited liability company

Signed: _____

By: Jason Azevedo
Title: Manager

Date: _____February 20, 2025_____

**Employee:**

_____

Rebecca Young

Date: _____

or any action in any other jurisdiction, but this Agreement shall be reformed, construed and enforced in such jurisdiction as if such invalid, illegal or unenforceable provision had never been contained herein.

11. Entire Agreement:

This Agreement constitutes the entire understanding between the Parties regarding the employment of the Employee and supersedes all prior agreements, understandings, and communications, whether written or oral, regarding the subject matter hereof.

12. Counterparts:

This Agreement may be executed in separate counterparts (including by means of electronic signature pages or signature pages exchanged in PDF or other electronic format), each of which is deemed to be an original and all of which taken together constitute one and the same agreement.

13. Amendment:

This Agreement may be amended or modified only by a written document signed by both Parties.

**IN WITNESS WHEREOF**, the Parties have executed this Employment Agreement as of the date first written above.

**Company:**

TECHMETALS, LLC, an Illinois limited liability company

Signed: _____

By: Jason Azevedo
Title: Manager

Date: _____

**Employee:**

Signed by:

*Rebecca Hoffman Young*
— 556F605B6E674E5...
Rebecca Young

Date: _____February 20, 2025_____

**Exhibit J**

**Hoffman Employment Agreement**

(See attached.)

## EMPLOYMENT AGREEMENT

This Employment Agreement ("Agreement") is made between **TechMetals, LLC**, an Illinois limited liability company ("Company"), and **Gerald Hoffman** ("Employee"), collectively referred to as the "Parties."

In consideration of the mutual covenants contained herein and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties hereto agree as follows:

1. Employment:

The Company shall employ Employee, and Employee hereby accepts employment with the Company, upon the terms and conditions set forth in this Agreement.

2. Term of Employment:

The term of this Agreement shall commence on the closing of that certain Asset Purchase Agreement between TechMetals, LLC, Hoffman Tool. Inc., and Technical Metals, Inc. (the "APA") and continue for a period of three (3) years unless terminated earlier in accordance with the provisions of this Agreement. At the end of the initial term, the Parties may mutually agree to renew this Agreement for an additional term under negotiated terms.

3. Position and Duties:

Employee shall serve in the role of Technical Manager, reporting to Jason Azevedo and Keven Azevedo (Managers). The Employee will continue to oversee operations, supervise staff, ensure compliance with company policies and safety regulations, and assist in the transition of ownership over the three-year term of the Agreement. In order to effectuate a smooth transition of leadership during the payout period of the purchase of the Company, Employee will work a gradually decreasing number of hours over the term of the Agreement, as follows:

Year 1: Employee will work approximately 40 hours a week;
Year 2: Employee will approximately 20-30 hours a week; and
Year 3: Employe will work approximately 10-20 hours a week.

Employee and Managers will work together to adjust job duties as appropriate based on the reduced work schedule.

4. Compensation:

a. Salary: The Employee shall receive an annual salary of $70,000.00, consistent with the responsibilities of the position. Payment will be made according to the Company's standard payroll practices, with applicable withholdings and deductions as required by law.

b. <u>Benefits</u>:   The Employee shall be entitled to participate in the Company's benefits programs for which full-time employees of the Company are generally eligible in accordance with their respective terms, including but not limited to:

   i.    Health, dental, and vision insurance
   ii.    Retirement plan with Company matching contributions
   iii.    Paid vacation, holidays, and sick leave, in accordance with company policy
   iv.    Other benefits typically offered to employees in similar positions.

Should Employee's work hours be reduced below the benefit plan minimum hours for coverage, the Company shall reimburse Employee for equivalent coverage for the above benefits and/or the Company and Employee share of COBRA for the continuation of the benefits through the duration of the Agreement.

Benefits will be effective immediately and should there be any gaps in coverage in connection with the transfer of ownership, Company will reimburse Employee for any COBRA costs associated with the continuation of benefits until the Company's benefits are in effect.

c. <u>Reimbursements</u>: The Company shall reimburse Employee for: all reasonable business expenses incurred by him in the course of performing his duties and responsibilities under this Agreement which are consistent with the Company's policies in effect from time to time with respect to travel, subject to the Company's requirements with respect to reporting and documentation of such expenses.

5. <u>Confidential Information:</u>
The Employee acknowledges that during the course of employment, they will have access to confidential information, trade secrets, and proprietary data of the Employer. The Employee agrees not to disclose such information to any third party or use it for any purpose other than the performance of their duties, both during and after the term of this Agreement.

6. <u>Termination of Employment:</u>

**a. This Agreement may be terminated by either Party under the following circumstances**:

   i.    <u>At Expiration of Employment Period</u>. Employee's employment with the Company shall terminate upon the expiration of the three-year term of the Agreement, unless the parties mutually agree in writing to extend the agreement.

   ii.    <u>For Cause</u>. The Company may terminate this Agreement immediately for cause upon written notice to Employee.  For purposes of this Agreement, the Company has cause if the Company, after review of all ascertainable facts and circumstances, makes a reasonable determination of Employee's

gross misconduct, willful neglect of duties, breach of confidentiality, or any act detrimental to the Company's business.

iii. <u>Good Reason</u>. Employee may terminate his employment at any time for Good Reason. For purposes of this Agreement, the Executive has "Good Reason" if (a) there is a material reduction in Employee's duties or compensation other than those outlined within this Agreement; (b) Employee, due to personal or health circumstances, needs to terminate his employment with the Company; or (3) the working relationship is no longer serving the interests of both the Company and Employee.

**b.** Upon termination for any reason, the Employee shall be entitled to receive payment for accrued but unpaid salary, vacation, and any other earned benefits, in accordance with Company policy.

7. <u>Post-Employment Involvement</u>:

Upon completion of the term of this Agreement, the Company may offer the Employee a consultancy or advisory role, subject to mutually agreed terms. Compensation and duties for any such post-employment engagement will be negotiated separately.

8. <u>Governing Law and Dispute Resolution</u>:

This Agreement shall be governed by and construed in accordance with the laws of the State of Illinois, without regard to its conflict of law principles. In the event of any dispute or claim arising out of this Agreement, the Parties agree to submit to first mediation with each party to bear their fees and costs, followed by binding arbitration in Illinois, under the rules of JamsEndispute. Any judgment on the award rendered by the arbitrator(s) may be entered in a court of competent jurisdiction.

9. <u>Severability</u>:

Whenever possible, each provision of this Agreement shall be interpreted in such manner as to be effective and valid under applicable law, but if any provision of this Agreement is held to be invalid, illegal or unenforceable in any respect under any applicable law or rule in any jurisdiction, such invalidity, illegality or unenforceability shall not affect any other provision of this Agreement or any action in any other jurisdiction, but this Agreement shall be reformed, construed and enforced in such jurisdiction as if such invalid, illegal or unenforceable provision had never been contained herein.

10. <u>Entire Agreement</u>:

This Agreement constitutes the entire understanding between the Parties regarding the employment of the Employee and supersedes all prior agreements, understandings, and communications, whether written or oral, regarding the subject matter hereof.

11. <u>Counterparts:</u>

**This Agreement may be executed in separate counterparts (including by means of electronic signature pages or signature pages exchanged in PDF or other electronic format), each of which is deemed to be an original and all of which taken together constitute one and the same agreement.**

12. <u>Amendment:</u>

This Agreement may be amended or modified only by a written document signed by both Parties.

**IN WITNESS WHEREOF**, the Parties have executed this Employment Agreement as of the date first written above.

**Company:**

TECHMETALS, LLC, an Illinois limited liability company

Signed: _____

By:  Jason Azevedo, Title: Manager

Date: _____February 20, 2025_____

**Employee:**

_____

**Gerald Hoffman**

Date: _____

11. Counterparts:

**This Agreement may be executed in separate counterparts (including by means of electronic signature pages or signature pages exchanged in PDF or other electronic format), each of which is deemed to be an original and all of which taken together constitute one and the same agreement.**

12. Amendment:

This Agreement may be amended or modified only by a written document signed by both Parties.

**IN WITNESS WHEREOF**, the Parties have executed this Employment Agreement as of the date first written above.

**Company:**

TECHMETALS, LLC, an Illinois limited liability company

Signed: _____

By:  Jason Azevedo, Title: Manager

Date: _____

**Employee:**

*Gerald L. Hoffman*
F5614413B0EC4C0
**Gerald Hoffman**

Date: _____ February 20, 2025 _____

TechMetals Employment Agreement - Gerald Hoffman                    4

**Exhibit K**

**Transition Agreement**

(See attached.)

## TRANSITION AND CUSTOMER SERVICING AGREEMENT

This Transition and Customer Servicing Agreement (this "Agreement") dated as of February 20, 2025 (the "Effective Date"), is entered into between Technical Metals Inc. ("TMI"), an Illinois corporation, and Hoffman Tool, Inc. ("HTI"), an Illinois corporation, on the one hand, and TechMetals LLC ("TMLLC" or "Buyer"), an Illinois limited liability company, on the other hand.  TMI and HTI shall be referred to collectively as "Seller"; and Seller and Buyer shall be referred to collectively as the "Parties".

Whereas, Seller has entered into an Asset Purchase Agreement dated February 20, 2025 (the "Asset Purchase Agreement") with Buyer whereby Buyer shall purchase all of Seller's right, title and interest in certain assets as more particularly described in the Asset Purchase Agreement;

Whereas, Buyer seeks to obtain factoring services and financial accommodations from REV Capital (California) Inc. ("REV Capital" or "Factor") to fund the purchase price due under the Asset Purchase Agreement.  In consideration thereof, Buyer has granted to Factor a duly perfected and first in priority security interest in all assets of Buyer as more particularly set forth in that certain Factoring and Security Agreement dated February 20, 2025 (the "Factoring Agreement");

Seller wishes to continue servicing certain customer contracts pending approval of a change of control of customer contracts to Buyer;

Whereas, in order to ensure an orderly transition of the business to Buyer, Seller has agreed to enter into this Agreement, pursuant to which Seller will provide certain services as set forth in Section 1 herein (the "Services") to Buyer, subject to the terms and conditions set forth herein;

NOW, THEREFORE, for good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties hereto agree as follows:

1.      Customer Contract Servicing. The Parties agree that, following the Effective Date for each Specified Contract (as defined below): (i) Buyer will perform the obligations under each Specified Contract in Seller's name; (ii) Seller will cooperate with Buyer, as reasonably requested by Buyer, in Buyer's efforts to bill and collect payment from the applicable customer or otherwise enforce the applicable Specified Contract; *provided*, *however*, that Seller shall have no obligation to directly pursue collection through a collection agency or litigation efforts; and (iii) Buyer will cooperate with Seller and provide to Seller (at no cost to Seller) and, to the extent necessary to permit Seller to perform its obligations under this Agreement, Seller's and its affiliates' employees and any third-party service providers or subcontractors, access to the facilities, assets and books and records of the business, in all cases to the extent necessary for Seller to fulfill its obligations under this Agreement. Buyer acknowledges that from and after the Effective Date, Seller will have no employees or other operational assets necessary to run the business and therefore further agrees to provide to Seller (at no cost to Seller) all personnel and other assets necessary for Seller to fulfill its obligations under this Agreement.

2.      Specified Contracts.  Any customer Contract in existence at the closing of the Asset Purchase Agreement that contains a provision that restricts the right of Seller to assign the Contract without the consent of the applicable customer, which consent has not been obtained (each, a "Specified Contract") will not be legally assigned to Buyer at Closing, and Seller will remain the party of record on the Contract; *provided*, *however* that the foregoing shall not impact the fact that Buyer will be entitled to all of the rights and benefits under each Specified Contract, subject to its obligations to Factor and Factor's rights pursuant to its Factoring Agreement.

3.      Representations. Seller makes no representations and warranties of any kind, implied or expressed, with respect to the Services, including, without limitation, no warranties of merchantability or fitness for a particular purpose, which are specifically disclaimed. Buyer acknowledges and agrees that this Agreement does

not create a fiduciary relationship, partnership, joint venture or relationships of trust or agency between the parties and that all Services are provided by Seller as an independent contractor.

4.      Payment Transfer. Any payments received by Seller from customers under the Specified Contracts after the Effective Date ("Specified Payments") shall be immediately accounted for and paid to Factor as soon as practicable but no later than the three (3) banking days following receipt.  Buyer shall be responsible for all taxes imposed or assessed as a result of the provision of the Services by Seller.

5.      Change of Control. Notwithstanding Section 1, once the change of control approval for any Specified Contract has been confirmed and executed in favor of Buyer, such Specified Contract will be immediately transferred to Buyer and Seller shall no longer have any obligations hereunder with respect to such Specified Contract.

6.      Termination. This Agreement will automatically terminate when all Specified Contracts have either (i) received change of control approval and are transferred to Buyer (as contemplated by Section 3) or (ii) all work to be completed on the part of Seller or Buyer under such Specified Contract has been completed (other than contingent warranty and re-work obligations). If Seller, on the one hand, or Buyer, on the other hand, shall cause or suffer to exist any material breach of its respective obligations under this Agreement and such breach is not cured within ten (10) days following written notice of such breach from the non-breaching party, then the non-breaching party may terminate this Agreement, including the provision of Services pursuant hereto, immediately by providing the breaching party written notice of termination. The breaching party shall reimburse the non-breaching party for all costs and expenses, including reasonable attorneys' fees, incurred to enforce the performance of any Services or other obligations under this Agreement.  No termination or expiration of this Agreement shall relieve any party from liability for any breach of this Agreement prior to termination thereof or, subject to the terms of such other agreements, from any liability for any breach under any other agreements between or amongst the parties. All liabilities relating to Specified Contracts arising or accruing from and after the Effective Date shall be and remain liabilities of Buyer, regardless of any termination or expiration of this Agreement.

7.      Good Faith Efforts. The Parties agree to work in good faith and use commercially reasonable efforts to ensure that all aspects of servicing the Specified Contracts, including but not limited to the prompt transfer of Specified Payments, are executed as efficiently as possible. Both Seller and Buyer commit to cooperate with one another as is reasonably necessary to fulfill the terms of this Agreement.

8.      Third Party Beneficiary.  Factor shall be an express third party beneficiary of this Agreement and shall be entitled to enforce this Agreement against either Buyer or Seller, as the case may be.  If Factor seeks to enforce its rights as a third party beneficiary, Factor's rights and Seller's and/or Buyer's respective obligations to Factor shall be governed by each of Buyer and/or Seller's agreements with Factor, as the case may be.

9.      Governing Law and Venue.  Except for Factor's rights as a third party beneficiary, which rights shall be enforced by Factorunder its applicable agreements with the parties, this Agreement shall be governed by and construed in accordance with the laws of the State of California, without regard to its conflict of laws principles. Any action to enforce or which otherwise relates to this Agreement involving the parties, but not Factor, shall be venued exclusively in Los Angeles County, California.

10.     Attorney's Fees In the event that either party brings an action to enforce this Agreement, the prevailing party shall be entitled to recover from the other party its reasonable costs and attorney's fees.

11.     Entire Agreement. This Agreement, together with the Asset Purchase Agreement and the related transaction documents, contains the entire agreement of the Parties with respect to the subject matter hereof and supersedes all prior negotiations, understandings, and agreements between the Parties. In the event of any

inconsistency between this Agreement and Factor's rights as a third party beneficiary, the terms of the applicable agreements with Factor shall control.

12.    Limitation of Liability; Indemnification. In no event shall Seller have any liability under any provision of this Agreement for any punitive, incidental, consequential, special or indirect damages, including loss of future revenue or income, loss of business reputation or opportunity relating to the breach or alleged breach of this Agreement, or diminution of value or any damages based on any type of multiple, whether based on statute, contract, tort or otherwise (collectively, the "Losses"). Buyer shall indemnify, defend and hold Seller harmless from any Losses ("Specified Losses") incurred or suffered by Seller arising out of the arrangements or transactions contemplated by this Agreement or Buyer's operation of the business following the Effective Date, including, without limitation, Seller's provision of the Services and Buyer's performance under the Specified Contracts, except to the extent the Specified Losses are the result of Seller's fraud, bad faith, gross negligence, or willful misconduct.

IN WITNESS WHEREOF, the Parties hereto have executed this Agreement, effective as of the Effective Date.


TECHNICAL METALS INC., an Illinois corporation

By: _____ *Gerald L. Hoffman*
    5E6868242053433...
Name: Gerald Hoffman
Title: President


HOFFMAN TOOL, INC., an Illinois corporation

By: _____ *Gerald L. Hoffman*
    5E6868242053433...
Name: Gerald Hoffman
Title: President



TECHMETALS, LLC, an Illinois limited liability company



By: _____
Name: _____
Title: _____

inconsistency between this Agreement and Factor's rights as a third party beneficiary, the terms of the applicable agreements with Factor shall control.

12.    Limitation of Liability; Indemnification. In no event shall Seller have any liability under any provision of this Agreement for any punitive, incidental, consequential, special or indirect damages, including loss of future revenue or income, loss of business reputation or opportunity relating to the breach or alleged breach of this Agreement, or diminution of value or any damages based on any type of multiple, whether based on statute, contract, tort or otherwise (collectively, the "Losses"). Buyer shall indemnify, defend and hold Seller harmless from any Losses ("Specified Losses") incurred or suffered by Seller arising out of the arrangements or transactions contemplated by this Agreement or Buyer's operation of the business following the Effective Date, including, without limitation, Seller's provision of the Services and Buyer's performance under the Specified Contracts, except to the extent the Specified Losses are the result of Seller's fraud, bad faith, gross negligence, or willful misconduct.

IN WITNESS WHEREOF, the Parties hereto have executed this Agreement, effective as of the Effective Date.

TECHNICAL METALS INC., an Illinois corporation

By: _____
Name: Gerald Hoffman
Title: President

HOFFMAN TOOL, INC., an Illinois corporation

By: _____
Name: Gerald Hoffman
Title: President

TECHMETALS, LLC, an Illinois limited liability company

By: _____
Name: Jason Azevedo
Title: Manager

**Exhibit L**
**Funds Flow Memorandum**


(See attached)

# Funds Flow Memorandum

Reference is made to that certain Asset Purchase Agreement (the "**Purchase Agreement**"), dated February 20, 2025, by and between TechMetals, LLC ("**Buyer**") and Technical Metals Inc. and Hoffman Tool Inc. ("**Seller**"). Capitalized terms used herein and not otherwise defined herein shall have the meanings given such terms in the Purchase Agreement.

This Funds Flow Memorandum (this "**Memorandum**") sets forth the flow of funds and payment instructions for Closing. The Seller acknowledges and affirms that Sections 1 – 7 of this Memorandum is a complete and correct statement of all amounts payable at Closing under the Purchase Agreement to the Seller, the Escrow Agent and third parties on behalf of the Seller. The Seller directs the Buyer to disburse, or cause to be disbursed, the payments set forth in Sections 1 – 7 of this Memorandum.

Payment to Seller

| | |
|---|---|
| Closing Date Payment | $10,000,000.00 |
| Total Amount Paid to Seller at Closing | $10,000,000.00 |

Payoffs

| | |
|---|---|
| Debt Payoff to Bank of Pontiac (Acct. 1294) | $92,166.16 |
| Debt Payoff to Bank of Pontiac (Acct. 2262) | $139,647.91 |
| Debt Payoff to Bank of Pontiac Revolving LOC (Acct. 2065) | $507,704.32 |
| Debt Payoff to US Bank (Acct. 522-0023367-000) | $245,715.36 |
| Debt Payoff to Alliance Funding Group (22-16341) | $79,594.00 |
| Debt Payoff to Alliance Funding Group (23-119617) | $807,020.00 |
| Debt Payoff to Jules and Associates, Inc. (Lease No. 20072687, Schedule 2) | $42,403.20 |
| Debt Payoff to Jules and Associates, Inc. (Lease No. 20072687, Schedule 3) | $162,721.46 |
| Debt Payoff to Jules and Associates, Inc. (Lease No. 20072687, Schedule 5) | $453,103.00 |
| Broker Fees to Benchmark International CSSD, LLC | $1,042,000.00 |

Legal Fees to Frost Brown Todd LLP                              $187,734.28

**TOTAL PAYOFFS**                                              **$3,759,509.69**

**PAYMENTS AND WIRE INSTRUCTIONS**

At Closing, Buyer is directed to initiate the following wire transfers in the amounts and to the accounts set forth below:

1.  $6,240,190.31, being the Closing Date Payment:

    Bank Name: Bank of Pontiac
    Bank Address: 300 W. Washington St., P.O. Box 710, Pontiac, IL 61764-0710
    ABA #: 071122263
    Account #: 000-008
    Account Name: Bank of Pontiac Trust Department
    Reference: N/A
    Phone: (855) 844-6151
    Email: Payoffs@bankofpontiac.com

2.  $739,518.39 to the following account of the Bank of Pontiac:

    Bank Name: Bank of Pontiac
    Bank Address: 300 W. Washington St., P.O. Box 710, Pontiac, IL 61764-0710
    ABA #: 071122263
    Account #: 990930
    Reference: TECHNICAL METALS INC.
    Phone: (855) 844-6151
    Email: Payoffs@bankofpontiac.com

3.     $886,614.00, to the following account of the Alliance Funding Group:

> Bank Name: CIBC Bank USA
> Bank Address: 120 South LaSalle
> Street, Chicago, IL 60603
> ABA #: 071006486
> Account #: 0002584174
> Reference: AFG-53/22-16341 &
> AFG-53/23-119617
> Phone: (844) 383-1509
> Email: payoffrequest@afg.com

4.     $658,227.66 to the following account of Jules and Associates, Inc.:

> Bank Name: JP Morgan Chase Bank.
> Bank Address: 1888 Century Park
> East, Floor 4, Lon Angeles, CA
> 90067
> ABA #: 322271627
> Account #: 80001829580
> Reference: TECHNICAL METALS
> INC.
> Phone: (213) 362-5600
> Email:
> Leticia@julesandassociates.com

5.     $245,715.36 to the following account of US Bank Equipment Finance:

> Bank Name: U.S. Bank.
> Bank Address: 1310 Madrid Street,
> Marshall, MN 56258
> ABA #: 091000022
> Account #: 173103320706
> Reference: 522-023367-000
> Phone: (800) 328-5371

6.     $1,042,000.00 to the following account of Benchmark International CSSD, LLC:

Bank Name: Truist Bank
Bank Address: 214 N. Tyron Street,
Charlotte, North Carolina 28202
ABA #: 053101121
Account #: 1000211959472
Account Name:
Reference: Benchmark International

7.      $187,734.28, to the following account of Frost Brown Todd LLP:

Bank Name: U.S. Bank
Bank Address: 425 Walnut Street,
Cincinnati, OH 45202
ABA #: 042000013
Account #: 821609195
Account Name: Frost Brown Todd
LLP
Reference: USBKUS44IMT

\*\*\*\*\*

**Exhibit M**
**Assigned Contracts**

1. All purchase orders from Caterpillar Industrias Mexico
2. All purchase orders from Tecnologia Modificada SA de CV (CAT Mexico Sub)
3. All purchase orders from Cat China Mach Comp Co.
4. All purchase orders from Caterpillar (NI) Limited (Ireland)
5. All purchase orders from Caterpillar (Thailand) Limited
6. All purchase orders from Caterpillar S.A.R.L.
7. All purchase orders from Caterpillar, Inc.
8. All purchase orders from Caterpillar Indian Private Limited
9. All purchase orders from Caterpillar of Canada Corporation
10. All purchase orders from Caterpillar Prodotti Stradali SRL
11. All purchase orders from Deere & Company
12. All purchase orders from Scot Forge Company
13. All purchase orders from Valve Automation, Inc. (Emerson)
14. All purchase orders from Komatsu America Corp.
15. All purchase orders from Progress Rail
16. All purchase orders from Kemp
17. All purchase orders from Marmon
18. All purchase orders from Brake Supply
19. All purchase orders from Morton Industries
20. All purchase orders from PPS
21. All purchase orders from MSB
22. All purchase orders from PGI
23. All purchase orders from CVG
24. All purchase orders from Kirby Risk
25. All purchase orders from Landrie
26. All purchase orders from TCS
27. All purchase orders from Hunting
28. All purchase orders from AMC
29. All purchase orders from Altorfer
30. All purchase orders from HT
31. All purchase orders from K&M
32. All purchase orders from Delphi
33. All purchase orders from Weiler
34. All purchase orders from Group O
35. All purchase orders from SPM
36. Equipment Lease Agreement by and between Company and Alliance Funding Group, dated December 18, 2025, Lease No. 25-150065, which will be assigned to Buyer by that certain Lease Assignment & Assumption Agreement by and between Technical Metals, Inc., and TechMetals, LLC, dated as of the date hereof.