# EXHIBIT 1

*Execution Version*

**ASSET PURCHASE AGREEMENT**

**by and between**

**TECHNICAL METALS, INC. and HOFFMAN TOOL, INC.**, as Sellers

**and**

**TECHMETALS, LLC**, **AN ILLINOIS LIMITED LIABILITY COMPANY**, **as Buyer**

**and**

**MANUFACTURING REVITALIZATION CORPORATION OF AMERICA**, **L.P. I, A DELAWARE LIMITED PARTNERSHIP**, **as Guarantor**

**dated as of**

**February 20, 2025**

*Execution Version*

## ASSET PURCHASE AGREEMENT

This Asset Purchase Agreement ("Agreement") is made and entered into as of February 20, 2025, by and among Technical Metals, Inc., an Illinois corporation, and Hoffman Tool, Inc., an Illinois corporation (each a "Seller" and collectively, "Sellers"), and TechMetals, LLC, an Illinois Limited Liability Company ("Buyer"), and Manufacturing Revitalization Corporation of America, L.P. I, a Delaware limited partnership in its capacity as guarantor for Buyer ("Guarantor").

### Recitals

WHEREAS, Sellers operate metal fabrication businesses that drill, tap, bore, ream, thread mill, roller burnish, grind, and broach metal to create precision components/products (collectively "Business");

WHEREAS, Buyer desires to purchase and Sellers desire to sell substantially all of the assets of Sellers, and Buyer desires to assume certain liabilities of Sellers, on the terms and conditions set forth herein.

NOW, THEREFORE, in consideration of the mutual covenants and agreements hereinafter set forth and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties hereto agree as follows:

1. Purchase and Sale of Assets

    a. Purchased Assets. Subject to the terms and conditions of this Agreement, Sellers agree to sell, transfer, convey, assign, and deliver to Buyer, and Buyer agrees to purchase from Sellers, all of Sellers' right, title, and interest in and to all of the assets, properties, and rights of Sellers of every kind and description, tangible and intangible, wherever situated and whether or not carried on the books of Sellers (collectively, the "Purchased Assets"), including but not limited to:

        i. Accounts receivable (including bank accounts that receive Accounts Receivable);

        ii. Inventory;

        iii. Equipment and machinery;

        iv. Intellectual property;

        v. Assigned Contracts (defined below);

        vi. Permits and licenses;

        vii. Goodwill; and

        viii. Other tangible and intangible assets.

*Execution Version*

b. <u>Excluded Assets</u>. Notwithstanding the forgoing, Buyer expressly understands and agrees that it is not purchasing or acquiring, and Sellers are not selling or assigning, any assets, properties, or rights of Sellers specifically set forth on **Exhibit A**, and all such assets and properties shall be excluded from the Purchased Assets (the "Excluded Assets").

2. <u>Purchase Price</u>

a. <u>Purchase Price</u>. The aggregate purchase price for the Purchased Assets shall be $17,000,000 (the "<u>Purchase Price</u>"), subject to adjustment as provided in Section 7 herein, plus the assumption of the Assumed Liabilities. Buyer shall pay the cash portion of the Purchase Price to Sellers at the Closing (as defined herein) by wire transfer of immediately available funds in accordance with Section 2(b) and the wire transfer instructions set forth in the Funds Flow Memorandum.

b. <u>Payment of Purchase Price</u>. The Purchase Price shall be paid by Buyer to Sellers as follows:

   i. $10,000,000 payable in cash at Closing.

   ii. $3,000,000 payable six (6) months after the Closing Date (the "<u>Deferred Payment</u>"). The Deferred Payment shall be guaranteed by Guarantor pursuant to the terms of the Guaranty.

   iii. $3,000,000 payable in the form of a promissory note (the "<u>Seller Note</u>") over a three (3) year period, commencing twelve (12) months after the Closing Date. The Seller Note shall be guaranteed by Guarantor. The payments of the note shall not be conditioned upon performance or sales metric. The terms and conditions of the promissory note are substantially in the form set forth on **Exhibit B** attached hereto. The Seller Note shall be guaranteed by Guarantor pursuant to the terms of the Guaranty.

c. <u>Allocation of Purchase Price</u>. Within 30 days of the Post-Closing Adjustment, Sellers shall deliver a schedule allocating the Purchase Price (including any Assumed Liabilities treated as consideration for the Purchased Assets for tax purposes) (the "<u>Allocation Schedule</u>"). Sellers and Buyer agree to allocate the Purchase Price between each Seller and among the Purchased Assets for all purposes (including tax and financial accounting) in accordance with the methodology set forth in **Exhibit C**. The Allocation Schedule shall be deemed final unless Buyer notifies Sellers in writing that Buyer objects to one or more items reflected in the Allocation Schedule within 15 days after delivery of the Allocation Schedule to Buyer. In the event of any such objection, Sellers and Buyer shall negotiate in good faith to resolve such dispute; provided, however, that if Sellers and Buyer are unable to resolve any dispute with respect to the Allocation Schedule

within 15 days after the delivery of the Allocation Schedule to Buyer, such dispute shall be resolved by a mutually agreeable, nationally or regionally recognized, independent accountant as soon as practicable within 30 days (or such other timeframe as the parties shall agree in writing). The fees and expenses of such accountant shall be borne equally by Sellers, on the one hand, and Buyer, on the other hand. Buyer and Sellers shall file all tax returns (including amended returns and claims for refund) and information reports in a manner consistent with such allocation.

3.    <u>Assumption of Liabilities</u>

a.    <u>Assumed Liabilities</u>. Buyer shall assume only those liabilities and obligations of Sellers specifically listed on **Exhibit D** or as specifically set forth in this Agreement (the "<u>Assumed Liabilities</u>").

b.    <u>Excluded Liabilities</u>. Buyer shall not assume, and shall not be liable for, any liabilities or obligations of Sellers other than the Assumed Liabilities (the "<u>Excluded Liabilities</u>").

4.    <u>Closing</u>

a.    <u>Closing Date</u>. The closing of the transactions contemplated by this Agreement (the "<u>Closing</u>") shall take place on or before February 20, 2025, or such other date as the parties may agree in writing (the "<u>Closing Date</u>"). The Closing shall take place remotely by exchange of documents and signatures (or their electronic counterparts). The consummation of the transactions contemplated by this Agreement shall be deemed to occur at 12:01 a.m. on the Closing Date.

b.    <u>Deliveries at Closing</u>. At the Closing:

i.    Sellers shall deliver to Buyer the following:

1.    a Bill of Sale and Assignment in the form of **Exhibit E** hereto (the "<u>Bill of Sale</u>"), duly executed by Sellers, transferring the Purchased Assets to Buyer;

2.    An assignment and assumption in the form of **Exhibit F** hereto ("<u>Assignment Agreement</u>"), duly executed by Sellers;

3.    Signature counterpart to the Lease Agreement (defined below);

4.    Signature counterpart to the Transition Agreement (defined below);

5.    a certificate of the President (or equivalent officer) of Sellers certifying as to the resolutions of the board of directors (or

its equivalent) of Sellers, duly adopted and in effect, which authorize the execution, delivery and performance of this Agreement and the transactions contemplated hereby;

6. an IRS Form W-9 duly executed by each Seller;

7. all third-party consents, if any, in connection with the Assigned Contracts; and

8. such other customary instruments of transfer, assumption, filings or documents, in form and substance reasonably satisfactory to Buyer, as may be required to give effect to this Agreement.

ii. Buyer shall deliver to Sellers the following:

1. cash portion of the Purchase Price (as set forth in Section 2(b)(i));

2. Assignment Agreement, duly executed by Buyer;

3. the Seller Note;

4. the Lease Agreement attached hereto as **Exhibit G** ("Lease Agreement"), duly executed by the Buyer;

5. the Guaranty and Suretyship Agreement by Guarantor for the Seller Note, attached hereto as **Exhibit H** ("Guaranty"), duly executed by Guarantor;

6. an employment agreement with Rebecca Young attached hereto as **Exhibit I** ("Young Employment Agreement");

7. an employment agreement with Gerald Hoffman attached hereto as **Exhibit J** ("Hoffman Employment Agreement");

8. the Transition and Customer Servicing Agreement attached hereto as **Exhibit K** ("Transition Agreement") and

9. a certificate of the President (or equivalent officer) of Buyer certifying as to the resolutions of the board of directors (or its equivalent) of Buyer, duly adopted and in effect, which authorize the execution, delivery and performance of this Agreement and the transactions contemplated hereby.

iii. The parties shall execute and deliver any other documents necessary to consummate the transactions contemplated by this Agreement, including the agreements set forth in the exhibits hereto.

*Execution Version*

5. <u>Funds Flow Memorandum</u>. On or prior to the Closing Date, the parties shall have prepared a mutually agreeable funds flow memorandum (the "<u>Funds Flow Memorandum</u>"), a copy of which is attached hereto as **Exhibit L**, setting forth the amounts to be paid pursuant to this Agreement and the wire transfer instructions for each payee thereunder.

6. <u>Withholding Tax</u>. Buyer shall be entitled to deduct and withhold from the Purchase Price all taxes that Buyer may be required to deduct and withhold under any applicable tax law; provided, however, that Buyer shall provide Sellers with written notice of its intent to withhold at least 3 days prior to the Closing with a written explanation substantiating the requirement to deduct or withhold, and the parties shall use commercially reasonable efforts to cooperate to mitigate or eliminate any such withholding to the maximum extent permitted by law. Assuming that each Seller delivers signed IRS Form W-9 at the Closing, Buyer acknowledges and agrees that no withholding is required as of the date hereof. Any such withheld amounts shall be treated as delivered to Sellers hereunder.

7. <u>Working Capital Adjustment</u>: The Purchase Price is subject to adjustment in connection with the Net Working Capital (defined below) level being maintained at the time of Closing relative to the Target Net Working Capital (defined below).

    a. As used in this Agreement, (i) "<u>Net Working Capital</u>" means the aggregate of (A) Sellers' accounts receivables, plus (B) Sellers' inventories (comprising raw materials, work-in-progress, and finished goods), minus (C) [Reserved], minus (D) Any outstanding checks issued by Seller that exceed the available bank balance (provided, however, that such checks shall not be drawn against or tied to any line of credit), (ii) "<u>Target Net Working Capital</u>" means $6,287,979.65, (iii), the "<u>Lower Limit</u>" will be an amount equal to $5,659,181.68, (iv) the "<u>Higher Limit</u>" will be an amount equal to $6,916,777.61 and (v) "<u>Actual Net Working Capital</u>" means Net Working Capital as of the Closing Date which will serve as the basis for any adjustment to the Purchase Price. It should be noted that all positive cash balances in bank accounts will be excluded from the Net Working Capital calculation. For the avoidance of doubt, Buyers are assuming the Sellers' short-term accounts payable.

    b. Within 90 days after the Closing Date, the Buyer shall prepare and deliver to the Sellers a statement setting forth their calculation of Actual Net Working Capital, which statement shall include a balance sheet of the Sellers's Business as of the Closing Date (without giving effect to the transactions contemplated in this Agreement) (the "<u>Closing Working Capital Statement</u>") The Closing Working Capital Statement shall be prepared in accordance with the Sellers' historic accounting methods, practices, principles, policies and procedures used in the preparation of the financial statements previously provided by Sellers to Buyer.

*Execution Version*

c.    The post-closing adjustment shall be an amount equal to the difference between Actual Net Working Capital and the Target Net Working Capital (the "Post-Closing Adjustment"). If Actual Net Working Capital is less than the Lower Limit of the Target Net Working Capital, the Sellers shall pay to the Buyer the amount of such shortfall as an adjustment to the Purchase Price. If Actual Net Working Capital exceeds the Higher Limit of the Target Net Working Capital, the Buyer shall pay to the Sellers the amount of such excess as an adjustment to the Purchase Price.

d.    After receipt of the Closing Working Capital Statement, the Sellers shall have 30 days (the "Review Period") to review the Closing Working Capital Statement. During the Review Period, the Sellers shall have full access to such books, records, work papers, and personnel of the Buyer as the Sellers may reasonably request for the purpose of reviewing the Closing Working Capital Statement and preparing a Statement of Objections (defined below), provided that such access shall be in a manner that does not interfere with the normal business operations of the Buyer. Before the last day of the Review Period, the Sellers may object to the Closing Working Capital Statement by delivering to the Buyer a written statement setting forth Sellers' objections in reasonable detail, indicating each disputed item or amount and the basis for Sellers' disagreement (the "Statement of Objections"). If the Sellers fail to deliver the Statement of Objections before the expiration of the Review Period, the Closing Working Capital Statement and the Post-Closing Adjustment, if any, reflected in the Closing Working Capital Statement shall be deemed to have been accepted by the Sellers. If the Sellers deliver the Statement of Objections before the expiration of the Review Period, the Buyer and the Sellers shall in good faith negotiate to resolve the objections within 10 days after the delivery of the Statement of Objections (the "Resolution Period"). If the Buyer and the Sellers resolve the objections within the Resolution Period, the Post-Closing Adjustment and the Closing Working Capital Statement with such changes as so agreed in writing by the Buyer and the Sellers shall be final and binding on the parties. If the Buyer and Sellers are unable to resolve the disputed items during the Resolution Period, then the parties shall submit the disputed items to a mutually agreeable, nationally or regionally recognized, independent accountant as soon as practicable within 30 days (or such other timeframe as the parties shall agree in writing). The independent accountant shall have 30 days after its engagement to resolve the disputed items. The parties agree that the independent account shall (A) make any and all adjustments without regard to materiality, (B) only decide the specific disputed items that remain under dispute by the parties, and (C) decide each disputed item within the range of values assigned to each such item in the Closing Working Capital Statement and the Statement of Objections, respectively. The independent accountant's resolution of the disputed items and its adjustments to the Closing Working Capital Statement and the Post-Closing Adjustment shall be final and binding upon the parties. The fees

*Execution Version*

and expenses of the independent accountant shall be shared equally by the Sellers, on the one hand, and by the Buyer, on the other hand.

e. Payment of the Post-Closing Adjustment shall be made within five business days of the determination of Actual Net Working Capital by wire transfer of immediately available funds to the account designated by the Buyer or the Sellers, as the case may be.

8. Real Estate Lease and Option to Purchase:   As a condition of this Agreement and concurrent with the Closing, the Buyer and the Sellers' principal landlord will execute and deliver a Lease Agreement for the properties located at (i) 1301 West Oak Street, Fairbury, IL 67136, (ii) 1301 ½ West Oak Street, Fairbury, IL 67136, and (iii) 1303 West Oak Street, Fairbury, IL 67136 (collectively, "Real Estate Premises").

9. Assigned Contracts; Third Party Consents.

a. Assigned Contracts:  "Assigned Contracts" shall mean any Contract (defined below) to which Sellers are a party and which is being assigned to Buyer pursuant to this Agreement as set forth on **Exhibit M** attached hereto. To the extent that Sellers' rights under any Assigned Contract may not be assigned to Buyer without the consent of any third party which has not been obtained, this Agreement will not constitute an agreement to assign the same if an attempted assignment would constitute a breach thereof or be unlawful. Sellers and Buyer will use its commercially reasonable best efforts to obtain any such required consent(s) as promptly as possible. Notwithstanding anything set forth in this Agreement, all of the parties agree to waive the provisions of Section 4(b)(i)(6) as a Closing deliverable.

b. Third Party Consents: If any such consent is not obtained prior to the Closing or if any attempted assignment would be ineffective or would impair Buyer's rights under the Assigned Contracts in question so that Buyer would not, in effect, acquire the benefit of such rights, Sellers, to the maximum extent permitted by applicable law and the Assigned Contract, will act after the Closing as Buyer's agent in order to obtain for Buyer the benefits thereunder. Sellers will cooperate, to the maximum extent permitted by applicable law and the Assigned Contract, with Buyer in any other reasonable arrangement designed to provide such benefits to Buyer, and Buyer will reimburse Sellers for Sellers' costs to provide the benefits to Buyer under the Assigned Contract.

10. Representations and Warranties

a. Representations and Warranties of Sellers. Except as set forth in the Disclosure Schedules, Sellers represent and warrant to Buyer that the statements contained in this Section 10(a) are true and correct as of the date hereof:

i.    <u>Organization and Authority of Sellers; Enforceability</u>. Both Sellers are corporations duly organized and validly existing under the laws of the State of Illinois. Sellers have full organizational power and authority to enter into this Agreement and the transactions documents to be delivered hereunder, to carry out its obligations hereunder and to consummate the Transaction. The execution, delivery and performance by Sellers of this Agreement and the transaction documents to be delivered hereunder and the consummation of the Transaction have been duly authorized by all requisite corporate action on the part of Sellers. This Agreement and the transaction documents to be delivered hereunder have been duly executed and delivered by Sellers, and (assuming due authorization, execution and delivery by Buyer) this Agreement and the transaction documents to be delivered hereunder constitute legal, valid and binding obligations of Sellers, enforceable against Sellers in accordance with their respective terms.

ii.    <u>No Conflicts; Consents</u>. The execution, delivery and performance by Sellers of this Agreement and the transaction documents to be delivered hereunder, and the consummation of the Transaction, do not and will not: (a) violate or conflict with the articles of incorporation, by-laws, or other organizational documents of Sellers; (b) violate or conflict with any judgment, order, decree, statute, law, ordinance, rule or regulation applicable to Sellers or the Purchased Assets; (c) conflict with, or result in (with or without notice or lapse of time or both) any violation of, or default under, or give rise to a right of termination, acceleration or modification of any obligation or loss of any benefit under any contract or other instrument to which Sellers are a party or to which any of the Purchased Assets are subject; or (d) result in the creation or imposition of any Encumbrance on the Purchased Assets. No consent, approval, waiver or authorization is required to be obtained by Sellers from any person or entity (including any governmental authority) in connection with the execution, delivery and performance by Sellers of this Agreement and the consummation of the Transaction.

iii.    Sellers have good and valid title to the Purchased Assets.

iv.    The execution and delivery of this Agreement and the consummation of the transactions contemplated hereby have been duly authorized by all necessary corporate action.

v.    Except as set forth on Section 10(a)(v) of the Disclosure Schedules, the Purchased Assets are free and clear of all liens, claims, and encumbrances, including but not limited to, any Uniform Commercial Code (UCC) liens ("<u>Encumbrances</u>").

*Execution Version*

vi.    Sellers have complied with all applicable laws, regulations, and ordinances relating to the Purchased Assets and the operation of the Business.

vii.    Sellers have filed all necessary tax returns and has paid all taxes due and owing. All financial statements provided to Buyer are true, and accurate and fairly represent the financial condition of Sellers.

viii.    There are no Actions pending or, to each Seller's knowledge, threatened against or by Sellers that challenge or seek to prevent, enjoin or otherwise delay the transactions contemplated by this Agreement. For purposes of this Agreement, "Action" means any claim, action, cause of action, demand, lawsuit, arbitration, inquiry, audit, notice of violation, proceeding, litigation, citation, summons, subpoena or investigation of any nature, civil, criminal, administrative, regulatory or otherwise, whether at law or in equity.

ix.    Material Contracts

1.    Section 10(a)-ix of the Disclosure Schedules lists each Contract (defined below) that is material to the Sellers ("Material Contracts"), including the following:

a.    each Contract of the Sellers involving aggregate consideration in excess of $100,000 and which, in each case, cannot be canceled by the Sellers without penalty;

b.    all Contracts that provide for the indemnification by the Sellers of any person or entity or the assumption of any tax, environmental, or other liability of any person or entity;

c.    all Contracts relating to intellectual property, including all licenses, sublicenses, settlements, coexistence agreements, covenants not to sue, and permissions;

d.    except for Contracts relating to trade payables, all Contracts relating to indebtedness (including, without limitation, guarantees) of the Sellers;

e.    all Contracts that limit or purport to limit the ability of the Sellers to compete in any line of business or with any person or entity or in any geographic area or during any period of time.

*Execution Version*

f.    Each Material Contract is valid and binding on Sellers, as applicable, in accordance with its terms and is in full force and effect. None of the Sellers nor, to the each Seller's knowledge, any other party thereto is in breach of or default under (or is alleged to be in breach of or default under) in any material respect, or has provided or received any notice of any intention to terminate or amend, any Material Contract. Complete and correct copies of each Material Contract (including all modifications, amendments, and supplements thereto and waivers thereunder) have been made available to Buyer. For purposes of this Agreement, "Contract" means all contracts, leases, deeds, mortgages, licenses, instruments, notes, commitments, undertakings, indentures, joint ventures and all other agreements, commitments and legally binding arrangements, whether written or oral.

x.    Equipment; Assets; Real Property; Title to Assets:

1.    Section 10(a)-x of the Disclosure Schedules lists all equipment and assets in which the Sellers or any combination of Sellers have an ownership or leasehold (or sub-leasehold) interest in and which are used in the operation of the Sellers' Business. Sellers represent and warrant to Buyer that: (1) the equipment and assets identified in Section 10(a)-x of the Disclosure Schedules are all the material assets and equipment owned by the Sellers; (2) all equipment and assets owned by the Sellers identified in Section 10(a)-x of the Disclosure Schedules are free and clear of all Encumbrances other than Permitted Encumbrances; (3) the Sellers own, or have a valid leasehold interest in, one hundred percent (100%) of all equipment and assets identified in Section 10(a)-x of the Disclosure Schedules, and (4) any equipment or other assets identified in Section 10(a)-x of the Disclosure Schedules that Sellers have a leasehold interest in will, immediately at the consummation of the Closing, change to an ownership interest, and that equipment and other assets will be owned by Sellers (and be deemed Purchased Assets under this Agreement) and transfer hereunder to Buyer free and clear of all Encumbrances other than Permitted Encumbrances. For purposes of this Agreement, "Permitted Encumbrances" means (i) liens for taxes not yet due and payable, (ii) mechanics, carriers', workmen's, repairmen's or other like liens arising or incurred in the ordinary course of business

consistent with past practice or amounts that are not delinquent and which are not, individually or in the aggregate, material to the business of the Sellers, and (iii) easements, rights of way, zoning ordinances and other similar encumbrances affecting Real Property which are not, individually or in the aggregate, material to the business of the Sellers.

2.   Section 10(a)-x of the Disclosure Schedules lists all real property used by the Sellers in which the Sellers have an ownership or leasehold (or subleasehold) interest (together with all buildings, structures, and improvements located thereon, the "Real Property"), including: (i) the street address of each parcel of Real Property; (ii) for Real Property that is leased or subleased by the Sellers, the landlord under the lease, the rental amount currently being paid, and the expiration of the term of such lease or sublease, and any termination or renewal rights of any party to the lease; and (iii) the current use of each parcel of Real Property. Sellers have delivered or made available to Buyer true, correct, and complete copies of all Contracts, title insurance policies, and surveys relating to the Real Property.

xi.   Brokers. Except as set forth in Section 10(a)-xi of the Disclosure Schedules, no broker, finder or investment banker is entitled to any brokerage, finder's or other fee or commission in connection with the Transaction based upon arrangements made by or on behalf of Buyer.

xii.   Except for the representations and warranties contained in this Section 10(a) (including the related portions of the Disclosure Schedules), neither Sellers nor any other person or entity has made or makes any other express or implied representation or warranty, either written or oral, on behalf of Sellers, including any representation or warranty as to the accuracy or completeness of any information, documents or material regarding the Business and the Purchased Assets furnished or made available to Buyer and its Representatives in any form (including any information, documents, or material delivered to Buyer on behalf of Sellers for purposes of this Agreement or any management presentations made in expectation of the transactions contemplated hereby), or as to the future revenue, profitability, or success of the Business, or any representation or warranty arising from statute or otherwise in applicable law. For purposes of this Agreement, "Representative" means, with respect to any person or entity, any and all directors, officers, employees, consultants, financial advisors, counsel, accountants and other agents of such person or entity.

*Execution Version*

b.   <u>Representations and Warranties of Buyer</u>. Except as set forth in the Disclosure Schedules, Buyer represents and warrants to Sellers that the statements contained in this Section 10(b) are true and correct as of the date hereof.

i.   <u>Organization and Authority of Buyer; Enforceability.</u> Buyer is a limited liability company duly organized and validly existing under the laws of the State of Illinois. Buyer has full organizational power and authority to enter into this Agreement and the transaction documents to be delivered hereunder, to carry out its obligations hereunder and to consummate the Transaction. The execution, delivery and performance by Buyer of this Agreement and the transaction documents to be delivered hereunder and the consummation of the Transaction have been duly authorized by all requisite corporate action on the part of Buyer. This Agreement and the transaction documents to be delivered hereunder have been duly executed and delivered by Buyer, and (assuming due authorization, execution and delivery by Sellers) this Agreement and the transaction documents to be delivered hereunder constitute legal, valid and binding obligations of Sellers, enforceable against Buyer in accordance with their respective terms.

ii.   <u>No Conflicts; Consents</u>. The execution, delivery and performance by Buyer of this Agreement and the transaction documents to be delivered hereunder, and the consummation of the Transaction, do not and will not: (a) violate or conflict with the articles of organization, operating agreement, or other organizational documents of Buyer; (b) violate or conflict with any judgment, order, decree, statute, law, ordinance, rule or regulation applicable to Buyer; (c) conflict with, or result in (with or without notice or lapse of time or both) any violation of, or default under, or give rise to a right of termination, acceleration or modification of any obligation or loss of any benefit under any contract or other instrument to which Buyer or (d) require consent, permit, governmental order, filing or notice which, in the aggregate, would not have a material adverse effect on Buyer's ability to consummate the transactions contemplated hereby. No consent, approval, waiver or authorization is required to be obtained by Buyer from any person or entity (including any governmental authority) in connection with the execution, delivery and performance by Buyer of this Agreement and the consummation of the Transaction.

iii.   <u>Solvency</u>. Immediately after giving effect to the transactions contemplated hereby, Buyer and Guarantor shall be solvent and shall: (a) be able to pay its debts as they become due; (b) own property that has a fair saleable value greater than the amounts required to pay its debts (including a reasonable estimate of the

amount of all liabilities); and (c) have adequate capital to carry on its business. No transfer of property is being made and no obligation is being incurred in connection with the transactions contemplated hereby with the intent to hinder, delay or defraud either present or future creditors of Buyer or Sellers. In connection with the transactions contemplated hereby, Buyer has not incurred, nor plans to incur, debts beyond its ability to pay as they become absolute and matured.

iv.   Proceedings. There are no Actions pending or, to Buyer's knowledge, threatened against or by Buyer that challenge or seek to prevent, enjoin or otherwise delay the transactions contemplated by this Agreement.

v.   Brokers. No broker, finder or investment banker is entitled to any brokerage, finder's or other fee or commission in connection with the transactions contemplated by this Agreement or any other transaction contemplated herein based upon arrangements made by or on behalf of Buyer.

vi.   Independent Investigation. Buyer has conducted its own independent investigation, review and analysis of the Business and the Purchased Assets, and acknowledges that it has been provided adequate access to the personnel, properties, assets, premises, books and records and other documents and data of Sellers for such purpose. Buyer acknowledges and agrees that: (a) in making its decision to enter into this Agreement and to consummate the transactions contemplated hereby, Buyer has relied solely upon its own investigation and the express representations and warranties of Sellers set forth in Section 10(a) of this Agreement (including related portions of the Disclosure Schedules); and (b) neither Sellers nor any other person or entity has made any representation or warranty as to Sellers, the Business, the Purchased Assets or this Agreement, except as expressly set forth in Section 10(a) of this Agreement (including the related portions of the Disclosure Schedules).

11.   Employees.

a.   Buyer shall, or shall cause an affiliate of Buyer to, offer employment effective on the Closing Date, to all employees, including employees who are absent due to vacation, family leave, short-term disability or other approved leave of absence (the employees who accept such employment and commence employment on the Closing Date, the "Transferred Employees").

b.    During the period commencing on the Closing Date and ending on the date which is 12 months from the Closing (or if earlier, the date of the Transferred Employee's termination of employment with Buyer or an Affiliate of Buyer), Buyer shall, or shall cause an affiliate of Buyer to, provide each Transferred Employee with: (i) base salary or hourly wages which are no less than the base salary or hourly wages provided by Sellers immediately prior to the Closing; (ii) benefits plans, retirement and welfare benefits that are no less favorable in the aggregate than those provided by Seller immediately prior to the Closing; and (iv) severance benefits that are no less favorable than the practice, plan or policy in effect for such Transferred Employee immediately prior to the Closing.

c.    Buyer and Seller intend that the transactions contemplated by this Agreement should not constitute a separation, termination or severance of employment of any employee who accepts an employment offer by Buyer that is consistent with the requirements of Section 11(b), including for purposes of any benefit plan that provides for separation, termination or severance benefits, and that each such employee will have continuous employment immediately before and immediately after the Closing. Buyer shall be liable and hold the Seller harmless for: (i) any statutory, common law, contractual or other severance with respect to any employee, other than an employee who has received an offer of employment by Buyer on terms and conditions consistent with Section 11(b) hereof and declines such offer; and (ii) any claims relating to the employment of any Transferred Employee arising in connection with or following the Closing.

12.    <u>Indemnification</u>. Subject to the limitations and other provisions of this Agreement, the representations and warranties contained herein shall survive the Closing and shall remain in full force and effect until the date that is twelve (12) months from the Closing Date. None of the covenants or other agreements contained in this Agreement shall survive the Closing Date other than those which by their terms contemplate performance after the Closing Date, and each such surviving covenant and agreement shall survive the Closing for the period contemplated by its terms. Notwithstanding the foregoing, any claims asserted in good faith with reasonable specificity (to the extent known at such time) and in writing by notice from the non-breaching party to the breaching party prior to the expiration date of the applicable survival period shall not thereafter be barred by the expiration of such survival period and such claims shall survive until finally resolved.

a.    <u>Indemnification by Sellers.</u> Sellers shall defend, indemnify, and hold harmless Buyer, its affiliates, and their respective stockholders, directors, officers, and employees from and against all claims, judgments, damages, liabilities, settlements, losses, costs, and expenses, including attorneys' fees and disbursements (collectively, "<u>Losses</u>"), arising from or relating to:

      i.      Any inaccuracy in or breach of any of the representations or warranties of Sellers contained in this Agreement or any document to be delivered hereunder;

      ii.      Any breach or non-fulfillment of any covenant, agreement, or obligation to be performed by Sellers pursuant to this Agreement or any document to be delivered hereunder; or

      iii.      Any Purchased Asset that is excluded from the transactions contemplated herein or any pre-Closing liability that is not an Assumed Liability.

b.      <u>Indemnification by Buyer</u>. Buyers shall defend, indemnify, and hold harmless Sellers, its affiliates, and their respective stockholders, directors, officers, and employees from and against all Losses, arising from or relating to:

      i.      Any inaccuracy in or breach of any of the representations or warranties of Buyer contained in this Agreement or any document to be delivered hereunder;

      ii.      Any breach or non-fulfillment of any covenant, agreement, or obligation to be performed by Buyer pursuant to this Agreement or any document to be delivered hereunder;

      iii.      any Assumed Liability; or

      iv.      Any post-Closing Losses or liabilities in connection with (i) the Benefits Plans that are not terminated by the Sellers post-Closing for the benefit of the Buyer's post-Closing operations, or (ii) COBRA. For purposes herein, "<u>Benefits Plans</u>" mean medical, vision, dental, disability, welfare, or other similar agreements, plans, policies, arrangements or programs whether or not reduced to writing.

c.      <u>Indemnification Procedures; Claims.</u> Whenever any claim shall arise for indemnification hereunder, the Indemnified Party (defined below) shall promptly provide written notice of such claim to the Indemnifying Party (defined below). Such notice by the Indemnified Party shall: (a) describe the claim in reasonable detail; (b) include copies of all material written evidence thereof; and (c) indicate the estimated amount, if reasonably practicable, of the Loss that has been or may be sustained by the Indemnified Party. In connection with any claim giving rise to indemnity hereunder resulting from or arising out of any Action by a person or entity who is not a party to this Agreement, the Indemnifying Party, at its sole cost and expense and upon written notice to the Indemnified Party, may assume the defense of any such Action with counsel reasonably satisfactory to the Indemnified Party. The Indemnified Party shall be entitled to participate in the defense of any such Action, with its counsel and at its own cost and

expense, subject to the Indemnifying Party's right to control the defense thereof. If the Indemnifying Party does not assume the defense of any such Action, the Indemnified Party may, but shall not be obligated to, defend against such Action in such manner as it may deem appropriate, including settling such Action, after giving notice of it to the Indemnifying Party, on such terms as the Indemnified Party may deem appropriate and no action taken by the Indemnified Party in accordance with such defense and settlement shall relieve the Indemnifying Party of its indemnification obligations herein provided with respect to any damages resulting therefrom. Sellers and Buyer shall cooperate with each other in all reasonable respects in connection with the defense of any claim, including: (i) making available (subject to the provisions of Section 13) records relating to such claim; and (ii) furnishing, without expense (other than reimbursement of actual out-of-pocket expenses) to the defending party, management employees of the non-defending party as may be reasonably necessary for the preparation of the defense of such claim. The Indemnifying Party shall not settle any Action without the Indemnified Party's prior written consent (which consent shall not be unreasonably withheld, conditioned or delayed).

d.      The party making a claim under this Section 12 is referred to as the "Indemnified Party," and the party against whom such claims are asserted under this Section 12 is referred to as the "Indemnifying Party." The indemnification provided for in Section 12(a) and Section 12(b) shall be subject to the following limitations:

i.      The Indemnifying Party shall not be liable to the Indemnified Party for indemnification under Section 12(a) or Section 12(b), as the case may be, until the aggregate amount of all Losses in respect of indemnification under Section 12(a) or Section 12(b) exceeds one percent (1)% of the Purchase Price (the "Deductible"), in which event the Indemnifying Party shall only be required to pay or be liable for Losses in excess of the Deductible.

ii.     The aggregate amount of all Losses for which the Indemnifying Party shall be liable pursuant to Section 12(a) shall not exceed fifteen percent of the Purchase Price.

iii.    In no event shall any Indemnifying Party be liable to any Indemnified Party for any punitive, incidental, consequential, special or indirect damages, including loss of future revenue or income, loss of business reputation or opportunity relating to the breach or alleged breach of this Agreement, or diminution of value or any damages based on any type of multiple.

iv.     Sellers shall not be liable under this Section 12 for any Losses based upon or arising out of any inaccuracy in or breach of any of the

representations or warranties of Sellers contained in this Agreement if Buyer had actual knowledge of such inaccuracy or breach prior to the Closing.

e. Any Losses payable to a Buyer Indemnified Party pursuant to this Section 12 shall be satisfied: (i) from the Deferred Payment; and (ii) to the extent the amount of Losses exceeds the amounts available to the Buyer Indemnified Party from the Deferred Payment, from the Seller Note. A Buyer Indemnified Party shall not have any right to set off against any other amounts, or to recover any further amounts from Sellers beyond the Deferred Payment and the Seller Note, to satisfy any unsatisfied amounts owed to such Buyer Indemnified Party.

f. The parties acknowledge and agree that from and after the Closing their sole and exclusive remedy with respect to any and all claims (other than claims arising from intentional fraud on the part of a party hereto in connection with the transactions contemplated by this Agreement) for any breach of any representation, warranty, covenant, agreement or obligation set forth herein or otherwise relating to the subject matter of this Agreement shall be pursuant to the indemnification provisions set forth in this Section 12. In furtherance of the foregoing, each party hereby waives, from and after the Closing, to the fullest extent permitted under Law, any and all rights, claims and causes of action for any breach of any representation, warranty, covenant, agreement or obligation set forth herein or otherwise relating to the subject matter of this Agreement it may have against the other parties hereto and their affiliates and each of their respective Representatives arising under or based upon any applicable law, except pursuant to the indemnification provisions set forth in this Section 12. Nothing in this Section 12(f) shall limit any person's or entity's right to seek and obtain any equitable relief to which such person or entity shall be entitled or to seek any remedy on account of any intentional fraud by any party hereto.

13. <u>Confidentiality</u>. Buyer and Sellers agree that this Agreement, including its subject matter, and all related discussions, negotiations, and documentation, will remain confidential and will not be disclosed to any third party without the prior written consent of the other party, except as required by law or as necessary to consummate the transactions contemplated herein.

14. <u>Non-Competition; Non-Solicitation</u>

a. <u>Restricted Period</u>: For five (5) years from the Closing Date (the "<u>Restricted Period</u>"), Sellers shall not, and shall not permit any of their affiliates to:

i. Engage in or assist others in engaging in the manufacturing and assembling of hose products (the "<u>Restricted Business</u>") in the United States of America (the "<u>Territory</u>").

*Execution Version*

      ii.      Have an interest in any entity that engages in the Restricted Business in the Territory in any capacity, including as a partner, stockholder, director, officer, member, manager, employee, contractor, principal, agent, volunteer, intern, advisor, or consultant.

      iii.     Interfere materially with the business relationships between the Buyer and its customers or suppliers related to the Business.

b.     <u>Exceptions</u>:   Sellers may own, solely as an investment, securities of any publicly traded company if they do not control or own 5% or more of any class of securities of such company.

c.     Sellers shall not be in breach of this section for services provided for or on behalf of Buyer or its affiliates after Closing.

d.     <u>Employee Non-Solicitation</u>: During the Restricted Period, Sellers shall not, and shall not permit any of their affiliates to, hire or solicit any current or former employee of the Buyer/Business or encourage them to leave the Buyer/Business, except through general solicitations not directed specifically at such employees. Sellers may hire:

      i.      Any employee terminated by the Buyer.

      ii.     Any employee who has resigned from the Buyer, after 180 days from the date of resignation.

e.     <u>Enforcement</u>: Sellers acknowledge that a breach of this section would cause irreparable harm to Buyer, for which monetary damages may not be adequate. Buyer shall be entitled to seek equitable relief, including temporary restraining orders, injunctions, and specific performance, without posting bond.

f.     <u>Reasonableness and Severability</u>: Sellers acknowledge that the restrictions are reasonable and necessary to protect Buyer's interests. If any covenant is deemed excessive by a court, it shall be reformed to the maximum limitations allowed by law. The covenants in this section are severable, and the invalidity or unenforceability of any provision shall not affect the validity or enforceability of the remaining provisions.

15.    <u>Misdirected Funds</u>:

a.     <u>Sellers' Obligations</u>: Following the Closing, each Seller will:

      i.      Segregate any funds received that are included in the Purchased Assets and payable to Buyer ("<u>Buyer Misdirected Funds</u>").

      ii.     Hold Buyer Misdirected Funds in trust for Buyer.

*Execution Version*

  iii.  Notify Buyer immediately upon receipt of such funds.

  iv.  Pay Buyer Misdirected Funds to Buyer within 5 business days following receipt.

 b. <u>Buyer's Obligations</u>: Following the Closing, Buyer will:

  i.  Segregate any funds received that are included in the Excluded Assets and payable to Sellers ("<u>Sellers Misdirected Funds</u>").

  ii.  Hold Sellers Misdirected Funds in trust for Sellers.

  iii.  Notify Sellers immediately upon receipt of such funds.

  iv.  Pay Sellers Misdirected Funds to Sellers within 5 business days following receipt.

16. <u>Further Assurances</u>: Following the Closing, each party shall execute and deliver additional documents and take further actions as reasonably required to carry out the provisions of this Agreement and give effect to the Transaction.

17. <u>Miscellaneous</u>

 a. <u>Expenses</u>. Except as otherwise expressly provided herein (including Section 17(c) hereof), all costs and expenses incurred in connection with this Agreement and the transactions contemplated hereby shall be paid by the party incurring such costs and expenses; provided, however, Sellers shall pay all amounts payable to Benchmark International.

 b. <u>Bulk Sales Laws</u>. The parties hereby waive compliance with the provisions of any bulk sales, bulk transfer or similar laws of any jurisdiction that may otherwise be applicable with respect to the sale of any or all of the Purchased Assets to Buyer.

 c. <u>Transfer Taxes</u>. All transfer, sales, use, registration, documentary, stamp, value-added, and other such taxes and fees (including any penalties and interest) incurred in connection with this Agreement and the transaction documents contemplated herein, if any, shall be borne and paid by Buyer when due. Buyer shall, at its own expense, timely file any tax return or other document with respect to such taxes (and seller shall cooperate with respect thereto as necessary)

  Each party shall be responsible for its own income, capital gains, or other taxes arising from the transaction. The Seller shall bear full responsibility for any capital gains or income taxes incurred as a result of the sale of the Purchased Assets, and the Buyer shall have no obligation with respect to such taxes.

*Execution Version*

d.      Governing Law. This Agreement shall be governed by and construed in accordance with the laws of the State of Illinois.

e.      Entire Agreement. This Agreement and the other transaction documents constitute the sole and entire agreement of the parties to this Agreement with respect to the subject matter contained herein and therein, and supersede all prior and contemporaneous representations, warranties, understandings and agreements, both written and oral, with respect to such subject matter. Except as set forth in Section 8 of this Agreement, in the event of any inconsistency between the statements in the body of this Agreement and those in the other transaction documents, the Exhibits and the Disclosure Schedules (other than an exception expressly set forth as such in the Disclosure Schedules), the statements in the body of this Agreement will control.

f.      Amendments. This Agreement may be amended or modified only by a written agreement signed by both parties.

g.      Counterparts. This Agreement may be executed in counterparts, each of which shall be deemed an original, but all of which together shall constitute one and the same instrument.

h.      Dispute Resolution. Except as provided in Section 7 and 14, all disputes shall be resolved as set forth herein:

      i.      Mediation: In the event of any dispute, controversy, or claim arising out of or relating to this Agreement, or the breach, termination, or validity thereof, the parties shall first attempt in good faith to resolve the dispute by mediation administered by JAMS Endispute before resorting to arbitration.

      ii.     Arbitration: If the dispute has not been resolved by mediation within ninety (90) days from the initiation of such mediation, the dispute shall be finally resolved by arbitration administered by JAMS Endispute. The arbitration shall take place in Illinois or as other agreed upon. The decision of the arbitrator(s) shall be final and binding upon the parties, and judgment upon the award rendered by the arbitrator(s) may be entered in any court having jurisdiction thereof.

i.      Notices. All notices, requests, demands, and other communications required or permitted hereunder shall be in writing and shall be deemed to have been duly given if delivered by hand or mailed, certified or registered mail with postage prepaid, to the addresses of the parties set forth below or to such other address as either party may designate by like notice:

*Execution Version*

For Sellers:

Technical Metals, Inc.
Hoffman Tool, Inc.
Attn: Gerald Hoffman
1301 West Oak Street
Fairbury, IL 61739

For Buyer:

c/o Manufacturing Revitalization
Corporation of America
Attn: Jason Azevedo
1284 Horizon Bvld
EL Paso, TX 79927

*(Signature Page Below.)*

IN WITNESS WHEREOF, the parties hereto have executed this Asset Purchase Agreement as of the day and year first above written.


TECHNICAL METALS, INC., an Illinois Corporation

By: *Gerald L. Hoffman*
— 116B52C994484B8...
Name: Gerald Hoffman
Title: President


HOFFMAN TOOL, INC., an Illinois Corporation

By: *Gerald L. Hoffman*
— 116B52C994484B8...
Name: Gerald Hoffman
Title: President


TECHMETALS, LLC, an Illinois limited liability company


By: _____
Name: Jason Azevedo
Title: Manager


MANUFACTURING REVITALIZATION CORPORATION OF AMERICA, L.P. I, a Delaware limited partnership in its capacity as guarantor for Buyer pursuant to Section 2(b)(ii) of this Agreement.


By: _____
Name: Jason Azevedo
Title: Manager

IN WITNESS WHEREOF, the parties hereto have executed this Asset Purchase Agreement as of the day and year first above written.

TECHNICAL METALS, INC., an Illinois Corporation

By: _____
Name: Gerald Hoffman
Title: President

HOFFMAN TOOL, INC., an Illinois Corporation

By: _____
Name: Gerald Hoffman
Title: President

TECHMETALS, LLC, an Illinois limited liability company

By: _____
Name: Jason Azevedo
Title: Manager

MANUFACTURING REVITALIZATION CORPORATION OF AMERICA, L.P. I, a Delaware limited partnership in its capacity as guarantor for Buyer pursuant to Section 2(b)(ii) of this Agreement.

By: _____
Name: Jason Azevedo
Title: Manager

**PROMISSORY NOTE**

$3,000,000.00                                                                                    February 20, 2025

TechMetals, LLC, an Illinois limited liability company ("Company"), hereby promises to pay to Technical Metals Inc., an Illinois corporation, and Hoffman Tool, Inc., an Illinois corporation (the "Holder"), in lawful money of the United States of America, the principal amount of $3,000,000, together with accrued and unpaid interest thereon, each due and payable on the date and in the manner set forth below, all in accordance with and subject to the following terms and conditions. Each anniversary of the date of this Promissory Note (at times, this "Note") is referred to herein as an "Anniversary".

1.        **Repayment.** All payments of interest and principal will be in lawful money of the United States of America. The principal and interest amount of this Note is payable in equal monthly payments of $83,333.34, commencing on the first Anniversary and continuing on the first day of each month thereafter until the third Anniversary (the "Maturity Date"), when any remaining amounts owing hereunder will be due in full.

2.        **Voluntary Prepayment; Applications of Payments.** This Note may be prepaid, in whole or in part, at any time prior to the Maturity Date without premium or penalty. All payments made under this Note will be applied first to any fees and expenses due hereunder, next to accrued and unpaid interest, and finally to reduce the principal balance.

3.        **Due on Sale.**  In the event that a "Change of Control" (as defined below) of the Company occurs, then all of the remaining, unpaid principal and accrued interest on this Note shall be due and payable as of the date of the Change of Control.  For purposes hereof, a "Change of Control" shall mean: (a) a tender offer in which voting securities representing fifty percent (50%) or more of the total voting power of the Company's voting securities are acquired; (b) the merger or consolidation of the Company with another entity pursuant to which less than fifty percent (50%) of the total voting power of the voting securities of the surviving or resulting company shall be owned in the aggregate by the former security holders of the Company determined immediately prior to the merger or consolidation; (c) the sale or other disposition by the Company of substantially all of its assets to another individual or entity that is not an affiliate of the Company; or (d) the acquisition by a person or persons acting as a group of voting securities representing fifty percent (50%) or more of the total voting power of the Company's voting securities.

4.        **Default.** The occurrence of any one or more of the following constitutes an "Event of Default":

(a)        The Company fails to pay timely any of the principal amount due under this Note on the date the same becomes due and payable or any accrued interest or other amounts due under this Note on the date the same becomes due and payable; Company shall have a fifteen (15) day right to cure with no penalty;

(b)        The Company defaults in its performance of any covenant or obligation under this Note (other than pursuant to Section 5(a)) and such default is not cured within 30 days after written notice of such default is provided to the Company;

(c)        The Company files any petition or action for relief under any bankruptcy, reorganization, insolvency or moratorium law or any other law for the relief of, or relating to, debtors, now or hereafter in effect, or makes any assignment for the benefit of creditors or takes any corporate action in furtherance of any of the foregoing; or

(d)      An involuntary petition is filed against the Company (unless such petition is dismissed or discharged within 60 days under any bankruptcy statute now or hereafter in effect, or a custodian, receiver, trustee, assignee for the benefit of creditors (or other similar official) is appointed to take possession, custody or control of any property of the Company.

5.      **Waiver of Presentment; Notice.** Company and any endorser of this Note hereby waives presentment for payment, notice of dishonor, protest, notice of protest, and diligence in collection, and consents that the time of said payments or any part thereof may be extended by Holder and further consents that all or any part of any collateral security for this Note may be released by Holder, without in any way modifying, altering, affecting, or limited the liability of Company hereunder.

6.      **Governing Law; Venue.** Company agrees that Illinois law will govern the interpretation and enforcement of this Note. Any proceeding arising out of or relating to this Note will be brought only in the state or federal courts sitting in Fairbury, Livingston County, Illinois. In any suit, action or appeal to enforce this Note, the substantially prevailing party will be entitled to recover its costs incurred, including reasonable attorneys' fees at trial or on appeal. IN THE INTEREST OF OBTAINING A SPEEDIER AND LESS COSTLY HEARING OF ANY DISPUTE, THE COMPANY AND HOLDER IRREVOCABLY WAIVE THE RIGHT TO TRIAL BY JURY.

*[THE REMAINDER OF THIS PAGE IS LEFT BLANK INTENTIONALLY.  THE SIGNATURE PAGE FOLLOWS.]*

EXECUTED as of the date first above written.

MAKER:

TechMetals, LLC, an Illinois limited liability company

By _____
Name: Jason Azevedo
Title: Manager for Red White Blue
Enterprises, LLC which is Manager of
TechMetals, LLC